Recorded 547- 587
Book 775 Page _____
Date 7-6-2015
Frankie Gray, Clerk



FILED IN OFFICE
HART SUPERIOR COURT
2015 JUL -6 AM 7:19
FRANKIE K. GRAY, CLERK

## LEASE AGREEMENT WITH OPTION

between

**Hartwell Railroad Company**
**and**
**The Great Walton Railroad Company**

as Lessor

and

**TORCH of Hartwell, Inc.**
as Lessee

**May ___, 2015**

Exhibit "B"

## LEASE AGREEMENT WITH OPTION

between

Hartwell Railroad Company
and
The Great Walton Railroad Company

as Lessor

and

TORCH of Hartwell, Inc.
as Lessee

May __, 2015

# TABLE OF CONTENTS

ARTICLE I      DEMISED PREMISES

     1.1   Premises.................................................................1
     1.2   Acceptance of Premises...............................................2

ARTICLE II      TERM

     2.1   Term....................................................................2

ARTICLE III      RENT AND ADDITIONAL RENT

     3.1   Rent....................................................................2
     3.2   Utilities ...............................................................3
     3.3   Taxes..................................................................3

ARTICLE IV      USE OF PREMISES

     4.1   Permitted Uses........................................................3

ARTICLE V      ALTERATIONS AND ADDITIONS

     5.1   Lessee Work...........................................................3

ARTICLE VI      LESSEE'S PROPERTY

     6.1   Ownership.............................................................3
     6.2   Removal of Lessee's Property upon Termination of Lease..........3

ARTICLE VII      LESSOR'S COVENANTS AND REPRESENTATIONS

     7.1   Authority..............................................................4
     7.2   Non-Interference......................................................4
     7.3   Quiet Enjoyment......................................................4
     7.4   Limitation          on          Lessor's
Marketing............................................4
     7.5   Replacement of Railroad Ties ........................................4

ARTICLE VIII      LESSEE'S COVENANTS AND REPRESENTATIONS

     8.1   Lessee's Duty to Maintain Premises....................................4
     8.2   Lessor Relieved of Duty to Maintain...................................4
     8.3   Yield-Up...............................................................4
     8.4   Use....................................................................5
     8.5   Risk of Loss to Lessee's Property..............................................5
     8.6   Lessor's Entry.........................................................5

| | 8.7 | Taxes............................................................................ | 5 |
| | 8.8 | Liens............................................................................ | 5 |

ARTICLE IX    INSURANCE

| | 9.1 | Building and Property Insurance......................................... | 5 |
| | 9.2 | Waiver of Subrogation.................................................... | 6 |
| | 9.3 | Liability Insurance........................................................ | 6 |
| | 9.4 | Lessor as Insured or Additional Insured................................ | |
6
| | 9.5 | Proof of Insurance......................................................... | 6 |

ARTICLE X    INDEMNIFICATION

| | 10.1 | Indemnity by Lessee...................................................... | 6 |
| | 10.2 | Indemnity by Lessor...................................................... | 6 |
| | 10.3 | Cooperation and Information............................................. | 6 |

ARTICLE XI    CONDEMNATION

| | 11.1 | Termination................................................................ | 7 |
| | 11.2 | Partial Taking.............................................................. | 7 |
| | 11.3 | Temporary Taking......................................................... | 7 |
| | 11.4 | Awards..................................................................... | 7 |

ARTICLE XII    FIRE AND CASUALTY

| | 12.1 | Lessee's Right to Terminate Lease due to Fire or Other Casualty.. | 7 |
| | 12.2 | Abatement of Rent........................................................ | |
8
ARTICLE XIII    ASSIGNMENT AND SUBLETTING

| | 13.1 | Consent Required.......................................................... | 8 |
| | 13.2 | Procedure.................................................................. | 8 |

ARTICLE XIV    DEFAULT

| | 14.1 | Events of Default.......................................................... | 8 |
| | 14.2 | Remedies................................................................... | 9 |
| | 14.3 | Right to Curve............................................................. | 9 |
| | 14.4 | Remedies Cumulative..................................................... | 10 |
| | 14.5 | Lessee's Right to Terminate.............................................. | 10 |

ARTICLE XV    SUBORDINATION; LEASEHOLD MORTGAGE

| | 15.1 | Subordination to Mortgages.............................................. | 10 |

- ii -

15.2    Estoppel Certificates…………………………………………10
15.3    Payment of Encumbrances…………………………………11

ARTICLE XVI    LESSEE OPTION

16.1    Generally…………………………………………………11
16.2    Term……………………………………………………...11
16.3    Purchase Price……………………………………………11
16.4    Effect of Termination of Lease………………………………11
16.5    Effect of Lessee Option……………………………………11
16.6    Conveyance of Leased Premises; Warranty of Title; Exceptions..11
16.7    Lessor Financing……………………………………………12
16.8    No Credit for Rent Payments………………………………12
16.9    Purchase "As Is"…………………………………………12
16.10  No Right to Purchase in Separate Parcels…………………12
16.11  Merger of Estates………………………………………... 12

ARTICLE XVII    LESSOR OPTION

17.1    Generally………………………………………………… 12
17.2    Condition………………………………………………… 13
17.3    Term…………...…………………………………………… 13
17.4    Purchase Price…………………………………………… 13
17.5    Effect of Termination of Lease…………………………… 13
17.6    Exercise of Lessor Option…………………………………

13

17.7    Conveyance of Conveyed Tract; Warranty of Title; Exceptions… 13
17.8    Purchase "As-Is"………………………………………… 14
17.9    No Right to Purchase in Separate Parcels…………………... 14

ARTICLE XVIII:    MISCELLANEOUS

18.1    Holding Over……………………………………………… 14
18.2    Severability……………………………………………… 14
18.3    No Waivers……………………………………………… 14
18.4    Remedies Cumulative…………………………………….. 14
18.5    Modifications in Writing………………………………… 14
18.6    Entire Agreement………………………………………… 14
18.7    Headings………………………………………………… 15
18.8    Notices…………………………………………………… 15
18.9    Binding Effect…………………………………………… 15
18.10  Submission Not an Offer………………………………… 15
18.11  Memorandum of Lease…………………………………… 15
18.12  Attorney's Fees………………………………………… 15
18.13  Exhibits………………………………………………… 15
18.14  Recitals Made Part of Agreement……………………………15

18.15   Counterparts..................................................................16
18.16   Time is of Essence..........................................................16
18.17   Compliance with Laws and Regulations............................16
18.18   Governing Law...............................................................16
18.19   Construction of Lease......................................................16

Exhibit A     --   Legal Description of Leased Premises
Exhibit A-1  --   Drawing of Leased Premises
Exhibit B     --   Legal Description of Best Powder Premises

## LEASE AGREEMENT WITH OPTION

THIS LEASE AGREEMENT WITH OPTION ("Lease" or "Agreement"), is made and entered into this _____ day of May, 2015, between **HARTWELL RAILROAD COMPANY**, a Georgia business corporation with principal office in Walton County, Georgia, and a mailing address of 1096 North Cherokee Road, Social Circle, Georgia 30025 ("HRR"), and **THE GREAT WALTON RAILROAD COMPANY**, a Georgia business corporation with principal office in Morgan County, Georgia ("TGWRC") (HRR and TGWRC are hereinafter sometimes collectively referred to as the "Lessor"); and **TORCH OF HARTWELL, INC.**, a Georgia nonprofit corporation with principal office in Hart County, Georgia, and a mailing address of P.O. Box 971, Hartwell, Georgia 30643 (the "Lessee").

## R E C I T A L S:

A. TGWRC owns a tract or parcel of land in the 1112th G.M. District of Hart County, Georgia, in the corporate limits of the City of Hartwell, including a tract of land located on Railroad Street, between South Forest Avenue and South Webb Street, and Seller's railroad right-of-way and turntable extending from South Webb Street to Athens Street, more particularly described on **Exhibit A**, attached to and made a part of this Agreement (this tract or parcel of land is referred to as the "Railroad Street Park Project Area"). Although the Hartwell Railroad is not currently in active operation on the Railroad Street Park Project Area, HRR has historically used the Railroad Street Park Project Area in connection with the operation of the Hartwell Railroad. TGWRC and HRR own certain furniture, fixtures, machinery and equipment (collectively referred to as the "Personal Property," and more particularly described in **Section 1.1** of this Lease) are located in the Railroad Street Park Project Area.

