

**TROUTMAN, SANDERS, LOCKERMAN & ASHMORE**

ATTORNEYS AT LAW

CANDLER BUILDING, SUITE 1400
127 PEACHTREE STREET, N.E.
ATLANTA, GEORGIA 30303-1810
404-633-0000
CABLE: WASSTRAP
TELECOPIER: 404-521-8409

JOHN R. MOLM

WRITER'S DIRECT DIAL NUMBER
404-658-8167

March 16, 1990

RECEIVED
MAR 19 1990
ICC

Ms. Moreta R. McGee
Secretary
Interstate Commerce Commission
ATTN: Mail Room (Room #1324)
12th Street & Constitution Avenue, N. W.
Washington, D. C. 20423

RE: Notice of Exemption - Finance Docket No. 31626

Dear Ms. McGee:

This letter is to supplement Notice of Exemption filed on March 14, 1990. Insofar as it is known, the mile-posts for the Hartwell Railway Company commence at mile-post 0 at Bowersville, Georgia and terminate at mile-post 10.5 at Hartwell, Georgia.

Thank you for your attention to this matter. A hard copy of this letter will delivered on Monday.

Very truly yours,

John R. Molm

JRM:jm

cc: Marion Guyton

ENTERED
Office of the Secretary

MAR 20 1990

☐ Part of
Public Record

Exhibit C

G-073F05G

BEFORE THE

INTERSTATE COMMERCE COMMISSION

FINANCE DOCKET NO. 31626

NOTICE OF EXEMPTION

COMES NOW Great Walton Railroad Company, for purposes of this exemption d/b/a Hartwell Railroad Company, and, pursuant to 49 CFR §§ 1180.2(d)(2) and (d)(7), 1180.4(g) and 1180.6, hereby gives notice to the Commission that Hartwell Railroad Company will acquire the rail line owned and operated by Hartwell Railway Company between Bowersville and Hartwell, Georgia and, pending closing of the proposed transaction, will operate over the rail line owned by the Hartwell Railway Company pursuant to a trackage rights agreement.

The Great Walton Railroad Company currently owns and operates a rail line between Social Circle and Monroe, Georgia and operates, pursuant to a lease with Central of Georgia Railroad Company, a rail line between Covington and Machen, Georgia. See Finance Docket No. 31402, The Great Walton Railroad Company, Inc., -- Lease Exemption -- Central of Georgia Company's Line Between Machen and Covington, Georgia.

The Great Walton Railroad Company d/b/a Hartwell Railroad Company for purposes of this transaction proposes to acquire the assets of Hartwell Railway Company. Pending consummation of this transaction, the Great Walton Railroad Company d/b/a Hartwell Railroad Company proposes to provide rail transportation service to shippers located along the rail line from Hartwell to Bowersville, Georgia pursuant to a trackage rights agreement to be entered into between the parties on or before March 21, 1990. The acquisition of the assets will be consummated on or before April 30, 1990.

The purpose sought to be accomplished by the proposed transaction is to achieve improved operating economies and to maintain and improve service to shippers located along the rail line.

A map showing the location of the rail line is attached hereto. In addition, 20 unbound copies of the map are filed herewith.

Also enclosed herewith is a copy of a draft Assets Purchase Agreement (without the Exhibits attached thereto which are now in blank). This Asset Purchase Agreement will be finalized prior to closing. Applicant will file a copy of the trackage rights agreement upon the same being executed by the parties.

-2-

No employees of the Hartwell Railway Company are being replaced. They will remain as employees of the Great Walton Railroad Company d/b/a Hartwell Railway Company if they so choose. There will be no impact on the current employees of the Great Walton Railroad as a result of this transaction.

