IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| HARTWELL FIRST UNITED METHODIST CHURCH, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CASE NO. 3:16-CV-169 CDL |
| HARTWELL RAILROAD COMPANY, F/K/A HARTWELL RAILWAY, AND GREAT WALTON RAILROAD COMPANY, | ) ) ) ) ) | |
| Defendants. | | |

## **DEFENDANTS' CLOSING ARGUMENT**

Defendants Hartwell Railroad Company and The Great Walton Railroad Company (collectively referred to as "Defendants") hereby file this their Closing Argument for the hearing held before the Court on February 9, 2017 respectfully showing the Court as follows:

### **INTRODUCTION**

The present controversy arises from an action filed by Plaintiff in the Superior Court of Hart County wherein Plaintiff sought and obtained an injunction that has prevented the railroad Defendants from being able to use a portion of their 100 year old track in the furtherance of interstate commerce. It is undisputed that the track in question has been a part of the interstate rail network for nearly a century, but inexplicably, has had the ownership of the underlying land challenged for the first time in that 100 years only 3 months ago. This track, the Defendants, and their predecessors (collectively, the railroad industry) have been a part of the most heavily,

1

federally regulated industries that anyone can envision. Further, the actions of Plaintiff have unequivocally denied Defendants access to a portion of its interstate rail network. There can be no question that this constitutes an interference with interstate commerce. Nonetheless, Plaintiff's want to characterize this dispute as one involving primarily state law so as to avoid this Court's jurisdiction and, more importantly, the jurisdiction of the STB. Defendants have already filed with the Court Defendants' Brief in Support of Motion to Dissolve the Injunction (Docket No. 8-1) and Defendants' Brief in Opposition to Motion to Remand (Docket No. 12). Rather than rehash the arguments and repeat the authorities cited therein, the Court is encouraged to re-read these briefs in light of the evidence presented at the hearing. The Court will immediately realize why the vast majority of the evidence presented during the hearing came from Defendants while so little was presented by Plaintiff. The Court correctly recognized that the issue is a mixed question of law and fact and was wise to request such a hearing to get the necessary threshold evidence required to confirm the broad and far reaching application of federal law to the issues at hand. It now has that evidence with nothing submitted by Plaintiff that is in anyway contradictory. The Court will easily be able to see the application of the authorities cited by Defendants in the briefs above to the facts at hand and should readily conclude that the issues presented are solely and exclusively under the jurisdiction of the STB, that there is complete preemption in the field and that this Court has jurisdiction to insure that the Plaintiff follow the correct legal procedure to comply with STB jurisdiction so as to avoid further inappropriate interference with interstate commerce.

**UNDISPUTED FACTS DEVELOPED AT THE HEARING**

Over the course of a day-long hearing, the Court heard substantial evidence submitted almost exclusively by Defendants. From the evidence produced at the hearing, certain salient and uncontroverted facts emerged. First, it is undisputed that the track in question (the runaround

2

track) has existed on the property claimed by Plaintiff since at least 1916, which is now over 100 years. It appears on the valuation map introduced into evidence by the Plaintiff. At that time, it was connected to the main line on the west end of the track. It is also undisputed that this track was extended east across Webb St. by an agreement dated 1919 and that this track was subsequently reconnected to the mainline on the east end and that this connection has been in place as long as anyone can remember with Mr. Anderson testifying it was there and in use at least since the early 1990s when he considered the acquisition of the line that was consummated in 1995. Mr. Bishop confirmed these facts as of the time he came to work for Defendants in 1996. Nothing was submitted at the hearing to suggest that this was not the case for many, many years prior Mr. Anderson's involvement with the line. Plaintiff submitted no evidence to the contrary and Mr. Whittemore acknowledged he could not dispute these facts.

It is also not contested that many years ago, the runaround track became a part of the "interstate rail system" and was utilized in interstate commerce. Mr. Anderson and Mr. Bishop both established that the track was used to allow a locomotive to swap ends on the train at the terminating point on the line so that it could make the return trip to Bowersville with the locomotive on the head end of the train. As Mr. Anderson testified, all activities of the Defendants over the last 20+ years were done under the authority of and in further of their duties to interstate commerce established by the Surface Transportation Board. Again, no contradictory evidence was submitted.