B. Lessee is a non-profit corporation, and has qualified as a tax-exempt organization under Section 501(c)(3) of the United States Internal Revenue Code. Lessee was formed primarily for the purpose of acquiring the Railroad Street Park Project Area and Personal Property, developing the Railroad Street Park Project Area as a public park, and using the Personal Property in connection with the development and operation of the park.

C. At Lessee's request, the City Council of the City of Hartwell, Georgia, has declared that the Railroad Street Park Project Area is a "slum area," as that term is defined in the Georgia Urban Redevelopment Law, has designated the Railroad Street Park Project Area as appropriate for an urban redevelopment project under the Georgia Urban Redevelopment Law, and has encouraged Lessee and any other interested parties to submit to the City an urban redevelopment plan that provides for the implementation of an urban redevelopment project regarding the Railroad Street Park Project Area.

D. Lessor is willing to lease the Railroad Street Park Project Area (the "Leased Premises") and certain personal property (the "Personal Property") to Lessee on a long-term basis.

E.  Accordingly, the parties desire to execute this Lease to confirm the terms and conditions of their promises, agreements, covenants and understandings, and to be legally bound by such promises, agreements, covenants and understandings.

NOW, THEREFORE, for and in consideration of TEN DOLLARS ($10.00) in hand paid, the mutual covenants, promises and undertakings outlined in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by both of the parties, Lessor and Lessee hereby covenant and agree as follows:

## ARTICLE I: DEMISED PREMISES

1.1      **Premises.**  Lessor hereby leases to Lessee and Lessee hereby leases from Lessor, for the term hereinafter set forth, and upon and subject to the terms and conditions of this Lease, that certain tract or parcel of land, with improvements thereon, more particularly described on **Exhibit A** to this Lease, together with all rights, ways, easements, improvements, fixtures, electrical, plumbing, heating and air conditioning systems, fences, mineral rights, riparian rights, permits and any and all appurtenances (collectively referred to as the "Premises" or "Leased Premises") and one railcar currently located on the Leased Premises on the Commencement Date (but specifically excluding the caboose) and the safe, restaurant equipment, and all other contents of all buildings and structures on the Leased Premises on the Commencement Date (such railcar, safe, restaurant equipment, and all other contents are collectively referred to in this Lease as the "Personal Property").  The parties acknowledge that the Premises include all other structures and improvements located on the tract of land described on **Exhibit A** to this Lease.  Accordingly, all references in this Lease to the "Premises" or "Leased Premises" shall include and also refer to all improvements and appurtenances to the tracts of land described on **Exhibit A** to this Lease, as well as the tract of land described on **Exhibit A** to this Lease.  The tract of land described on **Exhibit A** is sometimes referred to in this Lease as the "Land" or the "Lot".  Each building or structure located on a tract of land is sometimes referred to as a "Building" and are sometimes collectively referred to as the "Buildings".

1.2      **Acceptance of Premises.**  Lessee has examined and hereby accepts the Leased Premises and Personal Property in their present "as is" condition.  At the termination of this Lease, Lessee shall deliver the Premises and Personal Property in good order and condition, normal wear and tear only excepted, subject to any alterations, additions or improvements made by Lessee, as permitted in this Lease.

## ARTICLE II: TERM

2.1      **Term.**  The Premises and Personal Property are leased for a term of ninety-nine (99) years (the "Term") beginning on the _____ day of May, 2015 (the "Commencement Date") and ending on the 31st day of May, 2114 (the "Conclusion Date"), at which time this Lease shall terminate absolutely and without further obligation on the part of either party, unless otherwise provided herein, or unless sooner terminated as hereinafter provided.

## ARTICLE III: RENT; UTILITIES AND TAXES

3.1 <u>Rent</u>. In consideration of and for Lessee's right to use and occupy the Premises and Personal Property during the Term, Lessee shall pay rent to Lessor in accordance with the following schedule:

(a) <u>Rent-Free Period</u>. During the first nine months of this term of this Lease, Lessee shall not be obligated to make to Lessor any monthly payment as rent.

(b) <u>Two-Year Initial Rate</u>. After the nine-month period, beginning on March 1, 2016, and continuing on the first of each month thereafter until February 1, 2018, Lessee shall pay to Lessor as rent for the term of this Lease Agreement the sum of FIVE HUNDRED and NO/100's DOLLARS ($500.00) per month in advance (the "Initial Rent").

(c) <u>Regular Rate</u>. Beginning on March 1, 2018 (the same day upon which the Lump Sum Rental Payment [hereinafter defined] is due), and continuing on the first of each month thereafter until July 1, 2052, Lessee shall pay to Lessor as rent the sum of SEVEN HUNDRED and NO/100's DOLLARS ($700.00) per month in advance (the "Regular Rent").

(d) <u>Lump Sum Payment</u>. Additionally, no later than March 1, 2018, Lessee shall pay to Lessor the additional sum of FOUR THOUSAND EIGHT HUNDRED and NO/100's DOLLARS ($4,800.00) (the "Lump Sum Rental Payment"). Lessee shall be entitled to make a partial payment or multiple partial payments towards the Lump Sum Rental Payment in advance, from time to time, at such times and in such amounts as Lessee may desire, at its option. Any such payments shall be credited to the Lump Sum Rental Payment. Contemporaneously with any such advance payment, Lessee shall notify Lessor in writing that Lessee is making an advance payment to be applied to the Lump Sum Rental Payment.

(e) <u>Last Regular Payment</u>. On August 1, 2052 (one month after the last monthly payment of $700.00 is due), Lessee shall pay to Lessor as rent the sum of ONE HUNDRED FIFTY and NO/100's DOLLARS ($150.00) in advance (the "Last Regular Rent Payment").

(f) <u>Final Rent</u>. Beginning on September 1, 2052 (one month after the Last Regular Rent Payment is due), and continuing on September 1 of each year thereafter until the termination of this Lease, Lessee shall pay to Lessor as rent the sum of ONE and NO/100's DOLLAR ($1.00) per year in advance (the "Final Rent").

(g) <u>Parties' Intention</u>. The parties acknowledge that they intend that Lessee shall pay to Lessor the total sum of THREE HUNDRED THIRTY-ONE THOUSAND TWO HUNDRED FIFTY and NO/100's DOLLARS ($331,250.00) (the "Total Rent"), plus the nominal sum of ONE DOLAR per year after as rent for the Term of this Lease.

(h) <u>General Provisions Concerning Payment of Rent</u>. Each rental payment is payable in advance without demand on the date such payment becomes due. Although each monthly rental payment shall be due on the first (1st) day of the month, such payment shall not

be deemed late, and shall not constitute a default under this Lease, until the tenth (10th) of the month, notwithstanding any other provision of this Lease. All rent payments shall be made by check payable to Lessor, and shall be delivered or mailed to Lessor at 1096 North Cherokee Road, Social Circle, Georgia 30025, or at such other address as may be designated from time to time by Lessor by delivering to Lessee a written notice of such address change.

3.2    **Utilities.** Lessee shall contract for in its own name and pay or cause to be paid, when due, any and all charges for water, electricity, gas, sewage, waste, trash and garbage disposal, television, telephone and other utility services furnished to the Premises. Under no circumstances shall Lessor be obligated to pay for any such utility services.

3.3    **Taxes.** Lessor shall pay to the appropriate taxing authority any taxes, general and special assessments and other public charges of every description, levied on or assessed against the Premises, on or before the day on which any such taxes are due, and Lessee shall reimburse Lessor for the prorata portion of Lessor's property taxes attributable to the Premises. No sooner than thirty (30) days before Lessor's taxes are due to the taxing authority, Lessor shall notify Lessee of the amount that Lessee shall owe to Lessor as reimbursement under this paragraph, and shall provide such documents and information as Lessee may reasonably request to support Lessor's calculation. Lessee shall pay such amount to Lessor no later than thirty (30) days after Lessee's receipt of Lessor's demand and supporting documents and information.

## ARTICLE IV: USE OF PREMISES

4.1    **Permitted Uses.** Subject to the leases identified in Section 7.6 of this Lease, Lessee may use and occupy the Premises and Personal Property in any manner permitted by applicable law (collectively the "Permitted Use"), but shall not use or occupy the Premises for any illegal or improper purpose, or in a manner not permitted by applicable law, or in an manner that constitutes a nuisance. Lessor acknowledges that Lessee intends to develop the Leased Premises and Personal Property as a public park, and Lessor expressly approves such use.