The following additional information is also provided:

#### Name of Applicant

Great Walton Railroad Company
d/b/a Hartwell Railroad Company
1801 North Cherokee
Social Circle, Georgia 30279
(404) 267-0070

#### Attorney

John R. Holm
127 Peachtree St., N.E.
Atlanta, Georgia 30303-1810

#### Name of Landlord Railroad

Hartwell Railway Company
Railroad and Jackson
Hartwell, Georgia 30643

Respectfully submitted,

John R. Holm

Dated: March 14, 1990

-3-

TROUTMAN, SANDERS, LOCKERMAN
    & ASHMORE
1400 Candler Building
127 Peachtree St., N.E.
Atlanta, Georgia  30303-1810
(404) 658-8107



TROUTMAN, SANDERS, LOCKERMAN & ASHMORE
A LIMITED PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

ATTORNEYS AT LAW
CANDLER BUILDING, SUITE 1400
127 PEACHTREE STREET, N.E.
ATLANTA, GEORGIA 30303-1810
404-885-3000
CABLE: MASTINO
TELECOPIER: 404-221-6465

WRITER'S DIRECT DIAL NUMBER
404-885-8187

JOHN R. HOLM

March 13, 1990

Ms. Norata R. McGee, Secretary
Interstate Commerce Commission
ATTN: Mail Room (Room #1324)
12th Street and Constitution Avenue, N. W.
Washington, D. C. 20423

RE: Finance Docket No. 31626 - Notice of Exemption

Dear Ms. McGee:

Enclosed for filing are the original and ten (10) copies of the Notice of Exemption and a filing fee check in the amount of $600.00. You will note there are twenty (20) additional copies of the Map enclosed for your convenience.

Please acknowledge receipt of this letter on the extra copy and return it to me in the self-addressed, stamped envelope.

Very truly yours,

John R. Holm

JRH:jm

Enclosures

INTERSTATE COMMERCE COMMISSION

Notice of Exemption

Finance Docket No. 31626

Great Walton Railroad Company d/b/a
Hartwell Railroad Company --
Trackage Rights --
Hartwell Railway Company

The Hartwell Railway Company will agree to grant local trackage rights to Great Walton Railroad Company between Bowersville and Hartwell, Georgia, a distance of approximately 10.5 miles. The trackage rights will be effective on March 21, 1990.

This notice is filed under § 1180.2(d)(7). Petitions to revoke the exemption under 49 U.S.C. 10505(d) may be filed at any time. The filing of a petition to revoke will not stay the transaction.





ASSETS PURCHASE AGREEMENT

THIS ASSETS PURCHASE AGREEMENT (the "Agreement") is made and entered into this _____ day of March, 1990, by and between HARTWELL RAILWAY COMPANY, a Georgia railroad corporation (the "Seller"), and THE GREAT WALTON RAILROAD COMPANY, a Georgia railroad corporation (the "Purchaser").

W I T N E S S E T H:

WHEREAS, Seller presently owns and operates rail service over a line of railroad running between Bowersville and Hartwell, Georgia, all as more fully described hereinbelow as the "Line"; and

WHEREAS, Seller wishes to sell to Purchaser, and Purchaser wishes to purchase, the Line, all railroad equipment located on or associated with the Line and all real property of Seller (including fixtures attached thereto) adjacent to the Line, as more fully described hereinbelow;

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound hereunder, do hereby agree as follows:

1.  **Description of Assets.**  Seller agrees that on the "Closing Date" (as hereinafter defined) Seller shall sell, transfer and assign to Purchaser substantially all of Seller's assets, including without limitation the following (the "Assets"):

    (a)  all of Seller's right-of-way and associated property between Bowersville and Hartwell, Georgia as described on Exhibit "A-1" attached hereto and incorporated herein by this reference, _including_, without limitation, any and all tracks, rails, ties, switches, crossings, bridges, trestles, culverts, buildings, signals, crossing protection devices, communication lines and poles that are affixed on the date of this Agreement to the land between the above-described points (hereinafter collectively referred to as the "Line");

    (b)  all of Seller's railroad equipment and other personalty, including, without limitation:

        (i)     diesel locomotive number 2 (a forty-four (44) ton locomotive);



(ii)    diesel locomotive number 5 (a forty-four (44) ton locomotive);

(iii)    diesel locomotive number 7 a (fifty (50) ton locomotive);

(iv)    one flat car;

(v)    one tie remover/inserter;

(vi)    one spray car; and

(vii)    all parts, inventory, equipment and tools regarding the maintenance and operation of the Line and the foregoing equipment.