Also established without contradictory evidence is that the portion of the track found on the property claimed by the Plaintiff has never been removed. Mr. Anderson acknowledged that he took the track out of service and removed the rails during the period it was not needed for existing traffic on the line. However, also established as undisputed is the fact that the subgrade,

roadbed, ballast and cross-ties all remained in place, and are still there to the present day. As the evidence showed, they were buried by the Plaintiff during its building project in 2008. This was the same building project where Plaintiff sought and obtained from Defendants' two license agreements (a sidewalk and a sewer line) to cross **BOTH** tracks. (See Defendants' Exhibits 38 and 39). Not only did Plaintiff ask permission to cross property that it now claims it owns, but Plaintiff also submitted to Defendants' its own construction drawings to be used as an exhibit for the license agreements that show Defendants as the owners of the land that is now in dispute. As Mr. Bishop testified, had the Church disclosed its claim to the property at issue, it would not have gotten the license agreements and the issue would have been resolved at the time. Defendants' occupation of the property in question and the existence of the track has been continuous and uninterrupted. Indeed, even Mr. Whittemore admitted on cross examination that until 2015, he was not even aware that the land involving the runaround track might be a part of the Church's property. He admitted, that until 2015, he, like everyone else, believed that land was part of the railroad right of way. With that in mind, how could the track in question NOT be a part of the interstate rail system and thus subject to the exclusive jurisdiction of the STB?

Plaintiff wants to argue that removal of the rails suggests Defendants' intent to abandon, that was contradicted by Defendants' Exhibits 43 and 44 where Mr. Bishop sent letters in 2009, a year after the rail in question was removed, to the City of Hartwell and the Georgia DOT allowing the removal of the crossing (both tracks—mainline and runaround) in Webb Street, provided these authorities agreed to allow re-installation when the needs of the railroad demanded it. If Defendants had intended to abandon this track, they would not have insisted on this reservation of their rights.

The overwhelming and uncontroverted evidence presented at the hearing clearly establishes that the runaround track has existed for many decades and been a part of the interstate rail network. Without any known previous objections, the runaround track has been in place continuously on the property at issue for over 100 years and its location has not moved or been interrupted. It has been used regularly, off and on, for the furtherance if the movement of rail cars in interstate commerce by serving as a runaround track that allows the locomotive to swap ends for the return trip to Bowersville. This is now necessary for many reasons, not the least of which is the safety of the train crews and the public. This uncontroverted evidence establishes the exclusive jurisdiction of the STB and thus the Federal question needed for this Court's jurisdiction.

Now let's turn to the evidence Plaintiff actually produced at the hearing. All of Plaintiff's evidence was directed to the title issue, and even at that, as will be shown below, was less than adequate. In contrast, Defendants did not submit evidence on title because this is a case in which Plaintiff is attempting to interfere with a longstanding facility created and utilized in interstate commerce. As for Plaintiff's witnesses, they brought ONLY Mr. Whittemore to testify. The Court should note that he was offered as the representative for the Plaintiff. He is a retired CPA with no railroad or legal experience. Nonetheless, he was asked to testify about matters of the Church's and the railroads' title. On cross examination he acknowledged that the Church had a title certificate and title insurance, but the Plaintiff did not call the title attorney. Instead, they put up a layman who has no real personal knowledge, experience or expertise. Also of note is that the Plaintiff used Mr. Whittemore to tender Plaintiff's Exhibit 1, "the survey". This is the sole document Plaintiff has provided in support of their claim to title to the land in question. To Defendants' knowledge, Plaintiff has not put into evidence its own deed for the property in question. Since this is not a case involving title to land, Defendant has not done so either, but the

5

Court should note the absence of Plaintiff's proof on this issue. When asked if the "survey" was prepared to the professional standards of a surveyor, Mr. Whittemore's answer was something to the effect of "I presume so." He simply didn't know. Of note, Plaintiff did not bring the actual surveyor so that he could be cross examined and the inadequacies of his survey brought to the Court's attention. Plaintiff asserts that since the surveyor drew the boundary line here, it must be the Church's land. However, that begs the question, why did the surveyor conclude that a railroad track in place for over 100 years was not on railroad property? What was the extent of his investigation that could lead to such a conclusion? Since Defendants were unable to ask the surveyor at the hearing, and the Court was unable to hear the answer, Defendants are left only with the note that appears on the document itself [#2], blown up and inserted below:

> NOTES:
> 1) SURVEY IS VALID ONLY IF PRINT HAS ORIGINAL SEAL AND SIGNATURE OF SURVEYOR.
> 2) SURVEYOR HAS MADE NO INVESTIGATION OR INDEPENDENT SEARCH FOR EASEMENTS OF RECORD, ENCUMBRANCES, RESTRICTIVE COVENANTS, OWNERSHIP TITLE EVIDENCE, OR ANY OTHER FACTS THAT AN ACCURATE AND CURRENT TITLE SEARCH MAY DISCLOSE.