## ARTICLE V: ALTERATIONS AND ADDITIONS

5.1    **Lessee Work.** Lessor acknowledges that Lessee intends to develop the Leased Premises and Personal Property as a public park, and Lessor hereby authorizes Lessee to make any and all alterations, additions, modification and improvements to the Leased Premises and Personal Property as Lessee shall deem appropriate for Lessee's intended use; provided, however, that Lessee shall be permitted temporarily to remove any and all rails in the block between Forest Avenue and Webb Street, as long as Lessee re-installs all such rails at the conclusion of construction. Lessee shall not be obligated, however, to reinstall the rails in such a manner and to such specifications that the rails are able to support rail traffic. All alterations and additions shall become part of the Leased Premises or Personal Property, as the case may be, and shall not require any increase in Rent, and shall remain on the Leased Premises upon the termination of the Lease. Before Lessee commences any alteration or addition, it shall secure all licenses and permits required for the work, and if the alteration or addition to the Premises exceeds Fifty Thousand and 00/100 Dollars ($50,000.00), Lessee shall notify Lessor of the anticipated work. Lessee shall fully indemnify Lessor for any cause of action, claim, loss, or

- 4 -

liability against Lessor and which results from any alteration or addition initiated by Lessee. Lessee shall pay promptly when due the entire cost of any such work done in respect of its alterations and additions, and promptly discharge or bond any liens for labor performed or materials furnished in connection therewith that may attach to the Premises.

## ARTICLE VI: LESSEE'S PROPERTY

6.1    **Ownership.** All property of Lessee located on the Premises from time to time and not otherwise attached or affixed to the Land or to the interior or exterior of a Building ("Lessee's Property"), shall be and remain the property of Lessee. At any time during the Term, Lessee may remove any of Lessee's Property from the Premises, unless prohibited under the terms of other agreements between Lessee and Lessor.

6.2    **Removal of Lessee's Property upon Termination of Lease.** Upon termination of this Lease, Lessee shall remove all Lessee's Property from the Premises, except alterations and additions made by Lessee and/or any fixtures or equipment, the removal of which would damage a Building. Lessee shall have ten (10) days after the termination of this Lease to either (1) remove all of Lessee's Property or (2) pay a full month's rent thus allowing Lessee thirty (30) days after termination to remove all of Lessee's Property. If Lessee has not removed all Lessee's Property from the Premises within ten (10) days (or within thirty (30) days if extended as provided above), such remaining Lessee's Property shall be deemed abandoned by Lessee.

## ARTICLE VII: LESSOR'S COVENANTS AND REPRESENTATIONS

7.1    **Authority.** Lessor represents and warrants that it is the owner of the Premises, and has all requisite corporate authority to enter into this Lease without the consent or approval of any other party.

7.2    **Non-Interference.** Lessor shall not unreasonably interfere with Lessee's use of the Premises in the exercise of Lessee's rights, or in the performing of Lessee's maintenance, repair, service, and other obligations under this Lease.

7.3    **Quiet Enjoyment.** Lessor covenants that upon paying the Rent and observing and keeping all covenants, agreements, and conditions applicable to Lessee under this Lease, Lessee shall peaceably and quietly have, hold and enjoy the Premises, without hindrance or molestation from Lessor or anyone claiming by, through or under Lessor, except for the Best Powder Lease (defined in **Section 7.6** of this Lease).

7.4    **Sale to be Subject to Lease.** If Lessor contracts to sell, or enters into negotiations for the sale of, the Leased Premises during the term of this Lease, then Seller shall disclose this Lease to the prospective purchaser and shall require such purchaser to acquire the Leased Premises subject to this Lease, and to assume Lessor's duties and obligation under this Lease. Lessor agrees that it shall not sell the Personal Property during the term of this Lease.

7.5    **Replacement of Railroad Ties.** At Lessee's request, and for such reasonable fee or cost as Lessor may reasonably charge, Lessor shall assist Lessee with the replacement or

repair of any railroad ties on the rail line on the Leased Premises that are rotten or in a state of disrepair.

7.6 **Leases and Licenses in Favor of Other Parties.** Lessor represents and warrants that no part of the Premises is subject to a lease or other agreement in favor of any other party, or any other type of agreement allowing use or occupancy of any part of the Leased Premises by any other party, except for the following:

(a) **Lease to Best Powder, L.L.C.** A portion of the Premises, more particularly described on **Exhibit B** to this Lease (hereinafter referred to as the "Best Powder Premises"), is leased to Best Powder, L.L.C., pursuant to that certain Lease between Hartwell Railway Company, as lessor, and Hartwell Feed and Elevator Company, as lessee, dated May 1, 1974, subsequently assigned by Hartwell Feed and Elevator Company to Hartwell Lumber Company, subsequently assigned by Hartwell Lumber Company to Best Powder, L.L.C., as evidenced by a Quitclaim Deed from Hartwell Lumber Company to Best Powder, L.L.C., dated August 13, 2009, recorded on August 13, 2009, in Deed Book 641, at Pages 348-350, in the Office of the Clerk of the Superior Court of Hart County, Georgia (the "Best Powder Lease"). Lessee acknowledges that, although the Best Powder Premises are included in the Leased Premises, and Lessor is also leasing the Best Powder Premises to Lessee under this Lease, (a) Best Powder, L.L.C. is entitled to use and occupy the Best Powder Premises, (b) Lessee's rights to use and occupancy of the Best Powder Premises are subordinate and subject to the right of Best Powder to use and occupy the Best Powder Premises, and (c) Lessee cannot use or occupy the Best Powder Premises without the permission of Best Powder, L.L.C.

(b) **License Agreements with Hartwell First United Methodist Church.** Certain portions of the Premises, more particularly described in the following agreements, are subject to licenses in favor of Hartwell First United Methodist Church, pursuant to the following agreements (hereinafter referred to as the "Church Licenses"):

(1) Agreement between Hartwell Railroad Company and Hartwell First United Methodist Church, dated December 20, 2007, recorded on October 2, 2014, in Deed Book 760, at Pages 436-439, in the Office of the Clerk of the Superior Court of Hart County, Georgia;

(2) Agreement between Hartwell Railroad Company and Hartwell First United Methodist Church, dated July 31, 2008, recorded on October 2, 2014, in Deed Book 760, at Pages 440-443, in the Office of the Clerk of the Superior Court of Hart County, Georgia; and

(3) Agreement between Hartwell Railroad Company and Hartwell First United Methodist Church, dated August 1, 2008, recorded on October 2, 2014, in Deed Book 760, at Pages 444-453, in the Office of the Clerk of the Superior Court of Hart County, Georgia;

Lessee acknowledges that, although the areas subject to the Church Licenses (hereinafter referred to as the "Church License Areas") are included in the Leased Premises, and Lessor is also leasing the Church License Areas to Lessee under this Lease, (a) Hartwell First United Methodist Church is entitled to use and occupy the Church License Areas, (b) Lessee's rights to use and occupancy of the Church License Areas are subordinate and subject to the right of Hartwell First United Methodist Church to use and occupy the Church License Areas, and (c) Lessee cannot use or occupy the Church License Areas without the permission of Hartwell First United Methodist Church.

Lessor represents that no other portion of the Premises is subject to any other lease, license agreement, or similar agreement providing for any use or occupancy of the Premises or any portion of the Premises by Best Powder, L.L.C., Hartwell First United Methodist Church, or any other person or entity. Further, Lessor agrees that Lessee may terminate this Lease at any time without penalty if (i) Best Powder, L.L.C. uses or occupies the Best Powder Premises in a way that interferes with Lessee's intended use of any part of the Premises, or if Best Powder claims the right to use and occupy any other portion of the Leased Premises besides the Best Powder Premises; (ii) Hartwell First United Methodist Church uses or occupies the Church License Areas in a way that interferes with Lessee's intended use of any part of the Premises, or if Hartwell First United Methodist Church claims the right to use and occupy any other portion of the Leased Premises besides the Church License Areas; or (iii) any other party uses or occupies any portion of the Leased Premises in a way that interferes with Lessee's intended use of any part of the Premises, or if any other party claims the right to use and occupy any other portion of the Leased Premises.

## ARTICLE VIII: LESSEE'S COVENANTS AND REPRESENTATIONS

8.1     **Lessee's Duty to Maintain Premises.**  During the Term of this Lease, Lessee shall maintain the Premises in a good and safe condition, and shall promptly make any and all repairs and replacements required to maintain such condition.  The parties acknowledge that the Premises have not been regularly maintained for several years and are in a state of disrepair. Accordingly, Lessee shall not be obligated to make any alternations or additions to the Leased Premises.