(c)  all real property of Seller, together with all improvements, attachments, fixtures and personalty attached thereto or located thereon and all rights, privileges, easements, hereditaments and appurtenances associated therewith including, without limitation, the following (collectively, the "Subject Property"):

(i)    the real property consisting of approximately ___ acres adjacent to the Line located at _____, Hartwell, Georgia as described on Exhibit "A-2" and including the depot building located thereon;

(ii)    the real property consisting of approximately ___ acres adjacent to the Line located at _____, Hartwell, Georgia as described on Exhibit "A-3" and including the warehouse located thereon;

(iii)    the real property, consisting of approximately ___ acres adjacent to the Line located in Airline, Georgia as described on Exhibit "A-4" and including the maintenance building located thereon; and

(iv)    the real property consisting of approximately ___ acres adjacent to the Line located in Bowersville, Georgia as described on Exhibit "A-5" and including the roundtable located thereon;

(d)  one (1) Chevrolet truck and one (1) Ford truck;

(e)  the name "Hartwell Railway Company", together with all goodwill associated therewith; and

- 2 -

(f) any and all deposits, pre-paid accounts, contract rights, leasehold interests, permits, and other intangible property associated with any of the foregoing including, without limitation, those listed on Exhibit "B".

2. **Liabilities and Encumbrances.** The Assets shall be conveyed or assigned by Seller to Purchaser, free and clear of any and all liens, claims and encumbrances, except for such immaterial easements, uses and rights-of-way which do not adversely affect Purchaser's use of the Assets; and Purchaser shall not assume any liabilities or obligations of Seller of any nature, unless otherwise specifically provided for herein. Purchaser may pay any or all of the Purchase Price (as defined below) to discharge any liabilities to which the Assets are subject.

3. **Earnest Money.** Concurrently with the execution of this Agreement, Purchaser has deposited Five Thousand Dollars ($5,000.00) (the "Earnest Money") with Seller's attorney, the payment and receipt of which is hereby acknowledged by Seller, to be held as earnest money for the sale and purchase of the Assets. In the event this Agreement is terminated pursuant to Section 21(a) or 21(b), Seller shall immediately return the Earnest Money to Purchaser. In the event this Agreement is terminated by Seller pursuant to Section 21(c), Seller shall be entitled to retain the Earnest Money as liquidated damages as full and complete satisfaction of any and all claims Seller may have against Purchaser.

4. **Purchase Price.** The aggregate purchase price ("Purchase Price") for the Assets shall be One Hundred Eighty-Five Thousand Dollars ($185,000.00). At the Closing (as defined herein), the Earnest Money shall be applied against the Purchase Price and the balance of the Purchase Price shall be payable in cash or by check. Purchaser has concurrently delivered to Seller a letter from Purchaser's bank, confirming Purchaser's financial activity to pay the Purchase Price.

5. **Commission Approval.** Purchaser shall file with the Interstate Commerce Commission ("ICC") a petition for exemption concerning Purchaser's acquisition and operation of the Line. Seller agrees to pay one-half (1/2) of Purchaser's legal fees (up to Four Thousand Dollars ($4,000.00)) incurred in connection with applying for and obtaining such ICC exemption.

6. **Conveyance.**

(a) Conveyance of the Line shall be made to Purchaser by limited warranty deed, in form and substance satisfactory to Purchaser, with a warranty that the Line to be conveyed to

- 3 -



Purchaser hereunder is free and clear of all mortgages, deeds of trust, financing statements and other liens and encumbrances created by Seller. The Line shall, however, be subject to: reservations, exceptions and restrictions of record; building, zoning, subdivision and other applicable federal, state, county, municipal or local laws, ordinances and regulations; taxes and assessments, both general and special which may become due or payable on or after the Closing Date; any and all existing ways and servitudes, public utility easements and rights-of-way howsoever created for crossings, roads, streets and highways.

(b)  Conveyance of the Subject Property shall be made by limited warranty deed, in form and substance satisfactory to Purchaser, free and clear of any and all liens, claims and encumbrances except those certain encumbrances listed on Exhibit "C" (the "Permitted Encumbrances").

(c)  Seller shall convey by quitclaim deed all of Seller's right, title and interest in real property in the State of Georgia.