The "survey" itself reflects on its face that there was no investigation as to title. Thus, this is not a survey at all, but merely a drawing that does not establish as a fact for the Court that the line drawn is the actual boundary line for the Church's property or that of the Defendants. This disclaimer was included on this drawing to avoid a violation of Ga. Comp. R. & Regs. R. 180-7-.02, the regulations of the State of Georgia governing licensed surveyors in the performance of

their duties, because the surveyor did not perform the required investigation prior to preparing the document in question. (A copy of this specific regulation is attached hereto as Exhibit A.) This disclaimer is why the surveyor was not brought to testify. He would not have supported the Plaintiff's claim for title. Indeed, the "construction drawing" provided by the Church to Defendants for use with their license shows that at least one other surveyor disagrees with the information represented in Plaintiff's Exhibit 1.

Finally, on the "title" issue, Plaintiff ignores one huge glaring issue and refuses to address it. By its own admission, Plaintiff acknowledges that "[r]esearch has not uncovered any documents related to the original construction of the spur outside of the twenty foot right of way on what is now the Church's property." (See Docket No. 5 @ p. 3.) "Research has not uncovered any documents related to the original construction of the spur outside of the twenty foot right of way on what is now the church's property or the rights that the railroad at the time may have had to construct the track there." (See Docket No. 5-1 @ p. 5.) Given that fact, how does Plaintiff now explain the presence of that track on the property in dispute for over 100 years? Are they contending it has been trespassing that long? When did the alleged trespass by the railroad begin? After all, Defendants have now shown their track has been in place since long before Plaintiff bought the property, and it continued in place to the present. The subgrade, roadbed, ballast and cross ties were never removed and continued to belong to the railroad, so the trespass must have been continuous as well. So what prompted the Church to bring the claim now? Clearly their fear of STB jurisdiction and the obvious outcome of their claim. This case is not about the runaround track. It is about the entire right of way belonging to Defendants that the Church wishes to take for its own use. How can they seriously claim they are suffering a trespass with the current track when it was in place and plainly visible at the time they bought the property? Of course, as Mr.

Whittemore admits, at the time of the purchase, everyone at the Church believed the property under the runaround track belonged to the railroad. The issue the Church wants to the Court to completely ignore is, if this property truly belongs to the Church and its predecessors in title, spanning 100 years, how has the railroad been able to exist on the property and use the track without any objection from anyone until now? How is that possible? There is not one shred of evidence that any previous property owner asserted a claim adverse to the railroad's occupancy of the property or objected to its presence. Under these facts, as will be discussed below, even if the Defendants cannot produce evidence of a purchase, their use and occupancy for such an extended period of time vested/ripened for the Defendants some form of possessory right to the property that allowed it to conduct its rail operations and become a party of the interstate rail network. On cross examination, Mr. Whittemore even admitted all the elements of adverse possession for the railroads' interest in the property. Again, Plaintiff produced no evidence at the hearing that controverted Defendants' claim to the property.

To beat a dead horse, the uncontroverted evidence establishes that the runaround track became a part of the interstate rail network and thus subject to STB jurisdiction. Even if the Court were concerned about the title question, as a threshold issue, which it should not be, the evidence presented at the hearing shows more than ample proof of the Defendants' right to be on the property and to continue the conduct of its business as a railroad. Plaintiff has ample opportunity to address any grievance it has for the conduct of the Defendants to the STB, to whom Congress has delegated complete and total control.

## ADDITIONAL LEGAL AUTHORITY

Defendants again refer the Court to its two previous briefs for the extensive authority already submitted. At the same time, The Court is encouraged to recognize that Plaintiff really

has been unable to find a case that supports their position. This is such a well settled area of law, the Defendants would to like to direct the Court to two additional cases which may prove enlightening.

The Court is first directed to consider the decision in the U.S. Supreme Court case of *Thompson v. Texas Mexican Railway Company*, 328 U.S. 134, 66 S. Ct. 937, 90 L. Ed. 1132 (1946). The facts of the case are somewhat convoluted because it involves two different railroads including a bankruptcy of one of them. There are several bankruptcy issues addressed early in the opinion and the I.C.C. (STB predecessor) jurisdiction issue does not appear until the end. In the case, Tex-Mex and Brownsville are each railroads subject to the Interstate Commerce Act. Tex-Mex granted to Brownsville, subject to the payment of rent, the right to use Tex-Mex track. The agreement was subject to termination by either party on twelve months' notice. Like the runaround track, Brownsville used the Tex-Mex track for the movement of freight in interstate commerce. At some point in the future, Brownsville filed bankruptcy and Tex-Mex terminated the agreement. The Bankruptcy Trustee continued to operate Brownsville over the Tex-Mex line, after the lawful termination of the lease. Tex-Mex filed suit in the state court of Texas and got an injunction halting Brownsville's use of the track. Unlike the present suit involving the Church, in the *Thompson* case, there was no issue about ownership of the property. Tex-Mex was the lawful owner of the track and land, and Brownsville's interest was its authority to operate over the line under the ICC. Like Plaintiff in the present case, Tex-Mex did not get permission from the ICC before it commenced its proceedings to obtain the injunction.