8.2     **Lessor Relieved of Duty to Maintain.**  Lessee acknowledges that Lessor shall not be required to furnish any services or facilities, or to make any repairs or alterations, of any nature whatsoever with respect to the Premises.  Lessee hereby assumes the full and sole responsibility for the condition, operation, repair, replacement, maintenance and management of the Premises.

8.3     **Yield Up.**  Lessee covenants to yield up peacefully and surrender the Premises upon the termination of this Lease in as good a condition as upon commencement of this Lease, reasonable wear and tear, casualty and condemnation excepted, and to remove all Lessee's Property.

8.4    **Use.**  Lessee covenants that during the Term it will not use the Premises for any use other than the Permitted Use, nor injure or deface the Premises, nor permit any nuisance, nor suffer to occur on the Premises any activity that is improper, offensive, contrary to law or which will increase the premiums of Lessor's insurance on the Building or the Premises, unless Lessee agrees to bear such increased cost and pays such additional cost to Lessor at the time Lessee takes such action or allows such activity.

8.5    **Risk of Loss to Lessee's Property.**  Lessee's Property and all furnishings, fixtures, equipment, effects and property of those claiming by, through, or under Lessee, located in or on the Premises, shall be at the sole risk and hazard of Lessee, and if the whole or any part thereof shall be damaged or destroyed by fire, flood, the leakage or bursting of pipes, or by theft or by any other cause, no part of such damage shall be borne by Lessor.

8.6    **Lessor's Entry.**  Lessee covenants to permit the Lessor or its agents to enter the Premises during reasonable, non-peak business hours upon twenty-four (24) hours advance notice, or at any time in the event of an emergency, for the purpose of inspections and exercising any rights in carrying out any obligations Lessor may have under this Lease.

8.7    **Taxes.**  Lessee covenants to pay promptly when due all taxes, general and special assessments, and other public charges of every description, levied on, assessed against or imposed on Lessee's Property.

8.8    **Liens.**  Lessor and Lessee covenant that neither party will create any lien or encumbrance on the Premises or cause any lien or encumbrance to attach to the Premises, and if either party does so create a lien or allow a lien to attach to the Premises, it shall promptly cause the same to be discharged or bonded.

## ARTICLE IX: INSURANCE

9.1    **Building and Property Insurance.**  The parties acknowledge that the improvements on the Leased Premises consist of railroad tracks (consisting or railroad rails and ties), the Hartwell Depot Building and platform, the Rio's Mexican Café/All Aboard Travel building, the railroad turntable, and other miscellaneous improvements, and that all such buildings and improvements are in a dilapidated state.  Consequently, Lessee shall not be required to maintain casualty insurance on any contents of any building or other structure, and shall not be required to maintain casualty insurance on all improvements on the Leased Premises.  Instead, Lessee shall at all times throughout the Term maintain fire, casualty, and extended coverage insurance covering only the Hartwell Depot Building and the Rio's Mexican Café/All Aboard Travel building, and only in an amount not less than the full replacement cost of the Hartwell Depot Building and the Rio's Mexican Café/All Aboard Travel building, which policies shall have deductibles not higher than the deductibles customarily carried on similar buildings in the surrounding locality and which policies shall list Lessor as the insured.  Such coverage shall be provided by insurance companies chosen by Lessee and reasonably satisfactory to Lessor and licensed to issue insurance in the state in which the property is located.  Every such policy of insurance shall contain provisions for thirty (30) days written notice to Lessor of any cancellation, non-renewal or modification to the policy.  All such insurance policies shall be

issued by a properly licensed insurer acceptable to Lessor. All costs of insurance with respect to the Leased Premises (including casualty and liability insurance) shall be paid by Lessee, and the Lessor shall have no obligation or liability in this regard. Lessee shall pay the premiums for all such policies required by this Lease in a timely manner.

9.2   **Waiver of Subrogation.** Lessor and Lessee, on behalf of themselves and their respective insurers, hereby waive all causes and rights of recovery against the other and each of their respective officers, employees and agents, for any loss occurring to the property of either of them, regardless of cause or origin. Lessor and Lessee agree that all insurance policies presently existing or obtained after the date hereof, shall include a clause or endorsement to the effect that any such policies shall not be invalidated, nor shall the right of recovery against any party for loss occurring to the Building be impaired, by virtue of such waiver of subrogation, and denying the insurer's rights of subrogation against the other party to the extent such rights have been waived by the insured prior to the occurrence of the injury or loss. Notwithstanding the provisions of this section, however, neither party waives the right to enforce the provisions of this Lease against the other party.

9.3   **Liability Insurance.** Lessee shall procure and maintain in effect at all times during the Term, comprehensive general liability insurance with a combined single limit of liability of at least One Million and 00/100 Dollars ($1,000,000.00), which policy shall list Lessor as an additional insured, and shall not exclude coverage for activity within fifty (50) feet of a railroad track. Lessee shall furnish certificates of such insurance to Lessor promptly upon receipt of written request thereof. Any such policy shall be primary and non-contributory.

9.4   **Lessor as Insured or Additional Insured.** Lessor shall be the insured on any and all casualty policies, and shall be named on each liability policy as an additional co-insured party.

9.5   **Proof of Insurance.** At the commencement of this Lease, and subsequently from time to time upon Lessor's request, Lessee shall provide to Lessor proof of any such insurance obtained by Lessee by delivering to Lessor a certificate evidencing such insurance coverage.

## ARTICLE X: INDEMNIFICATION

10.1   **Indemnity By Lessee.** Lessee agrees to indemnify, defend and hold Lessor harmless from and against any loss, cost, liability, damage or expense, including without limitation, reasonable attorney's fees incurred in connection with or arising from: (a) Lessee's use, occupancy, or possession of the Leased Premises, including, but not limited to, the negligence of Lessee or its employees, agents, contractors, invitees, or licensees in or on the Premises other than the act or omission of Lessor; and/or (b) Lessee's failure to carry out its obligations under the Lease.

10.2   **Indemnity By Lessor.** Lessor agrees to indemnify, defend and hold Lessee harmless from and against any loss, cost, liability, damage or expense, including without limitation, reasonable attorney's fees incurred in connection with or arising from: (a) Any

negligence of Lessor or its employees, agents or contractors in or on the Premises, other than the act or omission of Lessee; and/or (b) Lessor's failure to carry out its obligations under this Lease.

10.3 **Cooperation and Information.** In carrying out their respective obligations to indemnify, defend, and hold the other harmless under the provisions of **Subsections 10.1 and 10.2,** Lessor and Lessee shall cooperate with each other in all respects, including without limitation, promptly notifying the other of any action or event which may reasonably be expected to be the basis of a claim or a suit for which the other is obligated to indemnify, defend, and hold harmless under the provisions hereof, and supplying the other with all information and documentation available to it relating to the same.

## ARTICLE XI: CONDEMNATION

11.1 **Termination.** If at any time during the Term all or any portion of any Building shall be condemned or taken for public or quasi-public use, or if any portion of the Lot, Building or Premises is so condemned or taken, which would materially affect Lessee's ability to conduct normal business operations on the Premises, this Lease shall automatically terminate as of the earlier of the date of the vesting of title, or the date of dispossession of Lessee as a result of such condemnation or taking.

11.2 **Partial Taking.** In the event of a partial condemnation or taking that does not result in a termination of this Lease in accordance with the provisions of **Section 11.1** hereof, the amount of Rent payable each month shall not abate, but the total owed by Lessee as rent, as provided in **Section 3.1(g)** of this Lease, shall abate by an amount equal to the condemnation award or other amounts paid to Lessor in connection with such condemnation or taking, and as a result, Regular Rent shall be payable for a shorter period of time, the Last Regular Rent Payment shall be due sooner, and Final Rent shall be payable for a longer period of time.

11.3 **Temporary Taking.** If at any time during the Term a substantial portion of the Building is condemned or taken for a public or quasi-public use for a limited period of taking time, this Lease shall remain in full force and effect, and the amount of Rent payable each month shall not abate,; provided, however, that the total owed by Lessee as rent, as provided in Section **3.1(g)** of this Lease, shall abate by an amount equal to any condemnation award or other amounts paid to Lessor in connection with such condemnation or taking, and as a result, Regular Rent shall be payable for a shorter period of time, the Last Regular Rent Payment shall be due sooner, and Final Rent shall be payable for a longer period of time.