(d)  Seller shall be responsible for and shall pay any and all costs and expenses for title inspection, subdivision approvals, surveys, transfer taxes, sales and use taxes, fees, stamps, charges and all documentary, recording or filing fees with respect to the transactions provided for herein.

7.  Proration of Taxes and Charges.  Any real and personal property taxes and charges for or taxes on water, sewer and utilities pertaining to the Assets shall be prorated, adjusted and apportioned between Purchaser and Seller as of the Closing Date.

8.  Assignment of Agreements.  At and as of the Closing, Seller will assign to Purchaser, and Purchaser will assume, all of Seller's rights and obligations in the contracts, agreements and leases pertaining to the Assets, attached hereto collectively as Exhibit "B" (the "Business Agreements").  Purchaser shall be entitled to all revenues for pre-paid freight and freight in route with respect to the Line as of the Closing Date.

9.  Representations and Warranties of Seller.  Seller hereby represents and warrants to Purchaser the following, which representations and warranties are true and complete on the date hereof and shall be true and complete on the Closing Date and shall be unaffected by any investigation now or hereafter made by Purchaser:

(a)  Seller is a corporation duly and validly organized and existing and in good standing under the laws of the State of Georgia and is duly qualified to do business in and

- 4 -



is in good standing in Georgia. Seller has full corporate power and all necessary permits and franchises to carry on the business of the Line as it is now being conducted and to own or control the Line and the Assets and to execute, deliver and perform this Agreement.

(b) The execution, delivery and performance of this Agreement by Seller have been duly authorized by all necessary corporate action by Seller, including, without limitation, approval by the Board of Directors and Shareholders of Seller, and does not and will not breach or violate any law, judgment, order, or decree, the Articles of Incorporation or By Laws of or pertaining to Seller or any contract or agreement to which Seller is a party or by which it or any of its properties are bound.

(c) This Agreement is valid and legally binding upon Seller and enforceable against Seller in accordance with its terms subject to usual equitable principles and subject to the limitations on enforcement created by or arising under any bankruptcy, insolvency or other laws of general application affecting enforcement of creditor's rights.

(d) No statement of a material fact by Seller contained in this Agreement and no written statement of a material fact furnished or to be furnished by Seller to Purchaser contains or will contain any untrue statement of a material fact or fails, to Seller's actual knowledge, to contain all information necessary to make the statement or statements contained therein not materially misleading.

(e) The Business Agreements constitute all the contracts, leases, licenses and other agreements to which Seller is a party which affect the Assets in any way. All contracts, leases, licenses and other agreements constituting the Business Agreements are in full force and effect and are valid and binding obligations of the parties thereto in accordance with their respective terms. No event of default or other occurrence which after a period of time or upon notice would constitute a default or breach under the Business Agreements has occurred or is in existence. No prepayment, deposit or other payment for services to be performed in the future has been made or on the Closing Date will be made to Seller.

(f) Seller has duly filed all federal, state and local tax returns and reports required to be filed by it; and Seller has paid in full or made adequate provision for all taxes, interest, penalties, assessments or deficiencies shown to be due by Seller to any taxing authority or otherwise due and owing, except for those for which payment

- 5 -



is being contested in good faith by Seller by appropriate proceedings.

(g)  There is no litigation, proceeding, labor dispute or governmental investigation of any kind pending or, to Seller's knowledge, threatened against Seller or in any way concerning the Assets.

(h)  Seller is the sole, true and lawful owner of the Assets and the Assets are free and clear of any and all liens, claims and encumbrances except for those listed on Exhibit "D".  Seller shall transfer, assign and deliver good and marketable fee simple title to the Assets, except as otherwise provided in Section 6(a), to Purchaser free and clear of any such liens, claims and encumbrances except for the Permitted Encumbrances.

(i)  The Assets are not subject to and Seller has not entered into any agreement regarding the sale, transfer or assignment of the Assets.

(j)  Seller has not received any notice of, and has no knowledge, information or belief of, any governmental assessments affecting the Assets which are unpaid (except ad valorem taxes for the current year), whether or not they have become liens, or any assessment or assessments which are or may become payable in installments.  Seller has not received any notice that the Assets or any portion or portions thereof is or will be subject to or affected by any special assessments, whether or not presently a lien thereon.  Seller has not received any notice that the Assets or any portion or portions thereof or any interest therein is or will be subject to or affected by any condemnation or similar proceedings.