Like here, there was the question of whether Tex-Mex must get an order of abandonment from the ICC before it can take actions that would interfere with Brownsville's use of the track.

On this issue, the *Thompson* Court stated unequivocally that even with the proper termination of the contract, Tex-Mex would still be required to obtain an order of abandonment from the ICC before it could interfere with the operations of Brownsville. *Id.* p. 145. "Until abandonment is authorized, operations must continue." *Id.* p. 147. Like in the present case, once the track in question became a part of the interstate rail network, the issue of ownership of the underlying track was irrelevant. "Thus, however the case may be viewed, the court below should have stayed its hand and remitted the parties to the Commission for a determination of the administrative phases of the questions involved. Until that determination is had, it cannot be known with certainty what issues for judicial decision will emerge. Until that time, judicial action is premature. The judgment will be reversed and the cause remanded so that the case may be held pending the conclusion of appropriate administrative proceedings." *Id.* p. 151. The *Thompson* Court establishes without doubt that this is an exclusively federal issue that may only be resolved by the STB. This Court has jurisdiction to insure that Plaintiff follows the proper administrative procedure.

As for the importance of this issue to the STB, the Court is directed to the decision in *Norfolk Southern Railway Company—Adverse Abandonment—St. Joseph County, IN*, STB Docket No. AB-290 (Sub-No. 286) (STB served Feb. 14, 2008), *aff'd sub nom. City of South Bend, IN v. STB*, 566 F.3d 1166 (D.C. Cir. 2009). filed an application for adverse abandonment with the STB for two very short segments of track (3.7 miles and 2.8 miles) owned by Norfolk Southern that the applicants claimed had not been used in over 10 years and were in a state of disrepair. Norfolk Southern neither supported nor opposed the abandonment. However, another railroad that was hoping to acquire the lines objected to the abandonment.

In facts remarkably similar to this case, with the exception of the title issue, the STB denied the petition for abandonment. In reaching its decision, it found even less existing need for the tracks in interstate commerce than is the case here, but instead relied on the possible future need for the track. In our case, there is an uncontroverted present need for the tracks with the clear indication for further demand in the future. These tracks are necessary for the safe service of Quality Plastics. The reason for reference to this STB decision is that this nearly identical proceeding before the STB clearly demonstrates the important Federal interests of the STB to be protected and preserved by this Court. These interests cannot be protected without this Court retaining jurisdiction. Indeed, if Plaintiff's injection of the spurious and unsupported property issue into the present case serves to defeat federal question jurisdiction in an area so heavily preempted, then it is difficult to envision any case where a federal question can be found. If Plaintiff is intent upon forcing the abandonment of the tracks, it must seek authority from the STB. That is its sole remedy. For these reasons, Plaintiff's Motion to Remand should be denied, the Court should retain jurisdiction, and the Court should grant Defendants' Motion to Dissolve the Injunction and require the Plaintiff to proceed, if at all, by pursuing its administrative remedies before the STB.

Respectfully submitted, this 23rd day of February, 2017.

Matthew D. Williams
Georgia Bar No. 763210
**MATTHEW D. WILLIAMS & ASSOCIATES, LLC**
2215 Pilgrim Mill Circle
Cumming, GA  30041
Telephone:  (770) 815-9331
Facsimile: (888) 815-9135
Email:  MWilliams@WilliamsLegalSolutions.com
  *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing **DEFENDANTS' CLOSING ARGUMENT** was served via ECF to:

Walter James Gordon, Sr.
The Gordon Law Firm
P.O. Box 870
Hartwell, GA  30643

This 23rd day of February, 2017.

Matthew D. Williams
Georgia Bar No. 763210
**MATTHEW D. WILLIAMS & ASSOCIATES, LLC**
2215 Pilgrim Mill Circle
Cumming, GA  30041
Telephone:  (770) 815-9331
Facsimile: (888) 815-9135
Email:  MWilliams@WilliamsLegalSolutions.com