·11.4 **Awards.** Lessor shall be entitled to the entire award resulting from any such condemnation or taking, including without limitation, any portion of any award attributable to the value of the leasehold estate created by this Lease; provided, however, that Lessee reserves to itself any portion of any award attributable to Lessee's Property, its relocation expenses, or the interruption or damage to its business, and further provided that the total owed by Lessee as rent, as provided in **Section 3.1(g)** of this Lease, shall abate by an amount equal to the condemnation award or other amounts paid to Lessor in connection with such condemnation or taking, and as a result, Regular Rent shall be payable for a shorter period of time, the Last Regular Rent Payment shall be due sooner, and Final Rent shall be payable for a longer period of time.

# ARTICLE XII: FIRE AND CASUALTY

12.1 **Lessee's Right to Terminate Lease due to Fire or Other Casualty.** If at any time during the Term, more than twenty-five percent (25%) of the Premises are damaged or destroyed by fire or other casualty, or if any portion of the Lot, Building or Premises is so damaged or destroyed, and such damage or destruction materially affects Lessee's ability to use the Premises for Lessee's purposes, Lessee may elect to terminate the Lease by so notifying the Lessor within thirty (30) days after the date of the damage or destruction. Notification of termination by Lessee must specify a date for termination that shall be not less than thirty (30) days from the date of such notice. If Lessee terminates this Lease pursuant to this provision, then Lessee shall pay to Lessor any insurance proceeds paid to Lessee due to damage to the Premises, up to a maximum of the amount of Total Rent provided in **Section 3.1(g)** of this Lease, and Lessee shall be entitled to retain any such insurance proceeds in excess of such Total Rent.

12.2 **Abatement of Rent.** During a ninety (90) day period following the damage or destruction of the Building or Premises, Lessee's obligation to pay Rent shall be abated, commencing on the date of such damage or destruction, in the proportion that the area of the part of the Premises is so damaged or destroyed or rendered untenantable bears to the total area of the Premises. Thereafter, Lessee shall continue to pay full Annual Rent until the full amount contemplated in **Section 3.1(g)** is paid in full.

# ARTICLE XIII: ASSIGNMENT AND SUBLETTING

13.1 **Consent Required.** Lessee shall not sublet any portion of the Premises or assign, mortgage, pledge or transfer any of its rights with respect to any of its rights or interest created by this Lease without Lessor's prior written consent in each instance, which consent shall be given or withheld as hereinafter provided, except by operation of law.

13.2 **Procedure.** If Lessee desires at any time to sublet any portion of the Premises or assign, mortgage, pledge or transfer this Lease or any of Lessee's rights or interest created by this Lease, Lessee shall give advance written notice to Lessor of Lessee's desire to do so, and the terms and provisions of the proposed assignment or sublease. Lessor shall, within thirty (30) days after receipt of such notice, provide Lessee with written notice of Lessor's consent to or disapproval of the proposed assignment, subletting, mortgage, pledge or transfer (any such disapproval specifying in writing the objections Lessor has to the proposed assignment, sublease, mortgage, pledge or transfer). In the event Lessor fails to provide any written notice of disapproval to Lessee as aforesaid within said thirty (30) day period, Lessor shall be deemed to have consented to the proposed assignment, sublease, mortgage, pledge or transfer. Consent by Lessor to any assignment, subletting, mortgage, pledge or transfer by Lessee shall not relieve Lessee of any obligation to be performed by Lessee under this Lease, and Lessee shall remain fully bound and obligated under the terms of this Lease.

# ARTICLE XIV: DEFAULT

14.1 **Events of Default.** An Event of Default shall be deemed to have occurred hereunder if:

(a) Lessee shall fail to pay any monthly installment of Rent due, as described in **Section 3.1** of this Lease, or fail to maintain insurance as required by **Sections 9.1 or 9.3** of this Lease;

(b) Lessee breaches or fails to comply with any term, provision, condition, or covenant of this Lease, other than the obligation to pay Rent and maintain insurance, as described in **Section 14.1(a)**;

(c) Lessee's interest in the Lease or the Premises shall be subjected to any attachment, levy, or sale pursuant to any execution, order or decree entered or filed against Lessee in any legal proceeding and such execution, order or decree shall not be vacated within fifteen (15) days of entry thereof or shall not be appealed (and diligently pursued) so as to stay enforcement thereof;

(d) Lessee shall make an assignment for the benefit of creditors; or

(e) An involuntary petition under the United States Bankruptcy Code is filed against Lessee and not dismissed within one hundred twenty (120) days.

14.2 **Remedies.** Upon the occurrence of an event of default, and after affording Lessee any cure period required by **Section 14.3**, then Lessor shall have the option to do and perform any one or more of the following in addition to, and not in limitation of, any other remedy or right permitted it by law or in equity or by this Lease:

(a) Lessor, with or without terminating this Lease, may upon reasonable notice and without unreasonably interfering with the operation of Lessee, thereafter re-enter the Premises and correct or repair any condition which shall constitute a failure on Lessee's part to keep, observe, perform, satisfy, or abide by any term, condition, covenant, agreement, or obligation of this Lease or of any notice given Lessee by Lessor pursuant to the terms of this Lease, and Lessee shall fully reimburse and compensate Lessor on demand.

(b) Lessor may immediately or at any time thereafter demand in writing that Lessee vacate the Premises and thereupon Lessee shall vacate the Premises and remove therefrom all property thereon belonging to or placed on the Premises by, at the direction of, or with consent of Lessee within thirty (30) days of receipt by Lessee of such notice from Lessor, whereupon Lessor shall have the right to re-enter and take possession of the Premises. Any such demand, re-entry and taking possession of the Premises by Lessor shall constitute an acceptance by Lessor of a surrender of this Lease and of the Premises by Lessee and shall constitute a termination of this Lease by Lessor.

14.3  **Right to Cure**. If Lessor declares a default, then Lessor shall give Lessee written notice, in accordance with **Section 17.8** of this Agreement, specifying with particularity the default or condition unsatisfied. Before exercising any remedies on account of such default, Lessor shall give Lessee the following period of time, depending on the nature of the default, after Lessee's receipt of written notice of default, to cure such default before Lessor utilizes any remedies under this Agreement:

      (a)    If the event of default is one described in **Section 14.1(a)**, or one which may be cured by Lessee's payment of money to a third party, then Lessee shall be afforded ten (10) days after its receipt of written notice of such default;

      (b)    If the event of default is one described in **Section 14.1(b)**, **Section 14.1(d)**, or **Section 14.1(e)**, then Lessee shall be afforded thirty (30) days after its receipt of written notice of such default (or, if any such event of default is not susceptible to cure within such thirty [30]-day period, then Lessee shall be afforded a longer cure period, but only as long as Lessee promptly commences and diligently pursues such cure, and in no event shall the cure period with respect to any such event of default exceed one hundred twenty [120] days); and

      (c)    If the event of default is one described in **Section 14.1(c)**, then Lessee shall be afforded the time period set forth in said **Section 14.1(c)** after its receipt of written notice of such default.

14.4  **Remedies Cumulative**. The exercise by Lessor of any one or more of the rights and remedies provided in this Lease shall not prevent the subsequent exercise by Lessor of any one or more of the other rights and remedies herein provided. All remedies provided for in this Lease are cumulative and may, at the election of Lessor, be exercised alternatively, successively, or in any other manner and are in addition to any other rights provided for or allowed by law or in equity.

14.5  **Lessee's Right to Terminate**. Lessee shall have the right to terminate this Lease at any time after giving written notice to Lessor at least thirty (30) days in advance of the date of such termination and paying to Lessor an early termination fee in the amount of SIX HUNDRED and NO/100's DOLLARS ($600.00). Additionally, Lessee shall be entitled to terminate this Lease at any time, without any penalty or payment, after giving written notice to Lessor at least thirty (30) days in advance of the date of such termination, if (a) Best Powder, L.L.C. or its successor uses or occupies the Best Powder Premises in a way that unreasonably interferes with Lessee's intended use of any part of the Premises, or if Best Powder claims the right to use and occupy any portion of the Leased Premises, or (c) Hartwell First United Methodist Church asserts, either under one or more of the Church Licenses or otherwise, any rights, powers, privileges, or interest that would, in Purchaser's sole opinion and discretion, prevent or interfere with Purchaser's proposed use of the Leased Premises or any portion thereof. Lessee shall be obligated to pay rent through the date of any such termination.