(k)  Seller is conducting and has in the past conducted its business in accordance with all applicable federal, state and loca. laws, rules and regulations, including all applicable occupational safety and environmental laws, and Seller has not received any notice of any claimed violation of any such laws, rules or regulations.  All of the licenses, permits, authorizations and approvals required by all governmental authorities having jurisdiction have been issued for the operation of Seller's business and the Assets as now being used, and are in full force and effect, all fees and charges payable with respect thereto have been paid and Seller is in compliance thereof.

10.  **Representations and Warranties of Purchaser.**  Purchaser hereby represents and warrants to Seller the following, which representations and warranties are true and complete on the date

- 6 -

hereof and shall be true and complete on the Closing Date and shall be unaffected by an investigation now or hereafter made by Seller:

(a) Purchaser is a corporation that is duly and validly organized and existing under the laws of the State of Georgia and is duly qualified to do business in and is in good standing in Georgia. Purchaser has full corporate power and authority to execute, deliver and perform this Agreement.

(b) The execution, delivery and performance of this Agreement by Purchaser have been duly authorized by all necessary corporate action by Purchaser and does not and will not breach or violate any law, judgment, order, or decree, the Articles of Incorporation or By Laws of Purchaser or any contract or agreement to which Purchaser is a party or by which it or any of its properties is bound.

(c) This Agreement is valid and legally binding upon Purchaser and enforceable against Purchaser in accordance with its terms subject to usual equitable principles and subject to the limitations on enforcement created by or arising under any bankruptcy, insolvency or other laws of general application affecting enforcement of creditor's rights.

11. <u>Conditions to Closing.</u> The obligation of Purchaser to close the purchase of the Assets shall be subject to the satisfaction, at or prior to Closing, of each of the following conditions:

(a) The ICC shall have issued an order approving or exempting from regulation Purchaser's acquisition and operation of the Line.

(b) All other consents, permits and approvals required for the sale and assignment of the Assets shall have been obtained.

(c) Seller shall have delivered to Purchaser a copy of all leases, agreements and other material documents regarding the operation and ownership of the Line and the other Assets.

(d) Purchaser's due diligence shall reveal that the Assets are satisfactory for Purchaser's purpose in all respects and that no material adverse condition exists with respect to the Assets.

- 7 -



(e) All of Seller's representations and warranties shall be true and correct at Closing.

(f) The Assets shall not suffer or be threatened with any material adverse changes or development.

(g) The representations and warranties made by Seller in this Agreement shall be true and correct on and as of the Closing Date with the same effect as though such representations and warranties had been made or given on and as of the Closing Date, and Purchaser shall have received a certificate from an executive officer of Seller to that effect.

(h) Seller shall have delivered or caused to have been delivered to Purchaser (i) a certificate of incumbency, (ii) copies, certified by Seller's officers, of the Articles of Incorporation and By-laws of Seller and resolutions of Seller's Board of Directors and Shareholders authorizing the execution, delivery and performance of this Agreement and authorizing the acts of the officers and employees in carrying out the terms and provisions hereof, and (iii) a certificate from the proper state officials evidencing the good standing of Seller in Georgia.

(i) Purchaser shall have received from counsel for Seller a written opinion, dated as of the Closing Date, addressed to Purchaser in form attached hereto as Exhibit F.

(j) All proceedings, corporate or otherwise, to be taken in connection with the transactions contemplated by this Agreement and all appropriate documents incident thereto shall be satisfactory in form and substance to Purchaser; and Seller shall have made available to Purchaser for examination the originals or true and correct copies of all records and documents which Purchaser may reasonably request in connection with the transactions contemplated hereby.

12. Closing. The consummation of the sale of the Assets (the "Closing") will take place on or before April 30, 1990 (the "Closing Date"). At the Closing, Seller shall deliver to Purchaser the deeds referred to hereinabove, owner's affidavits, a Bill of Sale for the other Assets, and all such other documents and instruments as shall be reasonably requested by Purchaser or Purchaser's title insurance company to fully effect the sale of the Assets pursuant to the terms of this Agreement; Purchaser shall deliver to Seller the purchase price specified hereinabove; and Seller and Purchaser shall enter into the assignment and assumption of Business Agreements concerning the Line, all as described hereinabove. Exclusive possession of the Assets shall

- 8 -



be delivered to Purchaser at the Closing. Seller shall bear all risk of loss with respect to the Assets prior to Closing.