## ARTICLE XV: SUBORDINATION

15.1 **Subordination to Mortgages.** Lessee agrees that upon the request of the Lessor it will subordinate this Lease to the lien of any mortgage, security deed, or deed of trust that may now or hereafter exist, for which the Building or Lessor's interest in the Premises or this Lease is pledged as security, provided that the mortgagees, grantees or beneficiaries named in such mortgages, security deeds, or deeds of trust agree in writing (a) to recognize the interest of Lessee under this Lease, (b) that, so long as Lessee shall perform its obligations under this Lease, the rights of Lessee hereunder shall remain in full force and effect, and (c) that they will not disturb Lessee's occupancy of the Premises under this Lease in the event of foreclosure or other action taken under the mortgage, security deed or deed of trust if Lessee is not then in default. Lessee shall execute and deliver to Lessor all instruments Lessor reasonably deems necessary to evidence and give effect to any such subordination, provided that no such instrument shall alter any of the terms, covenants or conditions of this Lease, and provided that said instrument shall contain the covenants of the lender as aforesaid.

15.2 **Estoppel Certificates.** Either party will at any time, from time to time, within thirty (30) days after receipt of a written request from the other party, execute and deliver to the requesting party a certificate stating, to the extent applicable, that: (a) the Lease is in full force and effect and unmodified (or if there have been any modifications, specifying the date and nature thereof); (b) to the certifying party's knowledge, it has no defenses, offsets, or counterclaims against its obligations to pay Rent (with respect to a Lessee estoppel) and to perform its other obligations under this Lease; (c) to its knowledge, there are no uncured defaults of the requesting party under this Lease; and (d) the dates to which Rent has been paid.

15.3 **Payment of Encumbrances.** Lessee acknowledges that Lessor may subsequently mortgage and encumber the Premises from time to time during the term of this Lease. During the term of this Lease, Lessor shall make, in a timely manner, any and all payments required by any and all loans or debts secured by the Premises.

## ARTICLE XVI: LESSEE OPTION

16.1 **Generally.** In consideration of this Lease, and for Ten and 00/100 Dollars ($10.00) and other good and valuable consideration, and the mutual covenants and obligations set forth in this Agreement, and on the terms and conditions hereinafter set forth, Lessor hereby grants to Lessee an option to purchase the Premises (including the real estate and improvements) and Personal Property from Lessor for the purchase price set forth in **Section 16.3** of this Lease, payable in cash or certified funds (the "Lessee Option").

16.2 **Term.** Beginning with Lessee's making the Last Regular Rent Payment, provided that Lessee has at such time paid to Lessor the Total Rent provided in **Section 3.1(g)** of this Lease, and ending on the termination of this Lease (this period of time is referred to as the "Lessee Option Term"), then Lessee shall have the right to purchase the Leased Premises and the Personal Property, under the terms and conditions set forth in this **Article XVI**. When this Lease terminates, unless Lessee has exercised this Lessee Option as provided in **Section 16.6** of this

Lease, this Lessee Option shall terminate automatically, without any further action by either party, and Lessee shall have no further rights under this article.

16.3  **Purchase Price.** The purchase price for the Leased Premises and the Personal Property shall be ONE and NO/100's DOLLAR ($1.00), payable at closing in cash or certified funds.

16.4  **Effect of Termination of Lease.** If this Lease is terminated by Lessor or Lessee, then this Lessee Option shall automatically terminate and be void and of no force or effect.

16.5  **Exercise of Lessee Option.** At any time during the Lessee Option Term, Lessee shall be entitled to exercise this Lessee Option by delivering to Lessor, in accordance with **Section 17.8** of this Agreement, a written notice stating Lessee's intent to exercise this Lessee Option and close the sale and purchase of the Premises at a mutually agreeable time no more than one hundred twenty (120) days and no less than thirty (30) days from the date of the notice, which time can be beyond the term of this Lease. The exercise of this Lessee Option shall ripen this instrument into a contract for the sale and purchase of the Premises without the necessity of any further instrument in writing except as provided herein, and shall automatically terminate this Lease without penalty.

16.6  **Conveyance of Leased Premises; Warranty of Title; Exceptions.** Lessor covenants that, upon the exercise of this Lessee Option by Lessee or its permitted assigns, and upon payment of the agreed purchase price as provided herein, Lessor shall convey, and cause to be conveyed to Lessee, good, unencumbered, marketable title to the Premises, in fee simple, and that Lessor will warrant the title to the Premises, by limited covenants of warranty, against the claims and demands of all persons claiming by, through, or under Lessor, subject only to the lien of ad valorem taxes for the year in which the sale is closed and any liens or encumbrances caused or created by Lessee. The purchase price shall be payable in full at Closing. Taxes for the year in which the sale is closed shall be prorated between the parties. Lessor shall pay all costs of preparing the warranty deed and bill of sale, Georgia Real Estate Transfer Tax, the costs of curing any title objections caused by Lessor, and the cost of paying and satisfying any liens or encumbrances created by Lessor. Lessee shall pay all costs of title examination, title insurance, escrow fees, Lessee's attorney's fees, and all other costs associated with the closing. Any such agreement to convey is conditioned upon approval by the appropriate regulatory body having jurisdiction over Lessor's right of way at the time of the proposed closing. Lessee will bear all cost and expense associated with obtaining such approval. If Lessee determines that the costs of such approval are excessive, in Lessee's discretion, then Lessee shall be entitled to extend this Lease for an additional period of fifty (50) years.

16.7  **Lessor Financing.** Intentionally Omitted.

16.8  **No Credit for Rent Payments.** Lessee shall not receive a credit at closing or otherwise for any rental payments made hereunder.

16.9  **Purchase "As-Is".** Lessee shall purchase the Premises in "as is" condition "with all faults" and specifically and expressly without any warranties, representations or guaranties, of

any kind, oral or written, expressed or implied, concerning the Premises from or on behalf of Lessor, except as expressly provided herein. Lessor shall not under any circumstances be required to repair, modify or alter any condition of the Premises.

16.10 **Merger of Estates.** The exercise of this Lessee Option shall not terminate this Lease or modify or reduce Lessee's obligations under this Lease. Upon closing of the purchase of the Premises pursuant to this Lessee Option, however, this Lease shall terminate and be of no further force and effect.

## ARTICLE XVII: MISCELLANEOUS

17.1 **Holding Over.** If Lessee holds over beyond the expiration of the Term, Lessee shall occupy the Premises as a lessee at will on a month-to-month basis upon all of the terms and conditions of this Lease, but shall pay to Lessor each month that Lessee holds over, the sum of one hundred fifty percent (150.0%) of the Annual Rent for the last month prior to such expiration, plus Additional Rent as set forth in this Lease.

17.2 **Severability.** If any provision or provisions of this Lease shall be determined to any extent to be void or unenforceable by any court of competent jurisdiction, the remainder of this Lease shall not be affected thereby, and each other provision of this Lease shall be valid and enforced to the full extent permitted by law.

17.3 **No Waivers.** The failure of Lessor or Lessee to insist upon the strict performance of any obligation of the other under this Lease, or to exercise any right, power, or remedy consequent upon a breach hereof, shall not constitute a waiver or relinquishment of any such obligation. A receipt of Annual Rent or Additional Rent by Lessor, or a payment of Annual Rent or Additional Rent by Lessee, with knowledge of the breach of any obligation hereunder, shall not constitute a waiver or relinquishment of any such obligation.

17.4 **Remedies Cumulative.** Except as expressly set forth in this Lease, the specific remedies to which Lessor or Lessee may resort are cumulative and are not intended to be exclusive of any other remedies or means of redress to which they may be entitled in law or in equity.

17.5 **Modifications in Writing.** This Lease may not be amended in any way, and no such purported amendment shall be effective, except by a writing executed by Lessor and Lessee.

17.6 **Entire Agreement.** This Lease contains all of the agreements of the parties with respect to the subject matter hereof, and supersedes all prior negotiations, agreements, and other dealings between them with respect to the same. Any representation, warranty, condition, understanding or agreement of any kind with respect to the subject matter of this Agreement not contained in this Agreement or in some other written agreement or instrument between the parties shall not be of any force or effect and shall not be relied upon by any party.

17.7 **Headings.** The headings of the paragraphs of this Agreement are for convenience of reference only, are not to be considered a part hereof, and shall have no bearing on the construction or interpretation of this Agreement.