13. **Closing Costs.** Seller shall be responsible for and shall pay any and all costs and expenses for transfer taxes, sales and use taxes, fees, stamps, charges, and all documentary, recording or filing fees with respect to the sale of the Assets.

14. **Proration of Taxes and Charges.** Any and all real and personal property taxes and charges for water, sewer and utilities pertaining to the Assets shall be prorated, adjusted and apportioned between Purchaser and Seller as of the date of the Closing.

15. **Expenses.** All legal and other costs and expenses incurred in connection with the Closing of the sale of the Assets shall be paid by the party or parties incurring such expenses (except as otherwise provided in Paragraph 5 above).

16. **Employees.** After the Closing, Purchaser may, in its discretion, employ certain of Seller's employees upon terms and conditions acceptable to Purchaser. Purchaser will not be liable for or assume any other employment contracts, benefits, accrued vacation, or any other employment liabilities of any kind including liability for wages, salaries, pensions, or employment taxes, all of which Seller shall pay, discharge or otherwise provide for at Closing.

17. **Due Diligence.** Purchaser and its representatives may, at reasonable times, visit the premises of Seller and inspect the Assets, and Seller shall provide full access to Purchaser and its representatives to all of the books, properties, contracts, commitments and records of Seller for the purpose of examining and conducting a prudent due diligence inquiry of Seller's operations and the Assets, including, at Purchaser's option, an environmental survey. Seller and its officers, employees and agents shall cooperate and assist in every respect with Purchaser and its representatives in connection with this inspection.

18. **Use of Name.** Purchaser agrees to operate the Line under the name "Hartwell Railroad Company" after the Closing Date. Seller agrees to change its name promptly after Closing to a name bearing no resemblance to "Hartwell Railway Company."

19. **Management Prior to Closing.** Seller hereby agrees that from the date of this Agreement until the Closing, Seller will operate and manage the Line as follows:

(a) Except as otherwise provided below, Seller will be responsible for all costs and expenses incurred in connection with the management and operation of the Line,

- 9 -



(b) Seller at its expense will provide materials, including without limitation, cross ties and spikes, determined by Purchaser to be necessary or appropriate for the maintenance, repair and operation of the Line. The materials supplied by Seller will be included in the Assets without any increase in the Purchase Price. However, in no event shall the cost of materials exceed $5,000.00.

(c) Purchaser will provide labor to replace and install the cross ties and spikes, at no expense to Seller, except, Seller will reimburse Purchaser for travel expenses ($.25 per mile for cars and $.32 per mile for trucks) and meals ($10.00 per day per employee) incurred by Purchaser or its employees in connection with such replacement and installation.

(d) Seller hereby releases Purchaser and agrees to indemnify Purchaser, its employees and agents, against any and all loss, liability and expense resulting from or arising out of all actions of Purchaser taken in connection with the terms of this Section 19.

(e) Seller shall diligently conduct its business and maintain its Assets in the ordinary course of business and in a manner consistent with prudent business practices.

20. **Brokerage Indemnification.** Seller represents that it has not engaged any broker or finder and shall indemnify Purchaser against any and all claims for the payment of brokerage commissions or finders fees in connection with the transactions contemplated herein.

21. **Termination.**

(a) This Agreement may be terminated by written agreement between Purchaser and Seller without further liability or obligation.

(b) This Agreement may be terminated prior to the Closing by Purchaser without further liability or obligation, in the event of any of the following: (1) the ICC fails or refuses to approve the transaction provided herein or issues an injunction prohibiting the consummation of the transactions as contemplated herein; or (2) any representation or warranty of Seller herein is not true and complete on the date hereof or the Closing Date, or (3) Seller has failed to perform any of its covenants or obligations hereunder prior to Closing.