17.8 **Notices.** Any notice, consent, request, demand, or other communication given, or required to be given under this Lease, shall be effective only if given in writing, sent by (a) nationally recognized, overnight courier service, delivery fee prepaid, (b) registered or certified mail, return receipt requested, postage prepaid, or (c) delivered by hand, if to Lessor, to Lessor's address set forth in the opening paragraph of this Lease; and if Lessee, to Lessee's address as set forth in the opening paragraph of this Lease, or to such other address as either party may specify to the other by written notice. Any such notice, approval, consent, request, demand, or election shall be deemed to have been given upon receipt, or if receipt is refused, then when delivery was attempted.

17.9 **Binding Effect.** The terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of Lessor and Lessee, and except as otherwise provided herein, their respective successors and assigns.

17.10 **Submission Not an Offer.** The submission of this Lease or a summary of any of its provisions for examination and review, does not constitute an offer to lease on the terms of this Lease or those provisions, and this Lease shall not be effective or binding on Lessor or Lessee until execution and delivery by both.

17.11 **Recording of Lease.** The parties agree to record this Lease in the Office of the Clerk of the Superior Court of Hart County, Georgia.

17.12 **Attorney's Fees.** In the event Lessor or Lessee is required to obtain the services of an attorney to enforce the provisions of this Lease resulting in litigation, the prevailing party shall be entitled to reimbursement by the other of its reasonable attorney's fees and costs.

17.13 **Exhibits.** The following exhibits are a part of this Lease and incorporated herein by reference:

Exhibit A   &ndash; Legal Description of Leased Premises
Exhibit A-1 &ndash; Drawing of Leased Premises
Exhibit B   &ndash; Legal Description of Best Powder Premises
Exhibit C   &ndash; Drawing of Hartwell First United Methodist Church License Areas

17.14 **Recitals Made Part of Agreement.** The recital of facts on the first page of this instrument is hereby made a part of this Lease as if fully set forth herein.

17.15 **Counterparts.** This Lease may be simultaneously executed in duplicate counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

17.16 **Time of Essence.** Time is expressly declared to be of the essence of this Lease.

- 17 -

17.17  **Compliance with Laws and Regulations.**  Lessee shall, at its own expense, comply with all laws, orders and requirements of all governmental entities concerning the use and occupancy of the Leased Premises.

17.18  **Governing Law.**  This Lease shall be interpreted and construed under and in accordance with the laws of the State of Georgia.

17.19  **Construction of Lease.**  Lessor and Lessee acknowledge that they have read, understand and have had the opportunity to be advised by legal counsel as to each and every one of the terms, conditions, restrictions, and effects of all the provisions of this Lease.  Should any provision of this Lease require judicial interpretation, it is agreed that the court interpreting or construing the provision shall not apply a presumption that the terms hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agent prepared the document.

(This Space Intentionally Left Blank)

IN WITNESS WHEREOF, the parties have caused their authorized agents to execute this Agreement on behalf of each party on the day and year first above written.

Lessor:

HARTWELL RAILROAD COMPANY,
a Georgia Business Corporation

By: _____

B.R. Anderson, Sr., Its President and
Authorized Agent

Attest: _____

Claire A. Treadwell, Its Secretary and
Authorized Agent

[CORPORATE SEAL]

Signed, Sealed and Delivered
in the Presence of:

_____
Unofficial Witness

_____
Notary Public, Walton County, GA

[NOTARY SEAL]

My Comm. Expires April 12, 2016

(Signatures Continued on Next Page)

THE GREAT WALTON RAILROAD
COMPANY, a Georgia Business Corporation


By: _B.R. Anderson, Sr._____
    B.R. Anderson, Sr., Its President and
    Authorized Agent


Attest: _M.K. Anderson_____
    M.K. Anderson, Its Secretary and
    Authorized Agent

[CORPORATE SEAL]


Signed, sealed and delivered in the
presence of:

_____
Unofficial Witness

_____
Notary Public, Walton County, GA

[NOTARY SEAL AFFIXED]

My Commission Expires: April 12, 2016


(Signatures Continued on Next Page)


- 20 -

Lessee:

TORCH OF HARTWELL, INC.,
a Georgia Nonprofit Corporation


By: _Mary L Gidley_

Mary Gidley, Its President and
Authorized Agent


Attest: _Sharon B. Morris_

_Sharon B. Morris_, Its Secretary and
Authorized Agent    _Treasurer_

[CORPORATE SEAL]


Signed, Sealed and Delivered
in the Presence of:

_____
Unofficial Witness

_____
Notary Public, _Elbert_ County, GA

[NOTARY SEAL]

My Comm. Expires: _11/15/2016_

EXHIBIT A
TO LEASE AGREEMENT WITH OPTION
BETWEEN HARTWELL RAILROAD COMPANY AND
THE GREAT WALTON RAILROAD COMPANY, AS LESSOR, AND
TORCH OF HARTWELL, INC., AS LESSEE,
DATED MAY_____, 2015

(Legal Description of Leased Premises)

## TRACT ONE:

All that tract or parcel of land, with improvements thereon, lying and being in the 1112th G.M. District of Hart County, Georgia, in the corporate limits of the City of Hartwell, more particularly described in that certain plat of survey prepared by W. Slate Bauknight, Registered Land Surveyor, dated January 11, 2013, said plat being expressly by reference incorporated into and made a part of this description.

This property is bounded now or formerly as follows, as shown on said plat: On the Northeast by property of Jane Holmes, property of Glasco Properties, LLC, property of Worley, property of Moore, property of Marett, property of Purcell, property of Hart Community Theater, property of Louise Bisso, other property of Louise Bisso, property of Sharif H. Farhan, property of Lee Carter, Jr., property of Rita Smith, et al., property of The Hartwell Railroad, property of Eddie Corcino, property of Jeff Sadler, property of 13 Depot Street, LLC, property of Hart Outfitters, LLC, and other property of Hart Outfitters, LLC; on the Southeast by the northwestern boundary of the right-of-way for South Forest Avenue and property of Eddie Corcino; on the Southwest by property of Francis J. Trainor, property of Eddie Corcino, and the northeastern boundary of the right-of-way for Railroad Street; and on the northwest by the southeastern boundary of the right-of-way for South Jackson Street and the southwestern boundary of the right-of-way for South Webb Street.

This property comprises (1) the right-of-way for the Hartwell Railroad extending from South Forest Avenue to South Webb Street in the corporate limits of the City of Hartwell, Georgia, and (2) the land between the northeastern side of Railroad Street and the right-of-way for the Hartwell Railroad, except for the lots owned by Eddie Corcino and Pamela Fields, which land is known as Tax Parcel I57H 000, using the present system of the Hart County Tax Assessors for designating parcels of real property for purposes of ad valorem taxation in Hart County, Georgia.

## TRACT TWO:

All that tract or parcel of land, with improvements thereon, lying and being in the 1112th G.M. District of Hart County, Georgia, in the corporate limits of the City of Hartwell, known as 41 Depot Street and the location of the former California Mexican Café (also known as Rio's Mexican Café) on Depot Street, bounded now or formerly as follows: On the Northeast by the southeastern boundary of the right-of-way for Depot Street; on the Southeast by property of

Eddie Corcino; on the southwest by the right-of-way for the Hartwell Railroad; and on the Northwest by property of Rita Smith, et al.

This property is known as Tax Parcel I57D 100 001, using the present system of the Hart County Tax Assessors for designating parcels of real property for purposes of ad valorem taxation in Hart County, Georgia.