(c) This Agreement may be terminated prior to the Closing by Seller without further liability or obligation in the event any

- 10 -

representation or warranty of Purchaser herein is not true and complete on the date hereof or the Closing Date, or Purchaser has failed to perform any of its covenants or obligations hereunder prior to Closing.

22. **Indemnification**.

(a) Seller hereby indemnifies and agrees to hold harmless Purchaser, its officers, directors, shareholders, and agents, from and against any and all losses, damages, liabilities, costs, obligations and expenses (including, without limitation, all expenses and fees of counsel) incurred by them, or any of them, as a result of: (1) a breach of any covenant, representation or warranty of Seller herein; (2) the failure of Seller to perform or comply with any covenant, agreement or duty required by this Agreement to be performed or complied with by Seller; or (3) the ownership or operation of the Assets before the Closing.

(b) Purchaser hereby indemnifies and agrees to hold harmless Seller, its officers, directors, shareholders, and agents, from and against any and all losses, damages, liabilities, costs, obligations and expenses (including, without limitation, all expenses and fees of counsel) incurred by them, or any of them, as a result of (1) a breach of any covenant, representation or warranty of Purchaser herein; (2) the failure of Purchaser to perform or comply with any covenant, agreement or duty required by this Agreement to be performed or complied with by Purchaser; or (3) the ownership or operation of the Assets after the Closing.

23. **Entire Agreement, Waivers and Expenses**. The foregoing constitutes the entire agreement between Purchaser and Seller concerning the purchase and sale of the Assets and supersedes any and all other prior understandings and agreements, both written and oral, between or among Purchaser and Seller with respect to the subject matter hereof, including, without limitation, that certain letter of intent dated February 22, 1990. This Agreement may be supplemented, amended or modified at any time and in any and all respects only by an instrument in writing executed by Purchaser and Seller. Purchaser and Seller understand that no joint venture or fiduciary relationship between or among them is contemplated by either Purchaser or Seller in connection with this Agreement. Except as otherwise provided herein, any and all expenses incurred by either Purchaser or Seller in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such expenses. Time is of the essence of this Agreement.

24. **Assignment, Survivors and Third Party Beneficiaries**. This Agreement shall be binding upon Purchaser and Seller, and their respective successors and assigns. The terms and

- 11 -



conditions of this Agreement shall survive Closing and the
delivery of the deed(s) and other instruments, notwithstanding
any language to the contrary therein. After the Closing, this
Agreement may not be terminated or rescinded unless mutually
agreed to in writing by the parties hereto. Nothing contained in
this Agreement is intended to or shall be construed to confer
upon any party other than Purchaser and Seller and their
respective successors and assigns any right or benefit under or
by reason of this Agreement.

25. **Nonassumption of Liabilities.** Except as to those
Business Agreements pertaining to the Line which Purchaser agrees
to assume under Section 8 hereinabove, Purchaser shall have no
obligation or liability for any claim or cause of action
involving the ownership or operation of the Assets prior to the
Closing, and Seller shall have no obligation or liability for any
claim or cause of action involving the ownership or operation of
the Assets after the Closing.

26. **No Encumbrances.** Seller covenants and agrees that from
the date hereof to the Closing Date, Seller will not mortgage,
pledge, or otherwise further encumber the Assets or any portion
thereof.

27. **Joint Cooperation.** Seller and Purchaser shall fully
and diligently support the transactions contemplated herein
before the ICC, courts and all administrative and governmental
agencies. After the Closing Date, each party hereto shall, at
any time and from time to time after the reasonable request of
the other party, furnish such other party with such documents,
instruments, and papers, and shall take all lawful steps as
the other may reasonably require, for the full carrying out of
the purposes of this Agreement.

28. **Applicable Law.** This Agreement shall be construed in
accordance with the laws of the State of Georgia.