The above-described Tracts One and Two include the following property:

All that tract or parcel of land, with improvements thereon, lying and being in the 1112th G.M. District of Hart County, Georgia, in the corporate limits of the City of Hartwell, on the northeast side of Railroad Street, containing 0.540 acre (23,501 square feet), more or less, and being more particularly described in a plat of survey prepared by Aaron P. Blomberg, Registered Land Surveyor, dated May 21, 2014, recorded in Plat Book _____, at Page _____, in the Office of the Clerk of the Superior Court of Hart County, Georgia, said plat and the recording thereof being expressly by reference incorporated into and made a part of this description

This property is more particularly described as follows:

BEGINNING at a PK nail found in the City of Hartwell, Georgia, at the intersection of the centerline of Railroad Street and the centerline of South Forest Avenue;

THENCE running North 70° 36' 40" West for a distance of 219.93 feet to an iron pin set at the intersection of the northeastern boundary of the right-of-way for Railroad Street with the common boundary between property of The Great Walton Railway Company and property of Eddie Corcino and the TRUE POINT OF BEGINNING;

THENCE turning and running 73° 54' 15" West along the northeastern boundary of the right-of-way for Railroad Street North for a distance of 145.11 feet to a PK nail set on such boundary;

THENCE turning and running North 13° 40' 05" East for a distance of 68.36 feet to a PK nail set on the southwestern boundary of the right-of-way for the Hartwell Railroad;

THENCE running North 13° 40' 05" East for a distance of 31.11 feet to a point on the northeastern boundary of the right-of-way for the Hartwell Railroad;

THENCE turning and running South 77° 13' 35" East along the northeastern boundary of the right-of-way for the Hartwell Railroad for a distance of 33.71 feet to a point at a building corner on such boundary;

THENCE turning and running South 76° 54' 00" East along the northeastern boundary of the right-of-way for the Hartwell Railroad for a distance of 30.60 feet to a point at a building corner on such boundary;

THENCE turning and running North 13° 12' 10" East along a party wall for a distance of 60.60 feet to a point on the southwestern boundary of the right-of-way (80 feet wide) for Depot Street;

THENCE turning and running South 76° 55' 55" East along the southwestern boundary of the right-of-way (80 feet wide) for Depot Street for a distance of 81.73 feet to a point at a building corner on such boundary;

THENCE turning and running South 13° 46' 35" West along a party wall for a distance of 60.81 feet to a point at a building corner on the northeastern boundary of the right-of-way (80 feet wide) for the Hartwell Railroad;

THENCE turning and running South 76° 45' 55" East along the northeastern boundary of the right-of-way for the Hartwell Railroad for a distance of 77.99 feet to a ½-inch open top pipe found at a building corner on such boundary;

THENCE running South 76° 40' 05" East along the northeastern boundary of the right-of-way for the Hartwell Railroad for a distance of 102.77 feet to a #4 re-bar found at a building corner on the northwestern boundary of the right-of-way (80 feet wide) for South Forest Avenue;

THENCE turning and running South 13° 35' 30" West along the northwestern boundary of the right-of-way (80 feet wide) for South Forest Avenue for a distance of 11.77 feet to a PK nail set on such boundary;

THENCE turning and running North 76° 40' 05" West along the southwestern boundary of the right-of-way for the Hartwell Railroad for a distance of 86.00 feet to an iron pin set;

THENCE turning and running South 13° 35' 55" West along the boundary of the right-of-way for the Hartwell Railroad for a distance of 6.96 feet to an iron pin set;

THENCE turning and running North 76° 40' 05" West along the southwestern boundary of the right-of-way for the Hartwell Railroad for a distance of 34.00 feet to an iron pin set;

THENCE turning and running South 13° 35' 30" West along the boundary of the right-of-way for the Hartwell Railroad for a distance of 12.50 feet to a point;

THENCE turning and running North 76° 39' 40" West along the southwestern boundary of the right-of-way for the Hartwell Railroad for a distance of 60.89 feet to an iron pin set;

THENCE turning and running South 13° 55' 35" West for a distance of 76.00 feet to an iron pin set on the northeastern boundary of the right-of-way for Railroad Street and the TRUE POINT OF BEGINNING;

This property is a portion of the property described in a Limited Warranty Deed from Hartwell Railway Company to The Great Walton Railroad Company, dated May 5, 1990,

recorded in Deed Book 217 at Pages 162-169, in the Office of the Clerk of the Superior Court of Hart County, Georgia, said deed being expressly by reference incorporated into and made a part of this description.

TRACT THREE:

All that tract or parcel of land, with improvements thereon, lying and being in the 1112th G.M. District of Hart County, Georgia, in the corporate limits of the City of Hartwell, Georgia, being the right-of-way for the Hartwell Railroad extending from South Webb Street to Athens Street, and including the railway turntable and any and all other fixtures and equipment.

Tract One, Tract Two, and Tract Three are highlighted in green on the tax map attached to this Agreement as **Exhibit A-1**, which is incorporated into and made a part of this Agreement, as if fully set forth herein.

EXHIBIT A-1
TO LEASE AGREEMENT WITH OPTION
BETWEEN HARTWELL RAILROAD COMPANY AND
THE GREAT WALTON RAILROAD COMPANY, AS LESSOR, AND
TORCH OF HARTWELL, INC., AS LESSEE,
DATED MAY _____, 2015

(Drawing of Leased Premises)

EXHIBIT A-1

**EXHIBIT B**
**TO LEASE AGREEMENT WITH OPTION**
**BETWEEN HARTWELL RAILROAD COMPANY AND**
**THE GREAT WALTON RAILROAD COMPANY, AS LESSOR, AND**
**TORCH OF HARTWELL, INC., AS LESSEE,**
**DATED MAY_____, 2015**

(Legal Description of Best Powder Premises)

All that tract or parcel of land, with improvements thereon, lying and being in the 1112th G.M. District of Hart County, Georgia, in the corporate limits of the City of Hartwell, on the northeast side of Railroad Street, containing 0.420 acre, more or less, and being more particularly described in a plat of survey prepared by Aaron P. Blomberg, Registered Land Surveyor, dated July 2, 2009, recorded in Deed Book 641, at Page 350, in the Office of the Clerk of the Superior Court of Hart County, Georgia, said plat and the recording thereof being expressly by reference incorporated into and made a part of this description

This property is more particularly described as follows:

BEGINNING at an iron pin set in the City of Hartwell, Georgia, at the intersection of the northeastern boundary of the right-of-way for Railroad Street and the northwestern boundary of the above-described property and the TRUE POINT OF BEGINNING;

THENCE running North 15° 30' 55" East for a distance of 45.01 feet to a point on the centerline of the right-of-way for the Hartwell Railroad;

THENCE turning and running North 88° 56' 00" East along the centerline of the right-of-way for the Hartwell Railroad for a distance of 30.73 feet to a point on the centerline of such right-of-way;

THENCE turning and running South 89° 20' 40" East along the centerline of the right-of-way for the Hartwell Railroad for a distance of 40.64 feet to a point on the centerline of such right-of-way;

THENCE running and running South 86° 52' 45" East along the centerline of the right-of-way for the Hartwell Railroad for a distance of 41.39 feet to a point on the centerline of such right-of-way;

THENCE turning and running South 84° 25' 55" East along the centerline of the right-of-way for the Hartwell Railroad for a distance of 34.26 feet to a point on the centerline of such right-of-way;

THENCE turning and running South 81° 23' 55" East along the centerline of the right-of-way for the Hartwell Railroad for a distance of 22.38 feet to a point on the centerline of such right-of-way;

THENCE turning and running South 81° 23' 55" East along the centerline of the right-of-way for the Hartwell Railroad for a distance of 17.88 feet to a point on the centerline of such right-of-way;

THENCE turning and running South 77° 27' 35" East along the centerline of the right-of-way for the Hartwell Railroad for a distance of 69.19 feet to an iron pin set;

THENCE turning and running South 15° 30' 55" West for a distance of 87.44 feet to an iron pin found on the northeastern boundary of the right-of-way (40 feet wide) for Railroad Street;

THENCE turning and running North 74° 29' 05" West along the northeastern boundary of the right-of-way (40 feet wide) for Railroad Street for a distance of 251.97 feet to an iron pin set and the TRUE POINT OF BEGINNING.

EXHIBIT C
TO LEASE AGREEMENT WITH OPTION
BETWEEN HARTWELL RAILROAD COMPANY AND
THE GREAT WALTON RAILROAD COMPANY, AS LESSOR, AND
TORCH OF HARTWELL, INC., AS LESSEE,
DATED MAY _____, 2015

(Drawing of Hartwell First United Methodist Church License Areas)





CALL BEFORE YOU DIG!!
UTILITY PROTECTION CENTER
1-800-482-8998



C3.0
DETAIL

HARTWELL FIRST UNITED METHODIST CHURCH
220 EAST HOWELL STREET

JULY 2007

ARMENTROUT ROEBUCK MATHENY
CONSULTING GROUP, P.C.
ENGINEERS · ARCHITECTS · CONSTRUCTION MANAGEMENT

CALL BEFORE YOU DIG!!
UTILITY PROTECTION CENTER
1-800-482-8998





# HARTWELL FIRST UNITED METHODIST
## CHURCH CROSSING
### DECEMBER 14, 2001



CROSSING

EXHIBIT C



EXHIBIT A-1