29. **Notices.** All notices, demands, requests and other
communications under this Agreement shall be in writing and
properly given if delivered by hand to the party to whose
attention it is directed or, when received, or delivery refused,
if sent, postage prepaid, by United States Registered or
Certified Mail, return receipt requested, addressed as follows:

        (a)  If to Seller:

             Hartwell Railway Company
             Railroad and Jackson
             Hartwell, Georgia  30643
             Attn:  President

- 12 -

With a copy to:

Robert E. Ridgway, Jr., Esq.
Robert E. Ridgway, Jr. Attorney-at-Law
Post Office Box 710
109 Carolina Street
Hartwell, Georgia 30643

(b) If to Purchaser:

The Great Walton Railroad Company
1081 North Cherokee
Social Circle, Georgia 30279
Attn: President

With a copy to:

Troutman, Sanders, Lockerman & Ashmore
Suite 1600
One Ravinia Drive
Atlanta, Georgia 30346
Attn: Robert C. Marshall, Esq.

or to such other address which any party entitled to receive
notice hereunder may hereafter designate to the other party in
writing.

30. **Paragraph Headings.** The paragraph headings set forth
herein are for convenient reference purposes only and are not
meant to, and shall not, affect in any way the meaning or
interpretation of the provisions of this Agreement.

31. **Counterparts.** This Agreement may be executed in two or
more counterparts, each of which shall be deemed an original but
all of which together shall constitute one and the same
instrument.



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed under seal as of the date first above written.

"SELLER"

HARTWELL RAILWAY COMPANY

By: _____
Title: _____

Attest: _____
Title: _____

[CORPORATE SEAL]

"PURCHASER"

THE GREAT WALTON RAILROAD COMPANY

By: _____
Title: _____

Attest: _____
Title: _____

[CORPORATE SEAL]

H:\HPDOCS\EFW\BOB\HARTRCLL.PUS

TROUTMAN, SANDERS, LOCKERMAN & ASHMORE
Candler Building, Suite 1400
127 Peachtree Street, N.E.
Atlanta, Georgia 30303-1810
404/658-8000

Telecopiers:  (404) 658-5947 (7th Floor)
              (404) 221-0469 (Word Processing Center)
              (404) 658-8462 (10th Floor)
              (404) 658-8360 (12th Floor)
              (404) 658-8405 (15th Floor)

Date: March 14, 1990            Time: 10:49am

PLEASE DELIVER THIS TRANSMISSION TO:

Name:              Moreta R. McGee

Company or Firm:   Interstate Commerce Commission

City and State:    Washington, D. C.

Telecopy No.:      202/275-9237

Telephone No.:     202/275-7428

· · · · · · · ·

From:              John R. Molm

Number of Pages (including this cover sheet):

Client/Matter No.: 84047.57935

Message:  _____

          _____

          _____

· · · · · · · · ·

IF PROBLEMS OCCUR, PLEASE CALL 658-5947 (7TH FLOOR), 658-8438 (WORD
PROCESSING CENTER), 658-8465 (10TH FLOOR), 658-8258 (12TH FLOOR),
OR 658-8231 (15TH FLOOR)

**TROUTMAN, SANDERS, LOCKERMAN & ASHMORE**
A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS
ATTORNEYS AT LAW
CANDLER BUILDING, SUITE 1400
127 PEACHTREE STREET, N.E.
ATLANTA, GEORGIA 30303-1810
404-658-8000
CABLE: MARSTRO
TELECOPIER 404-658-8000

JOHN R. HOLM

WRITER'S DIRECT DIAL NUMBER
404-658-8050

March 14, 1990

Ms. Noreta R. McGee                      FD - 31626
Secretary
Interstate Commerce Commission
ATTN: Mail Room (Room #1324)
12th Street & Constitution Avenue, N. W.
Washington, D. C. 20423

Re: Notice of Exemption

Dear Ms. McGee:

This letter is to supplement the Notice of Exemption filed on this day. With respect to the proposed acquisition by Great Walton Railroad Company d/b/a Hartwell Railroad Company of the assets of the Hartwell Railway Company, this is to certify that this transaction involves the acquisition of the assets of a nonconnecting carrier where (i) the railroads would not connect with each other or any railroads in their corporate family; (ii) the acquisition is not part of a series of anticipated transactions that would connect the railroads with each other or any railroad in their corporate family, and (iii) the transaction does not involve a Class I carrier.

Please also note that on page three (3) of the Notice of Exemption, third line, 'Hartwell Railway' should read 'Hartwell Railroad.'

Thank you for your attention to these matters. A hard copy of this letter will be delivered tomorrow.

Very truly yours,

John R. Holm

JRH:jm

cc: Beryl Gordon