IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

---

| | | |
|---|---|---|
| HARTWELL FIRST UNITED METHODIST CHURCH, INC. PLAINTIFF | : | Case No. 3:16-CV-169(CDL) |
| V | : | February 9, 2017 |
| HARTWELL RAILROAD COMPANY, INC., GREAT WALTON RAILROAD COMPANY & HARTWELL RAILROAD COMPANY, INC. DEFENDANTS | : | Athens, Georgia |

---

TRANSCRIPT TESTIMONY OF
WITNESSES AND JUDGE'S DIRECTIVES

BEFORE THE HONORABLE CLAY D. LAND
UNITED STATES DISTRICT JUDGE PRESIDING

APPEARANCES:

FOR THE PLAINTIFF: WALTER JAMES GORDON, SR.
P.O. BOX 870
HARTWELL, GA 30643
776-376-5418

FOR THE DEFENDANTS: MATTHEW D. WILLIAMS
2215 PILGRIM MILL CIRCLE
CUMMING, GA 30041
770-815-9331

---

TAMMY W. DIROCCO, USCR
P.O. BOX 539
MACON, GA 31202-0539
(478-752-3497)

# I N D E X

FEBRUARY 9, 2017

BENNIE RAY ANDERSON - WITNESS


| ATTORNEY: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MR. WILLIAMS | 5 | | | |
| MR. GORDON | | 44 | | |
| MR. WILLIAMS | | | 90 | |
| MR. GORDON | | | | 102 |
| MR. WILLIAMS | | | 105 | |


JONATHAN TALBOT COLEHOWER - WITNESS


| ATTORNEY: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MR. WILLIAMS | 107 | | | |
| MR. GORDON | | 113 | | |


CHARLES DAVID BISHOP - WITNESS


| ATTORNEY: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MR WILLIAMS | 115 | | | |
| MR. GORDON | | 131 | | |
| MR. WILLIAMS | | | 144 | |
| MR. GORDON | | | | 148 |

JOSEPH WHITTEMORE - WITNESS


| ATTORNEY: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MR. WILLIAMS | | 151 | | |
| MR. GORDON | 189 | | | |
| MR. WILLIAMS | | | | 214 |
| MR. GORDON | | | 214 | |


JUDGE'S DIRECTIVES

JUDGE LAND Page 215

COURTROOM DEPUTY: Do you solemnly swear that your testimony in this case shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT: How are you, sir?

THE WITNESS: Fine, sir.

THE COURT: Good. Just make sure you speak into the microphone. The court reporter has got to take all this down so she needs to hear you; as well as I need to hear you. Tell us your name and spell it for the court reporter.

THE WITNESS: Bennie Ray Anderson. I'm the owner and President of the Hartwell Great Walton Railroad.

THE COURT: Your first name is?

THE WITNESS: Bennie.

THE COURT: Bennie. Spell it for her. She's going to write this down so want to make sure we don't misspell your name.

THE WITNESS: B-E-N-N-I-E (Spelling).

THE COURT: And Anderson is O-N or E-N (spelling)?

THE WITNESS: O-N (spelling).

THE COURT: All right. Y'all can either question him from there, as long as she can hear you, or you can go to the lecture, whatever you are most comfortable doing.

MR. WILLIAMS: I would prefer the lectern, but we had technical difficulties over there.

THE COURT: Okay. So that's not working. All right.

MR. WILLIAMS: With Your Honor's permission, may I remain seated?

THE COURT: Yes. That would be fine.

BENNIE RAY ANDERSON

Witness having been first duly sworn, testified on

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q Mr. Anderson, where were you born?

A Social Circle, Georgia.

Q What year was that?

A 1935.

Q And how far did you go in school?

A Eighth grade.

Q And where did you grow up?

A Social Circle.

Q And tell me about your business background, if you would, please?

A Oh, I've been in several businesses and still am. But I got in the railroad business in 1987, I bought my first one.

Q And which railroad was that?

A That was from Social Circle to Monroe, Georgia.

Q And what's the name of that railroad?

A The Great Walton Railroad.

Q What was your next railroad acquisition?
A The next acquisition was in 1990, bought the Bowersville to Hartwell Railroad.
Q And is that the railroad we're here about today?
A That's correct.
Q And who did you buy that from?
A The Hartwell Railway.
Q That was an asset purchase; is that right?
A That's correct.
Q You created your own company for that purchase?
A That's right. I changed it to Hartwell Railroad.
Q And, when you did that, were you granted operating authority by the Surface Transportation Board?
A That's correct, I did.
Q Actually it was the ICC back then, wasn't it?
A That's right.

THE COURT: When did you say you bought that railroad?

THE WITNESS: 1990.

THE COURT: 1990. Or the assets?

MR. WILLIAMS: For the record, Your Honor -- yeah. The ICCTA was created in 1995, that's when the Surface Transportation Board was created. So it was previously under the ICC.

THE WITNESS: That's correct.

BY MR. WILLIAMS:

Q So you received your operating authority originally from the Interstate Commerce Commission?

A That's correct.

Q And describe that railroad for us, just a little bit. Where does it run and what's it made up of?

A It's a nine mile line. It ran from Bowersville, Georgia to Hartwell, Georgia and it dead end -- the end of the track was in Hartwell. We interchanged with Norfolk Southern at Bowersville.

Q And when you say interchange, what does that mean?

A That means we picked up loads of empty cars to be loaded and carried and unloaded.

Q And what kind of customers did you have on the Hartwell line?

A We had several companies. We have Mica Mines, which would haul sand, and then we had Hartwell Grain and Elevator which would handle corn, wheat and agricultural commodities. Plus Gold Kist was a fertilizer company there in Hartwell. And Monroe -- it was called Monroe back then, which was Monroe Shock Absorbers and they changed the name. Tenneco bought them out, that's when they changed to Tenneco, but we brought oil in to them.

Q You also have a customer called Quality?

A We do have a customer now Quality. They were not on

board in '90.

Q Did you buy anymore railroads after that?

A Yes, sir. I bought the one from Toccoa to Elberton, Georgia in '95.

Q And what's the name of that railroad?

A Hartwell Railroad.

Q Who did you buy it from?

A Norfolk Southern.

Q And is that the railroad that now connects with the Hartwell line in Bowersville?

A That's correct.

Q And who does the Hartwell Railroad that runs from Toccoa to Elberton connect with?

A We connect with Norfolk Southern in Toccoa and a year ago we put in an interchange track with CSX at Elberton. So now we are connected to two Class I railroads.

Q And throughout the history of the Hartwell line, has the Hartwell line always been connected to the interstate rail network as far as you know?

A Yes, sir.

Q Did you buy any other railroads?

A We leased the one in Athens from Center to Madison, Georgia in 2000. And in the agreement we had the right to purchase it and we are in the process of purchasing it now.

Q Is that the railroad track that runs behind Sanford

Stadium?

A That's correct.

Q What are your duties with the railroad?

A All of it, from engineer to working on tracks. That covers all of it. And day to day operations.

THE COURT: You don't swing the hammer knocking down the spikes into the crossties, do you?

THE WITNESS: Occasionally.

THE COURT: You still do that?

THE WITNESS: I still do that.

BY MR. WILLIAMS:

Q And you're a qualified engineer; is that correct?

A That's correct.

MR. WILLIAMS: And, Your Honor, when I say engineer I'm talking about the gentleman that operates the train, not the guy that works on the blueprints.

THE COURT: I understand.

BY MR. WILLIAMS:

Q You're also qualified as a conductor; is that right?

A That's correct.

Q Explain the difference between an engineer and a conductor, please?

A An engineer operates the locomotives and a conductor does the groundwork in connecting cars and the paperwork.

Q Now what is the relation -- we have two Defendants in

the case, we have the Hartwell Railroad Company and we have the Great Walton Railroad Company. What is the relationship between those two companies in terms of the operation of the Hartwell Line?

A The Great Walton owns the Hartwell Railroad, but we just do business as Hartwell Railroad.

Q And both railroads are authorized under jurisdiction of the STB; is that right?

A That's correct.

Q They have operating authority?

A That's correct.

THE COURT: Where do you connect -- how long is the Hartwell line? How many miles?

THE WITNESS: Bowersville to Hartwell is nine miles. It's 48 miles from Toccoa to Elberton.

THE COURT: Okay. And what you call the Hartwell line covers the 53 miles or just the nine miles?

THE WITNESS: At the time we interchange with them at Bowersville it was just the nine mile line. But then when we bought that, of course, that did away with the interchange of Norfolk Southern because it was all us, all the Hartwell Railroad and the Great Walton.

THE COURT: So is there still an interchange there in Bowersville?

THE WITNESS: Well, we got a wye there. We can turn

cars and turn the locomotives. And the wye is very important to the point that you run it back and forth the wheels wear and so you turn them, the locomotives, turn them and run them in the other direction. As well as the visibility now -- we call it a low nose engine versus the old high nose -- you can see the crossings by far better and safer.

THE COURT: So is most of your delivery from Bowersville to Hartwell, is most of your delivery freight that is picked up along that nine mile stretch or is it freight that is delivered from Norfolk Southern to you somewhere else that you then continue the delivery on, say, to Hartwell?

THE WITNESS: That's right. We pick it up in Toccoa or Elberton now, since we interchange, and then we deliver it. And we just look at the Hartwell line now as a customer that we just serve just like we would on that 48.

THE COURT: So most of what you're delivering is first brought to you by Norfolk Southern?

THE WITNESS: That's correct or CSX.

THE COURT: Or CSX. And then there's a freight yard somewhere where it's hooked up to your train?

THE WITNESS: Yes, sir. We own our locomotives as well. And so we just -- we got an interchange track in Elberton and we've got an interchange track in Toccoa. They set them off on designated tracks for us and we pick it up and return the empties back to the designated tracks at what we

call the interchange point.

THE COURT: Okay. Go ahead.

BY MR. WILLIAMS:

Q Can you describe for the Judge what a --

THE COURT: I worked two years at a railroad freight yard in Columbus, Muscogee County for a contractor that built side tracks off of these mainlines. And we also, in addition to laying the side track, we had the terrible job of having to clean out the freight cars when they delivered them back to the freight yard, before they picked them up, to go get new stuff put in them.

THE WITNESS: I understand that.

THE COURT: I'm sure you've done all that?

THE WITNESS: Yes, sir.

THE COURT: I didn't end up owning a railroad though, see, so your work paid off. Mine didn't. But go ahead.

Those are hard working folks, though, swinging that sledgehammer and knocking the spike in those creosote soaked railroad ties. Well, you can't do that for environmental purposes now, can you?

THE WITNESS: No. They still use creosote today but not as much.

THE COURT: They used to like them -- they have a lot in them because it made the spike go down in them easier.

THE WITNESS: That's right.

THE COURT: Go ahead. It's all irrelevant. He and I share a special relationship now.

THE WITNESS: That's right.

MR. WILLIAMS: That's good.

THE COURT: Not that it's going to affect my decision in the case. I want the church to understand that.

MR. GORDON: We understand, Judge.

THE COURT: Go ahead.

BY MR. WILLIAMS:

Q Describe briefly for the Judge what a wye is, please, Mr. Anderson?

A The wye is where we can turn cars like a box car and if it says unload from the other side we'd run it threw that wye and it turns it. It's hard to draw, but it comes down this way and you go back out this way and that puts that door on the other side.

Q It's like making a three-point turn in a car?

A Exactly right.

Q And you have a wye on the west end of the Hartwell line; is that correct?

A That's correct.

Q And for purposes of my questions, Mr. Anderson, the part between Bowersville and Hartwell I'm going to refer to as the Hartwell line and the part that runs from Toccoa to Elberton I'm going to refer to as the Toccoa line?

A That's correct.

THE COURT: I'm not sure I understand the wye. So at the end of the Hartwell track it just ends?

THE WITNESS: That's correct.

THE COURT: So you've got to find some way to turn the engine around?

THE WITNESS: That's the purpose. Can I explain that?

THE COURT: Yes. But how did it work -- how did it work prior to it going out -- when did the mainline that terminates there near the church, when did it go out of service?

THE WITNESS: The mainline, that's as far as it has ever been.

THE COURT: At the church?

THE WITNESS: It always dead ends into the track, we call it, at Hartwell.

MR. WILLIAMS: Your Honor, just so we're clear, it terminates two blocks east of the church.

THE COURT: Okay. So how did you get the engine to go back the other way?

THE WITNESS: It had a turntable back in the steam engine days and the steam engine primarily was built to operate one direction. So, in Hartwell there's a track right where we refer to as this runaround track. The track went in, the

locomotives went up on the turntable and it turned it and it came back out. Then it hooked onto the cars, went to Bowersville. That was the purpose of the wye in Bowersville. It went out this track and came back down this one and came back in there and picked up its cars. So that's how it was turned at Bowersville and the turntable in Hartwell.

THE COURT: So when it went down the wye it didn't turn around down there, it just went down there and then came back?

THE WITNESS: That's correct. And today -- now since the diesel locomotives came into play that's when this track was -- it was put in prior to the diesel era, but that's when the runaround was used, been used for a long time to runaround to get to the other end of the cars. You bring the cars in, the cut off cars go past the switch, throw it and come back through the runaround and throw the switch out and come back and hook to these cars and go to Bowersville.

THE COURT: So you don't have to push them back?

THE WITNESS: Uh-uh (Negative).

THE COURT: You're pulling the whole way?

THE WITNESS: That's right. For safety reasons, economics and all, that's why the runaround was there and it has been used since -- golly in the 1930s. This runaround has been in place and we used it up until we didn't have a need for it at that time and now we have got a need because we've

got this customer that has bought the Quality Industries and their business is mighty good and it's good for the community and it's good for the railroad as well.

THE COURT: So how does the runaround -- it doesn't turn the train around? Does the train actually have to take the -- it seems like it would take a big wide turn to have to turn it around. How does the runaround work compared to the way the old table used to work with the steam engine?

THE WITNESS: Well, it does. The wye is along this way to go out on what we used to call the mainline from Toccoa -- I mean, when Norfolk Southern owned it. And then we went down the mainline, threw the switch and come back through it. We called it the south switch, the north switch and the tail switch. So you'd either go out either one you wanted to and come back and go the other way. And then you hooked these cars and carried them to Hartwell. The runaround that we're discussing here today and for us to prove and show --

THE COURT: But the locomotives, are they designed so that they can go either direction equally efficiently?

THE WITNESS: Yes.

THE COURT: In other words, there's no front end to the locomotive, correct?

THE WITNESS: We've got a definition of F on the front, but we call that because of the visibility, that is the front. But it will run -- it's got a forward and reverse is

all it's got and then it's got the automatic brake, the independent brake and --

THE COURT: So are you running it -- it doesn't run in reserve as efficiently as it does forward or it does?

THE WITNESS: No, it doesn't make any difference. It will run --

THE COURT: It doesn't make any difference?

THE WITNESS: They are designed to operate at about 70 miles an hour on a Class I railroad, Norfolk Southern or CSX.

THE COURT: So if you've got the locomotive coming into Hartwell and let's say that it's going with the -- is there a window -- which side is the engineer on? On the left or the right?

THE WITNESS: He's on the right side.

THE COURT: So if he's coming into Hartwell and the engineer is there at the window on the right?

THE WITNESS: That's correct.

THE COURT: When he is leaving Hartwell is he then at the rear of the train on the window on the left or does the train go through the runaround and completely turn around, make a 360 turn so that he's on the right?

THE WITNESS: No, sir. It goes back still sitting on the right-hand side.

THE COURT: So it makes a complete 360 turn or he

just changes seats?

THE WITNESS: No. He goes in this way and he runs through this runaround but he's still on what we call the engineer's side and it's still a definition of the fireman's side on the other side.

THE COURT: So he stays on the same side --

THE WITNESS: He stays on the same side.

THE COURT: -- when he's going into Hartwell and when he's leaving Hartwell?

THE WITNESS: That's correct.

THE COURT: So if going into Hartwell he's in the front, when he's leaving Hartwell he's going in reverse?

THE WITNESS: That's right.

THE COURT: The train is not doing a full 360 turn in the runaround?

THE WITNESS: No, sir.

THE COURT: The purpose of the runaround is so you can get the train situated on the right tracks in relations to the cars it has got to pull back?

THE WITNESS: We refer to "on the other end".

THE COURT: Right.

THE WITNESS: Right. But --

THE COURT: But the train is going the same way?

THE WITNESS: That's right. We call it the long end and the short end.

THE COURT: All right. Go ahead.

MR. WILLIAMS: Your Honor, if I may.

BY MR. WILLIAMS:

Q Mr. Anderson, if you would look at what's on the screen in front of you. Do you recognize the area in the photograph?

A I do.

Q Can you point to the church property there?

A (Complies). It's not real clear but --

MR. WILLIAMS: And I understand he can write on that?

THE COURT: Yeah. He can put his finger on there and it will make a mark wherever he puts his finger on the screen.

THE WITNESS: (Marking on screen). Right there is the church property.

BY MR. WILLIAMS:

Q And do you see the runaround track shown on that --

MR. WILLIAMS: I took the liberty, Your Honor, of drawing the railroad track in with a yellow line to simplify things.

BY MR. WILLIAMS:

Q Does that yellow line reflect roughly where your railroad track is?

A That's correct. Then the runaround track is the short part of it.

Q And that runaround track, where is the east switch on

that runaround track?

THE COURT: Which way is this going?

MR. WILLIAMS: Up is north. So west is to the left and east is to the right.

THE COURT: Which way is Hartwell? Are we in Hartwell?

MR. WILLIAMS: This is downtown Hartwell.

MR. GORDON: Downtown Hartwell.

THE COURT: And Bowersville is back to the east?

MR. WILLIAMS: To the west.

THE WITNESS: To the west.

THE COURT: To the west, okay. So it ends right here at this road down here on the far right end of the picture?

MR. WILLIAMS: Where the yellow line ends is where the railroad ends.

THE COURT: Okay.

BY MR. WILLIAMS:

Q Mr. Anderson, if you could -- and I don't know if you can do it with your finger or not.

THE COURT: Just draw a circle around it -- well, I see where the church is. Right there where your arrow is?

MR. WILLIAMS: That's right.

THE COURT: What was the next question.

BY MR. WILLIAMS:

Q And, Mr. Anderson, this is the west switch right here where my cursor is?

A That's correct.

Q And the east switch is over here?

A That's correct.

Q And where is Quality in this picture? It's going to be further down just out of the picture, right?

A That's right.

Q And Quality is currently the primary customer you're serving on the Hartwell line; is that right?

A That's correct.

THE COURT: Well, why do you have to have the runaround unless you got cars that you've been pulling that you need to put on this -- park on this mainline? Why do you need that runaround? Unless down on that end -- somebody is moving the picture.

MR. WILLIAMS: I am. I'm trying to find one that might answer your question, Judge.

THE COURT: Does the reason you need the runaround would it not be to park cars on the one line so you can put the locomotive on the other and clear the way?

THE WITNESS: Yes, sir. We work Quality and then we were going to pull these empty cars out of Quality because we work them.

THE COURT: You're going to pull them down to the mainline?

THE WITNESS: Pull them down on the mainline and cut them off or cut off from them and then throw the switch --

THE COURT: And come back on the runaround?

THE WITNESS: -- the engines runs back through the runaround and gets them on the other end.

THE COURT: Because you can't get through the other way because that's where your parked empty cars are?

THE WITNESS: That's right.

THE COURT: So you're going to unload them upstream, come down when they're unloaded, park them on that side line and then come back up to the runaround, go past them, come back and attach to them and then pull them out empty?

THE WITNESS: That's correct.

THE COURT: Okay.

BY MR. WILLIAMS:

Q Mr. Anderson, look at the left-hand corner of the photograph that you have before you. Do you see Quality in there?

A I do.

Q Do you see the Quality siting for the industrial lead for Quality?

A I do.

Q Can you point to that for the Judge, please?

A The switch is -- I'm going to put my finger right there. That's the switch right there and that's their siding going in to Quality's --

THE COURT: Who is Quality again?

MR. WILLIAMS: Tell him who Quality is, Mr. Anderson.

THE WITNESS: Quality is -- I'll put my finger right on top of it.

THE COURT: But what do they do?

THE WITNESS: They pulverize -- they get plastic in and it's in pellet form and they pulverize it for several different customers that they've got. And we're taking the loaded cars in to them now for that reason and they are also telling us that they are going to start loading cars and send them back out to their customers that are served by rail at different locations.

THE COURT: So what part of this line down here by the church is no longer used? Is the mainline still there?

THE WITNESS: Yes, sir.

THE COURT: It's used?

THE WITNESS: Yes, sir, we can use it. It's serviceable.

THE COURT: What's not serviceable?

THE WITNESS: The runaround was not serviceable, but we got a need for it now because we have got this customer up there.

THE COURT: Okay.

THE WITNESS: And so we were rehabbing it when we had the stop order.

THE COURT: So before you had Quality you didn't have any need, at the moment, for the runaround because you weren't bringing freight down that far down the line, correct?

THE WITNESS: That is correct.

THE COURT: So how long ago -- how long has it been that you've had Quality?

THE WITNESS: The new owners bought it about nine months ago or ten months ago.

THE COURT: So you haven't served them yet?

THE WITNESS: Yes, sir, we're serving them now.

THE COURT: But you're serving them without the runaround?

THE WITNESS: Without the runaround.

THE COURT: So you're bringing the cars in and backing them into their sidetrack?

THE WITNESS: That's correct.

THE COURT: Then leaving them there -- are you having to push them back or are you pulling them back?

THE WITNESS: We pull them out and then we have to push them back, which is not safe. So that's why we have spent the money to rehab the track, as we call it, all the way -- the mainline and was rehabbing the runaround, that way we could

better serve the customers. They already -- they were getting one car at a time in and now they get up to three cars and looking for more.

THE COURT: So the track that's parallel to the mainline, which you call the runaround --

THE WITNESS: Yes, sir.

THE COURT: -- that's where you want to do this construction that the Hartwell Judge has stopped you from doing?

THE WITNESS: That's correct. And there's always been a --

THE COURT: Is there no track there?

THE WITNESS: Yes, sir, the track is there now.

THE COURT: But you got to get it up to standard?

THE WITNESS: We were doing that until the stop order. We put heavier rail back and replaced the old light rail with heavy rail.

THE COURT: In the exact location?

THE WITNESS: In the exact location. And to clarify that it was and still is a runaround, the east switch and the west switch to the mainline is still there. It's still in service today.

THE COURT: Since you've owned the Hartwell line -- that was 1990 you bought it?

THE WITNESS: Yes, sir.

THE COURT: Have you used the mainline from this -- is it Camp? Is that what we said?

THE WITNESS: Quality.

THE COURT: Quality. Quality?

THE WITNESS: Yes, sir.

THE COURT: Have you used the mainline from that Quality wye down to the runaround?

THE WITNESS: Yes, sir. We used that. Tenneco is there now, the shock absorbers, they make them, which used to be Monroe.

MR. WILLIAMS: Show him where Tenneco is on the drawing, Mr. Anderson.

THE WITNESS: (Complies) Let's see where -- Tenneco is right here. (marking on diagram)

THE COURT: So what part of this mainline has not been in use? Has all of the mainline been in use?

THE WITNESS: We used it as long as Hartwell Grain and Elevator was there for soybeans and wheat and corn. They were in the retail business to sell to the farmers and cattle growers and so forth.

THE COURT: When you used that, you'd have to push the cars back?

THE WITNESS: Well, we pulled them in towards this end of the track and we cut them off right here and went back through the runaround and pushed them back and spotted them for

cars to either be loaded or unloaded. And the same way with the fertilizer company.

THE COURT: So you have used the runaround as a runaround since you've owned the Hartwell line?

THE WITNESS: Yes, sir, up until '08 when Hartwell Grain and Elevator went out of business.

THE COURT: Okay. So in '08 that's when you stopped using the runaround?

THE WITNESS: That's correct.

THE COURT: But it's your testimony that before '08 you used that part of the track as a runaround. That was the purpose of it?

THE WITNESS: That's correct. That was the only way --

THE COURT: It wasn't a sidetrack to go to some private business, it was a runaround so that you could serve private businesses along the mainline?

THE WITNESS: That's correct. We had to have that. And people prior to me buying it had to have that runaround to get around their cars.

THE COURT: So you would push --

THE WITNESS: We would pull the cars in.

THE COURT: -- them empties all the way down to the terminus?

THE WITNESS: We'd pull them all the way in, cut off

and go around and get on the other end and push them. But because Hartwell Grain and Elevator was right at the end of the line that's where they had the grain bins and they unloaded the cars and loaded them back.

THE COURT: Okay. So you would pull them --

THE WITNESS: From Bowersville.

THE COURT: -- you would pull them and then you would stop your train right past the runaround and move it up the other way?

THE WITNESS: Stopped right in the middle of the runaround.

THE COURT: Okay.

THE WITNESS: And then get on the other end and then push them back to the end of --

THE COURT: You pushed them to the back?

THE WITNESS: To the back, that's correct.

THE COURT: And then pulled them out when they were empty?

THE WITNESS: That's correct.

THE COURT: So the whole thing here is you want to pull them in and you want to pull them back, you don't want to have to pull them in and push them back?

THE WITNESS: That's correct.

THE COURT: But it's your testimony that from the time you owned the company up until 2008 that area was used as

a runaround and not a private sidetrack?

THE WITNESS: No, sir.

THE COURT: Is that correct?

THE WITNESS: It was always a runaround.

THE COURT: And you want to upgrade the rail on it?

THE WITNESS: That's correct.

MR. WILLIAMS: Your Honor, I think, Mr. Anderson will testify that there has never been a customer, while he's owned the railroad, on the runaround track. Isn't that true, Mr. Anderson?

THE WITNESS: That's correct.

THE COURT: And I thought there was something mentioned in our phone conversation a few weeks ago about there was some gas station somewhere that they wanted to build a sidetrack to? Is there a new potential customer along here that wants you to bring in petroleum to them?

THE WITNESS: No, sir. AmeriGas is down there. That track was built at the lake for the material coming in to build Hartwell dam and that was what it was built on. It's built on Core of Engineers' property.

THE COURT: That's a sidetrack for the petroleum company?

THE WITNESS: That -- but the main thing was to build the dam, all of the material that came in to build Hartwell dam.

THE COURT: But that doesn't go through the church's property? The issue for the church is this parallel line --

THE WITNESS: Runaround.

THE COURT: -- that they're calling the runaround; is that right?

MR. GORDON: Yes, Your Honor.

THE COURT: There's not another sidetrack? This is it?

MR. GORDON: There are other sidetracks but not that we're concerned about.

THE COURT: Okay.

THE WITNESS: Right. And the val map, as it would be referred to I'm sure by our attorney and Mr. Gordon, it showed both the runaround and the mainline and that's where it comes under the STB jurisdiction. It was a val map shown there then back when the val maps were first put into play showing what the railroads right-of-way is and what they can use.

THE COURT: Were you owner of the line when there was a deal reached with the church for them to use certain property near the railroad right-of-way?

THE WITNESS: Yes, sir. We got an agreement with the church to use the crosswalk and trying to be a good neighbor and work with anybody we can along the line. But we would certainly work with the church and gave them permission to go across it.

THE COURT: As you understand it, did the church own property on each side of the railroad track?

THE WITNESS: At the time the old cotton mill was there the church just owned property on the north side of the track, I recall it for reference. And then when the cotton mill closed, which we know a lot of mills closed, and then the church bought that property on the other side.

THE COURT: It was on the south side of the track?

THE WITNESS: Where the cotton mill -- they bought the cotton mill property and that made them own the property on both sides of the tracks.

THE COURT: So y'all have given them an easement to come across your track in a location where they can access one piece of property from the other?

THE WITNESS: Yes, sir. We gave them a permit to do so. We don't call it easements on the railroad.

THE COURT: Okay. A permit.

THE WITNESS: We got a permit. And still the agreement was still there. We have never canceled and never attempt to and I don't think about it even today. We still want to work with them and they can still cross the track with the crosswalk as well as a vehicle crossing. We've got two agreements with them.

THE COURT: And since 2008, since you have not been using the runaround, did you reach any agreement with them on

the area where the runaround track is?

THE WITNESS: It's still that agreement is to cross both tracks. Both tracks were there at the time of the agreement.

THE COURT: But your understanding of the agreement was to just let them cross your track?

THE WITNESS: Yes, sir.

THE COURT: Not a right to construct something, a parking area or anything on top of the unused runaround track?

THE WITNESS: No, sir. That's correct.

THE COURT: Okay.

BY MR. WILLIAMS:

Q Speaking of the agreements, Mr. Anderson, who handled the arranging for and negotiating the agreements for the Hartwell Railroad with the church?

A Dave Bishop, he was my general manager at that time. He has retired since then but he still works for us on a consulting basis.

Q And is he sitting out in the hall waiting to testify?

A He is.

MR. WILLIAMS: So we have a witness to specifically speak to that component of the issue, Judge.

THE COURT: All right. Well, he's answered most of my questions. If you've got something you think is essential that he hasn't covered then let's go ahead and get Mr. Bishop

so he can be on his way.

MR. WILLIAMS: Okay.

THE COURT: I mean, if you think there's something essential that he needs to cover that he hadn't covered --

MR. WILLIAMS: Well, let me look at my notes real quick.

THE COURT: I'm going to let him cross examine him.

MR. WILLIAMS: I don't really feel like I'm earning my paycheck, Judge, because you're doing all that questioning up there and I don't want him to ask for a refund.

THE COURT: Okay. Well, I don't want you to ask questions that I don't need to know the answers to.

MR. WILLIAMS: And I don't want to ask those questions.

THE COURT: Not that you would. I'm sure you would have asked exactly what I asked, but let's just not duplicate it. If there's something else you've got to ask him that will be fine. When you say that the transp -- what do you call them, the STB?

THE WITNESS: STB, Surface Transportation.

THE COURT: When you say that they've got authority or jurisdiction over this runaround what do you mean as far as what do you have to do to get their permission before you can -- do you have to get their permission before you put in new rail on the runaround or what is it that you have to do

with them in that area?

THE WITNESS: The STB has the jurisdiction over the railroads.

THE COURT: Right.

THE WITNESS: Not what you do with them other than --

THE COURT: Do they have to approve --

THE WITNESS: -- you buying it or leasing it or whatever. And then they have jurisdiction over you or are going to serve these customers under the public utilities. Then, if you wanted to -- you can't just quit operating that railroad without STB --

THE COURT: Let's say somebody came in and -- let's say the church went out of business. I know that isn't going to happen. But let's just say the church went out of business and somebody came down and put a plant down in that area that needed rail access. As long as you own that line would you be required, under your permit and license from the STB, to serve them? I mean, you're like a public utility so you would have to serve them, correct?

THE WITNESS: That's correct.

THE COURT: I mean, you just can't pick and choose who you serve?

THE WITNESS: No, sir.

THE COURT: And the rates are established by the ICC or is that a matter of private contract?

THE WITNESS: No. That act went away several years ago.

THE COURT: Whatever the current act is?

THE WITNESS: Right.

THE COURT: Does it establish your rates?

THE WITNESS: Right. We establish now our own rates.

THE COURT: You're like a public utility sort of?

THE WITNESS: That's correct.

THE COURT: So if any business comes along this mainline that can show they need rail service you've got to serve them?

THE WITNESS: That's right. And that goes back to deciding if they want a switch put in, either the railroad participates in the cost of it or they can put in the whole side and pay for the switch. The switch then belongs to the mainline, whoever it is, once they pay for it and put it in it belongs to the mainline, but the spur track into the industry belongs to them. And they are not under the STB jurisdiction, that is their siding. But anything we do on our railroad if we wanted to -- say we would have to file for abandonment if we wanted to abandon it. Nobody wants to abandon a railroad. It's too hard to come by and too expensive.

THE COURT: So is it your testimony that this runaround track is considered part of the mainline?

THE WITNESS: It's part of the operation under the

STB, yes, sir. Because it's got a switch that's tied in on both ends and that's why it's called a runaround and it's part of the operation of the railroad.

THE COURT: And it's your testimony that you could not serve this entire line without some type of runaround toward the end of the line; is that true?

THE WITNESS: That's true because it's at the end of the line and there's no other way to get back to the other end with your cars loaded or empty, whichever the case may be.

THE COURT: So if you didn't have the runaround and you served customers on this end of the line, the only way you could do it is push them back?

THE WITNESS: That's correct.

THE COURT: Which is not efficient or safe?

THE WITNESS: Safe.

THE COURT: It's not safe?

THE WITNESS: No, sir.

THE COURT: And the STB would be able to tell you you can't do that?

THE WITNESS: The FRA, which is the Federal Railroad Administration has the jurisdiction on you operating a safe railroad.

THE COURT: And it's your belief that they wouldn't let you regularly push the trains all the way back down the line?

THE WITNESS: That's right. It's not safe. And they are out there to promote safety.

THE COURT: So it's your testimony that you cannot serve this part of the line without the runaround?

THE WITNESS: That's correct, safely.

THE COURT: Safely. And if you wanted to relocate the runaround farther east you'd have to get the STB to sign off on any relocation of the runaround?

THE WITNESS: And justify the expense of it.

THE COURT: Right.

THE WITNESS: Which would be very expensive.

THE COURT: Okay.

BY MR. WILLIAMS:

Q Mr. Anderson, did you just recently have to go through an STB approval for the Elberton interchange?

A We did.

Q And what did that involve?

A Their approval. We had to submit all kind of plans and engineering and whatever CSX required from their rules and regulations, and it was a two and a half million dollar investment to put that interchange track in. It was very beneficial for Northeast Georgia for the growth and everything there.

THE COURT: And it would be your testimony you never indicated to the church that you intended to abandon this end

of the line?

THE WITNESS: No, sir.

THE COURT: Or the runaround?

THE WITNESS: No, sir.

BY MR. WILLIAMS:

Q Do you anticipate, Mr. Anderson, growth because of the Elberton interchange?

A Yes, sir, very much so.

Q Explain that to the Judge, please.

A By connecting with both CSX -- we call them Class I railroads -- and Norfolk Southern we are classed as a short line railroad and they're classed as a Class I railroad. It gives competitive rates, where CSX and Norfolk Southern can't come in and say this is the rate and that's it. The other thing is a service -- oh, I can't think of the thing -- in other words the service, say it took three days to get to the port down at Savannah by CSX, it would take five days by Norfolk Southern because it's a more direct route. So whether it comes from New Orleans or Indiana or Pennsylvania, wherever, it's faster service if it originates on one line. And we call it a one line haul until it gets to us. And then they don't have to hand it off to another line, which we call a two line haul, to originate on CSX. They would have to give it to Norfolk Southern and then we've got it until we put that interchange in down in Elberton.

THE COURT: Where is the closest interchange on this line to the west? In other words, if you had to push the empties back how far have you got to push them?

THE WITNESS: Nine miles.

THE COURT: Oh, the whole length of that line?

THE WITNESS: Yes, sir.

THE COURT: And this stretch from Quality to the end of the line is about how many miles?

THE WITNESS: Just about three quarters of a mile to the runaround.

THE COURT: And this area from Quality down to the runaround -- well, down to the runaround is that -- I guess with the Methodist Church there that's got to be downtown Hartwell?

THE WITNESS: Yes, sir.

THE COURT: So are there industrial uses along this line other than Quality and -- I know you say the Elberton line is going to increase the need but really the significance for the runaround is whether there is increase in need -- do you use the runaround for customers anywhere during the nine mile stretch or just when you get down here toward the end?

THE WITNESS: We've got a shop four miles back with a community called Airline. We've got a shop there so we bring locomotives in and work on them and cars as well.

THE COURT: So the runaround is used for customers

that are from the shop down to the end; is that right?

THE WITNESS: That's correct. And then Tenneco now is trying to get a freight rate on oil coming into them that is more competitive than trucks.

THE COURT: And where are they located?

THE WITNESS: They are between Quality and this runaround.

THE COURT: So there are some other industrial type businesses that you could service in this three-quarter mile stretch?

THE WITNESS: Yes, sir.

MR. WILLIAMS: One quick thing, if I may, Judge --

THE COURT: Well, where does the actual downtown of Hartwell start? Over here where I -- is Main Street in Hartwell shown on this map?

THE WITNESS: It would be a little bit to the north of the end of the line. The end of the line really is in downtown Hartwell.

THE COURT: All right.

MR. WILLIAMS: One other thing I might bring up, Judge, if I may.

BY MR. WILLIAMS:

Q Mr. Anderson, describe for the Judge when you're shoving a car -- instead of pulling it like you would prefer to do -- when you're shoving a car, describe the process that you

have to utilize to get through a rail crossing, a road crossing?

A It's a rule by the FRA if you are shoving a car you stop, the conductor or brakeman, or whichever you may be called, is on the car and he stops short of the crossing, dismounts and tells the engineer to come on back and shoves across the crossing, it's clear. But he's got to flag that crossing before we can shove across it. And then he gets back up on the car and then goes to the next crossing.

Q And how many --

THE COURT: Y'all don't have cabooses anymore, do you?

THE WITNESS: No, sir.

THE COURT: You have an electronic caboose, don't you?

THE WITNESS: Yes, sir.

BY MR. WILLIAMS:

Q How many crossings have you got between the end of the line and Hartwell and Bowersville?

A Forty-five.

Q So if you're shoving the whole length you would have to stop, get off, flag and get back on 45 different times?

A That's correct. That's a big safety issue.

Q And where does the railroad -- the conductor, where does that employee ride the train while they're shoving?

A He -- as we refer to it -- hangs on the side of the car. He puts his foot up on the steps and holds on to the grab iron.

Q And roughly how long does it take to -- when you're shoving -- because that's what you're doing right now, isn't it, you're shoving?

A That's right.

Q How long does it take to get from downtown Hartwell back to Bowersville right now when you're shoving?

A An hour and a half to two hours.

THE COURT: Well, who are you shoving for now? I thought Quality you could push them down their side track?

THE WITNESS: No. We just push them in the track to load. It's a dead-end track once you shove the cars in. And see we were only -- we've only done this a short spell because the company that bought them -- before this company bought them out it was still called Quality Industries and it still is. But under that name they still use it -- we only brought one car in about every couple of months or so. And then when this company bought them out nine months ago and they got more machinery and more customers and using more rail cars and predicting --

THE COURT: You're pulling them into Quality and backing them into their side track?

THE WITNESS: Yeah. We pull past their switch and

then push them into their side. There is silos to be unloaded.

THE COURT: And then you pull the locomotive back toward where it came from -- well, no you can't do that, can you? So the empties at Quality you're having to push back up?

THE WITNESS: That's correct. And that's why we were rehabbing the runaround to get around that.

THE COURT: And the FRA said you can do that but you're just saying they think it's less safe?

THE WITNESS: They don't -- I mean, it's permissible but you've got to stop at every crossing and flag it and then he remounts and goes.

THE COURT: Anything else?

MR. WILLIAMS: I believe that's all I have for Mr. Anderson, Your Honor.

THE COURT: All right. Why don't we take about ten minutes and then we'll come back for the cross examination. And then we may take a lunch break and have to get Mr. Bishop after lunch. How long do you think Mr. Bishop is going to take?

MR. WILLIAMS: Twenty-five minutes.

THE COURT: We'll play it by ear.

MR. WILLIAMS: Your Honor, I have one other witness. I brought Jonathan Colehower, he is the CEO of Quality and this is a big deal to him and he wanted to come and --

THE COURT: Well, we'll try to get these witnesses in

before we go to lunch.

MR. WILLIAMS: I don't think Mr. Colehower will take very long.

THE COURT: We've been going about two hours. I know people need a break. So let's take ten minutes.

(RECESS)

THE COURT: Cross examination, Mr. Gordon?

MR. GORDON: Thank you, Your Honor.

MR. WILLIAMS: Your Honor, may I tender Defendant's Exhibit Number 1 which is the drawing we've been looking at?

THE COURT: Yes, sir. It's admitted.

CROSS EXAMINATION

BY MR. GORDON:

Q Mr. Anderson, did I understand you to say that you have not used this runaround track for hauling anything for Quality Industries?

A No, sir, I didn't say that.

Q When was this spur track severed? What you're calling the runaround track, that doesn't exist on Webb Street now, does it?

A When it goes across Webb Street which is Highway 172 State Route -- and we were not using it very much and not any since '08. DOT came to us and asks us could they pave over it and remove the cross buck signs where the school buses wouldn't have to stop, and we agreed with that with a letter that then

when we needed to put the track back across the road we had permission to do so, had the right to do so. Not permission, had the right to do so.

Q But there are no tracks on Webb Street today?

A That's correct.

Q Neither at the mainline nor what you call the runaround track?

A That's correct. Would have been if it hadn't been for the stop order.

Q So how is it, then, that you use the runaround to service Quality Industries?

A We don't use the runaround for Quality now. That's the reason we're in here today is to --

Q Well, that was my question earlier. Did you use the runaround to service Quality Industries today and you said, "Yes" but you really mean no?

A We used it to serve the Quality Industries before the new owners, yes, sir, we did use it then.

Q You used the runaround then?

A Yes, sir.

THE COURT: Prior to 2008?

THE WITNESS: Yes, sir.

BY MR. GORDON:

Q Is it true that you have a runaround in your Airline switch yard?

A There are runaround switches out there that's occupied with equipment we're working on.
Q But you could use -- if you were to pull or shove cars out of Quality Industries you could switch your engine in Airline?
A No, sir, not at all times.
Q Why is that?
A Because we have equipment parked on them that we are repairing that's disabled.
Q Don't you have more than one runaround there?
A No, sir.
Q Is it impossible to move the equipment from the runaround in Airline?
A No, sir.
Q So they could be moved and then you could take it on to Bowersville from there?
A No, sir. Because that equipment we are working on is out of service, so you couldn't use that runaround for that.
Q But that's voluntary on your part. You have parked equipment on the runaround, correct?
A Out of service equipment, yes, sir, that we're working on.
Q And that's why you can't or why you don't use the Airline runaround today because you've parked equipment there?

A That we are repairing, yes, sir.

Q And is it true that the Airline runaround is approximately four miles from Quality Industries?

A That's correct.

Q And is it also true that the non-existent runaround, in the middle of the town of Hartwell is about two miles from Quality Industries?

A No, sir, it's a little over -- about a mile.

Q Now, the Federal Railway Administration does allow shoving of cars, correct?

A They allow it, but it's not safe and they realize that.

Q They have a rule, don't they, that governs the shoving of cars?

A That's correct.

Q Rule 218.99?

A I don't know the number.

Q And that rule specifically allows for shoving of cars, does it not?

A It does.

Q In fact, shoving cars is a fairly common practice, isn't it?

A No, sir.

Q Not by you?

A Not by anybody that I know of.

Q Let me turn your attention to the wye that is in Bowersville. That wye was in place when you bought the railroad?

A That's correct.

Q Did you realize that that was a relatively new installation?

A What?

Q That it was a fairly new installation? It had not been there for a hundred years like the rest of the railroad?

A I can't answer that.

Q So you don't know, then, that Frank Pollock built the wye in Bowersville in approximately 1982 when he started his passengers service train? He had the little scenic railroad.

A I don't know.

Q If the wye were not there in Bowersville you couldn't turn around there either, could you?

A Yes, sir.

Q That's correct?

A That's correct.

Q And the wye has been there since you have operated the railroad?

A That's correct.

Q But you don't know when it was placed there?

A No, sir.

Q The permits that you gave to the church to cross the railway, those are walking trail permits, aren't they? Sidewalk permits?

A Yeah. It's two permits, I believe.

Q Right. And they are sidewalk permits, not driveway permits?

A I believe one is a driveway on Bank Street.

Q Let me ask you to take a look at the map. I think we can use the one here. Excuse me.

MR. GORDON: Judge, let me see if I can get my exhibit up. Let's go to the survey, please. I don't think I can touch my screen, can I?

COURTROOM DEPUTY: No. The one at the lecturn you can.

BY MR. GORDON:

Q Mr. Anderson, where I've just made the new dot, that's the church property; is that correct?

A That's correct.

Q That's the old mill property?

A Your mic is not on.

Q Where I have just made some dots, that's the church property, as far as you know, right?

A That's right.

Q And as you will see between the church property --

what bisects the church property is your mainline, right?

A (Witness nodding).

Q And, then, we also show the spur line which is to the north of the mainline, correct?

A That's the runaround.

Q You're calling it a runaround. Now it's not a runaround today though?

A From the STB standpoint and our standpoint it is a runaround.

Q Is this an accurate depiction of the fact that there are no tracks crossing Webb Street?

A That's correct.

Q So you can't use that as a runaround today?

A That's correct.

Q Now, the track that -- this track right here, that's the track we're talking about today?

A That's correct.

Q Do you have any deed or document of possession of right-of-way underlying that track?

A When we bought it we bought what the Hartwell Railway gave us deeds to.

Q I understand. So if the Hartwell Railway provided you with their interest in a 20-foot right-of-way at that area that is what you have?

A Yes, this track was there at that time.

Q The track was there but if they sold you their interest in a 20-foot right-of-way that's what you have?

A And the track.

Q Now, do you recall telling me once that you had a 40-foot right-of-way there?

A No, sir. The deed shows the 20-foot, but that track has been there since before 1900.

Q Do you remember telling me, the day that you started construction, that you didn't have a deed -- well, you didn't use quite that language -- but you didn't have a deed and you didn't need a deed and that you had 40 feet because the val map says so?

A The val map told the states that's what we got.

Q Now, if we could look to Exhibit --

MR. WILLIAMS: Your Honor, based on the initial argument and discussion I kind of thought this was a little bit far afield of what was relevant for this proceeding. So I just wanted to have that objection noted.

THE COURT: It's been noted but I have overruled at the moment.

MR. WILLIAMS: Thank you.

THE COURT: I mean, is part of your argument, Mr. Gordon, that the Defendant only owns a 20-foot right-of-way and that they do not have any -- regardless of what type of tracks are over there, they don't have any property interest --

MR. GORDON: Yes, sir.

THE COURT: -- in the area where the "runaround" runs?

MR. GORDON: Yes, sir. That is exactly my argument.

THE COURT: Okay.

MR. GORDON: If we can look at Exhibit 2 on the screen. Your Honor, that exhibit is also in the courtroom, that's one of the original renderings of the 1916 val map.

THE COURT: What is a val map?

MR. GORDON: Valuation map.

THE COURT: For the tax assessors?

MR. GORDON: No, the railroad. The way that works, Your Honor, if I could just take a moment. The United States government required that all railroads survey their property and enumerate their personal property, you know, the locomotives and so forth, and submit that to an agency in Washington, DC. It was the Valuation Act, the Federal Valuation Act of 1913, and it was required that all railroads do this.

The primary purpose of it was to assist railroads in setting fair tariffs by looking at the value of what they have. That's why they call it a val map or valuation map.

But the law in the State of Georgia, which was made very clear in 2008, that if a val map were produced and if that val map were recorded in the deed records in the county where

the area is located that the val map was determinative of any property boundary, that it was determinative, and we have cited that statute in the brief.

THE COURT: Okay.

BY MR. GORDON:

Q As far as you know, Mr. Anderson, this val map has been recorded in Hart County, hasn't it?

A That's correct.

MR. GORDON: Now, if we could move to Defendant's 3.

THE COURT: Well, if you claim the railroad doesn't have property interest in the 20 -- other than 20 feet right-of-way, where the mainline runs, is there a deed that gives the interest in the runaround track property, that's adjacent to the church, to the church or are you claiming somebody --

MR. GORDON: Your Honor, there is.

THE COURT: There is?

MR. GORDON: Yes.

THE COURT: You're claiming that there's a church deed that covers where the church owns the property and there is no right-of-way to the railroad on it, the church owns it unencumbered?

MR. GORDON: That's correct, Your Honor.

THE COURT: Okay.

MR. GORDON: In fact, if we could look back

momentarily at Exhibit 1. Can you enlarge it for me please. P-1.

Now, Your Honor, I think this eliminates exactly what your question is. You'll see that it's noted that the Hartwell Railway has a 20-foot right-of-way. Now, that right-of-way line begins here (indicating) that darker line and it ends here (indicating). Now, that line is a little hard to see because the track is shown there. Now, that track is no longer there. But it's important to note that --

THE COURT: So somebody built part -- his predecessor in interest perhaps built part of the runaround beyond the right-of-way boundary?

MR. GORDON: That's right. And that's not the only area, Judge. This is how we're going to be able to show that this is not a runaround track, per se, that it is a private industrial track, and that's the most important question that I think you have to answer. If you will note at where it moves into Webb Street, it clearly shows 10 feet on each side of the center line. Now, if you move over across Webb street -- if the tracks were there and they're not -- but if you move over you'll see the right-of-way lines here on the main track. And I will represent to you, Your Honor, and we have the deed to prove it, that the right-of-way on that mainline is 12 feet wide. It is six feet on either side of the center line. The remainder of this track is entirely on private property, in its

entirety. And that was the subject of the Clinkscales agreement which appears in the court record. I will get the document number, but the Clinkscales agreement appears there.

THE COURT: All right. Well, let's cross examine the witness and then you'll be able to argue from the evidence later.

MR. GORDON: Very well.

THE COURT: But let's go ahead and get these witnesses taken care of.

MR. GORDON: All right. Now, if I can go back to Number 3.

THE COURT: While this is fresh on my mind. Mr. Williams, does the railroad take the position that his predecessor in interest adversely -- through adverse possession obtained a right-of-way interest, even if the track is outside of the deeded right-of-way, or is it your position that there are deeds that establish the track being within the deeded right-of-way?

MR. WILLIAMS: A couple of comments. He made reference to the Georgia State law governing valuation maps --

THE COURT: Uh-huh (affirmative).

MR. WILLIAMS: -- and that law doesn't say that it is conclusive. It says it is conclusive about the railroad's interest as of the date of that map which was, in this case, 1916, which means it doesn't preclude later acquisitions.

THE COURT: Right.

MR. WILLIAMS: And we do take the position that at a minimum -- since the track has been there since at least 1916, because it's on the valuation map -- that we've acquired, at a minimum, an adverse -- a prescriptive interest.

THE COURT: So you don't have deed evidence that --

MR. WILLIAMS: We do not have a piece of paper, Judge, and I would dispute that they have one.

THE COURT: So you don't think any legal description of the properties puts the track on somebody else's property other than the railroad's? Surely there are deed records that put the track, based on legal descriptions, on somebody's property or the other?

MR. WILLIAMS: Not entirely. This is a common problem in Georgia. And I'll keep talking if you want me to but I don't want to waive my position that none of this is relevant.

THE COURT: Right.

MR. WILLIAMS: Because I thought we were here to determine whether STB had jurisdiction and this title is strictly a state law issue.

THE COURT: Well, it seems to me that if the Court were to determine, that regardless of the past use of the track, if there has not -- if the facts establish that the area in question that the Plaintiff claims you are trespassing upon,

that there is evidence to show that that piece of property was never owned by the railroad either by deed or by prescriptive use, if the evidence shows that, then there wouldn't be an STB issue?

MR. GORDON: That's our position, Judge.

THE COURT: That's just a state law dispute as to where the property goes.

MR. WILLIAMS: I will respectfully disagree.

THE COURT: Okay.

MR. WILLIAMS: And this is why I harken back to the *New Orleans/Spencer* case, if I remember the name correctly, cited in my brief.

That was a Louisiana Parish attempting to terminate crossing permits that it had given to the railroad to allow it to cross their public road. There's no dispute it was their public road and they were coming in telling the railroad we are canceling your permit, take your track up. And the Court ruled you can't do it until you go talk to the STB, even if it's your property.

THE COURT: So it's your position that if a railroad is building a track adjacent to my property and for whatever reason, their convenience or they need a little more room or whatever, they come over onto my property and they build their track right through my property, with no permission from me, and I don't realize that until a couple of years later, after

they have already been riding their trains on my property without my permission, then for me to keep the railroad from continuing to trespass on my property I've got to go to Washington, DC and get some administrative agency to tell me that I've got the right to get my property back?

MR. WILLIAMS: I don't have a good comment to your hypothetical, but that's clearly not our facts.

THE COURT: No. But the principle is the same.

Now, in this case it seems like to me that Mr. Gordon has got a little bit of difficulty in suggesting that even if the deeds don't clear it up that there was uninterrupted use for a certain period of time that was potentially adverse to where the railroad may have, at least, adversely obtained the interest or whatever that may be. But to suggest that a railroad could come in and run something over my property and then I've got to litigate that in front of the STB, that's troublesome. I mean, maybe that's the law. I have to think about that a little longer. It doesn't strike my --

MR. GORDON: Your Honor, that's our point exactly.

THE COURT: Okay.

MR. GORDON: That's why we filed this lawsuit.

THE COURT: Well your point also, I'm assuming, is that even if they ended up with a right -- even if they ended up encroaching on that other property, that the reason they were allowed to encroach by that property owner is because

there was going to be a private line to serve that property owner, and he says come on over, --

MR. GORDON: Yes, sir.

THE COURT: -- he would not have allowed them to build a runaround just for the railroad's benefit?

MR. GORDON: Yes, sir. And that's actually the subject of the Clinkscales agreement.

THE COURT: So it could either be purposeful where the owner said come on over to serve me or it could have been a mistake where the railroad just -- whoever was laying down the track -- didn't carefully study the survey and went on over or it could be factually that he didn't go over. I mean, I'm just looking at -- I'm not looking at all the evidence yet. Maybe the evidence ultimately is they're completely within the 20-foot right-of-way, but it doesn't look like it. But go ahead. We'll do the argument later.

MR. GORDON: I think the survey will show that, Judge.

THE COURT: Go ahead.

MR. GORDON: The survey is to scale and when we introduce that into evidence that's going to show it's way over that 20-foot area.

THE COURT: How long has the church been there?

MR. GORDON: The church has been there for -- the church property was originally granted by the judges of the

inferior court of Hart County in 1856 when Hart County was created. Now, was it the --

THE COURT: The property that the track encroaches upon, how long has that been church property?

MR. GORDON: That was subsequently purchased by the church. Most of that was purchased in the late 1990s and early 2000s.

THE COURT: So the predecessor in interest was somebody that used the railroad?

MR. GORDON: Yes.

THE COURT: Go ahead. Let's do the evidence. Let's get these witnesses up and then we will come do the argument later.

MR. GORDON: And, Your Honor, if I might point out too, any element of adverse possession -- well, any claim of adverse possession would have to show continuity.

BY MR. GORDON:

Q Mr. Anderson, you admit that the track has not been there since 2008, this church spur track that we're calling it?

A The rail was removed because we were going to put heavier rail down when the need was there. And we've always contended never to abandon it.

Q But you took up the rails in October 2008; is that correct?

A Only the rail and the tie plates were removed. Not the crossties.

THE COURT: When you bought the line, Mr. Anderson, did you believe that the runaround was within the 20-foot right-of-way or were you aware that it could -- perhaps it extended beyond the right-of-way or did you just not know?

THE WITNESS: I contend that whatever I bought and what was in operation, which was the runaround, that was what I was buying and that's what I was going to use and did use until --

THE COURT: You knew that the railroad company that you bought the property from had that track, wherever that track was, and you thought that when you bought it you owned that right-of-way for that track?

THE WITNESS: That's correct.

MR. GORDON: Your Honor, we don't dispute that he owns the rails. We don't dispute that at all. The railroad company has always owned the rails.

BY MR. GORDON:

Q Did you do a title examination or did you have your lawyers do a title examination of the underlying title of the railroad right-of-way?

A No, sir.

Q And your deed simply says that -- it defines the area, does it not?

A The only thing it defined was what was in use and we continued to use it until we didn't have a need for it.

Q Doesn't your deed say that you bought all rights-of-way and other easements associated with the railroad?

A That's correct.

Q And, of course, the track itself. But your property purchase was limited by the rights-of-way and easements which the Hartwell Railway Company owned when you bought it; isn't that right?

A That's correct.

Q So, if they had made a mistake you didn't know about it, it wasn't your mistake, but it could have been a mistake, right?

A I want to go back to what I just said. We bought what was in operation and continued to operate the railroad.

Q And it's described in a deed?

A With the STB approving us buying it and operating it.

Q And did you receive a deed describing the property that you bought?

A What property?

Q This property that we're talking about, Hartwell Railway? You received a deed that granted the Hartwell Railway property to you, right?

A That's correct.

Q And you did not have the title examined on the underlying right-of-way?

A No, sir.

Q Now, let me focus you on Webb Street --

THE COURT: Who owns the fee title under the mainline subject to his 20-foot right-of-way?

MR. GORDON: Louise Thornton. That was the lady that was condemned in 1880. Mrs. Thornton owned a good bit of that property. She subsequently, when the railway took the 20 feet, she sold to Mr. Kidd and that went on through other owners and ultimately became the property of the church. It's reflected on the survey with the railroad's 20-foot right-of-way and the track being off the right-of-way in full.

BY MR. GORDON:

Q Mr. Anderson, if I can point to Webb Street there. Does that show that the mainline crossed Webb Street at the time of the valuation map?

A It's not real clear what's on the north side on my map.

Q Does that help you a little bit more, Mr. Anderson? We're talking about just above my -- what I just put there. Does that show the mainline crossing Webb Street?

A That's just mainline.

Q Okay. And it does, at that time, the time of the creation of this map, was there any connection between what we

call the church spur and what we call the Clinkscales Spur? There wasn't, was there?

A It doesn't appear, no, sir.

Q So that came on sometime later?

A That's correct.

Q Are you familiar with the terms of the Clinkscales agreement?

A Since we have got to where we are today, yes, it was brought up. But then it was also the extension of the runaround or the side of it, at that time, which was called the side and then it extended across Webb Street and there was a switch put in and that's when it started being called as a runaround.

Q Now, if you could just answer the question. Are you familiar with the Clinkscales agreement? You either are or not?

A No.

Q You're not, okay. That document will speak for itself. We're going to put it into evidence and it will show that that Clinkscales track, which is here, was built fully on private right-of-way for the purpose of a cotton field or mill.

Now, what commercial use have you made on the tracks shown on this portion of the val map since you bought it in 1980? I'm not talking about your storage of an old caboose or an old car there, but commercial traffic hauling --

A Since when?
Q Since you bought it.
A Since when?
Q Since you bought it.
A Since I bought it. Yes, sir, I served Hartwell Grain and Elevator.
Q That no longer exists, right?
A That's correct.
Q And it's not a current customer?
A No.
Q And the Gold Kist or Farmers Mutual Exchange that's also gone now, isn't it?
A That's correct.
Q And that was not shown on this particular map. Looking at this track here, do you know anything about that one?
A Other than what I see here that it went to the cotton house.
Q Right. Let's take these two together that I've just outlined for you. Those tracks aren't there anymore, are they?
A No, sir.
Q Well, they were on the val map. Did you buy those tracks?
A No, sir, they were private --
Q They were private tracks.

A -- owned side tracks to serve the cotton mill.

Q They were private side tracks commissioned by the Hartwell Mills to be built to service their cotton plant, as far as you know?

A As far as I know.

Q Would that be right?

A As far as I know.

Q But they're not there anymore?

A No, sir.

Q Did you petition the STB to abandon either one of those tracks?

A That was before my time.

Q Okay, that was before your time. Did you petition the STB to abandon the spur track that's the subject of this litigation?

A That we're referring to as the runaround?

Q Yes, sir.

A No, sir. I've never petitioned the STB to --

Q You did not seek permission to abandon it, you simply took the rails up?

A It's not abandoned.

Q I understand that you don't believe it to be. Now, if we can go back --

THE COURT: So I'll understand. Is the spur track defined under the federal statute, do you know?

THE WITNESS: The side track and a spur track is --

THE COURT: The side track and the spur track are the same thing?

THE WITNESS: That's right. And that is not --

THE COURT: But the side track and the spur track -- is the difference between that and a runaround that the sidetrack and the spur track does not intersect with the mainline in two locations? In other words, it goes and dead ends and comes back and it's also on private property?

THE WITNESS: It's on private property. It is not under the jurisdiction -- any industry can come in and buy a piece of property or whatever the amount of land and build on it and it serves them, and the STB has no jurisdiction over you just building that track to serve your property.

THE COURT: And as you said in your direct examination, you actually used this runaround as a runaround until 2008?

THE WITNESS: That's correct, in the operations --

THE COURT: In other words, you didn't use it to go down some side track to a private business and leave cars. You used it for the purpose of setting cars along the track so that you could pull the engine back so you wouldn't have to push it back up the track, right?

THE WITNESS: Right. And also push the loaded cars or say empties, whichever the case may be, we brought them in

and got on the other end of them and pushed them down.

THE COURT: But did you ever use what you called the runaround track to deposit full cars that some businesses alongside the track would then come up to the runaround and unload them?

THE WITNESS: No, sir.

THE COURT: Never did that?

THE WITNESS: No, sir. It was strictly for the operation of the railroads.

THE COURT: Okay. Go ahead. I mean, you have to concede, don't you, that at one time this particular track that he refers to as a runaround track was used by his railroad as a runaround?

MR. GORDON: Your Honor, I can concede that it may have been used in that fashion, but I cannot concede that they had the right to use it or that it was under the purview of STB or that it was even the property of Hartwell Railway.

THE COURT: Right. I understand all that.

MR. GORDON: We go back to your example of the track through your private property. It can stay there for as long as they want it to, but unless they have some adverse possession claim to it it's not theirs. They can use it and use it by mistake. You know, a title examination would probably have shown this and he could have figured it out or fixed it at that time.

BY MR. GORDON:

Q But, Mr. Anderson, you believed that you didn't need that, right?

A Did not need the runaround track?

Q No. You didn't need a title examination?

A No, sir, that's pretty common in buying a railroad.

Q Tell me how many cars you handle for Quality Industries today?

A Today?

Q Yes.

A You mean for how long a period?

THE COURT: He said for how long a period? Weekly, daily, a year?

BY MR. GORDON:

Q You can define that. I'd like to know daily, but if it's weekly --

A Right. At the present time, two a month.

Q Two cars per month?

A Per month.

Q Have you had a commitment for service from Quality Industries?

A That's correct, we do.

Q Do you have a copy of that commitment for service from Quality?

A Not uncommon to have a prediction of what they're

going to grow their business, which you are there to service them under the STB.

Q Mr. Anderson, do you understand that there is a distinction between a prediction and a commitment for service on a railroad?

A Yes, sir, I understand that.

Q So you don't have a commitment from Quality. You have a prediction from Quality that they may use more?

A We have an obligation to however many cars they order that we deliver them to them. That's our commitment.

Q But their current commitment to you is two cars a month?

A Correct.

Q For which you do not need the runaround?

A No, sir, we need the runaround.

Q But you're using it without the runaround now?

A That's the reason we are here today to finish to where we can use it. We need it for safety reasons, as well as economics.

Q Let's talk about, just for a moment, what else you would have to do other than rebuild the church spur track. Would you have to rebuild the track across Webb Street?

A Yes, sir, and we've already got it.

Q And you have not done that yet, right?

A As soon as we get this lifted we hope we will.

Q Now, you would have to rebuild what you call the runaround track as well?

A I'll define rebuild and just put in some gauge ties to get us to where we can operate on it.

Q Yes, sir. But you couldn't do it today? I mean, you would have to do the rehabilitation work on that?

A No, sir. You could run a train on it today.

Q Now what about Athens Street, where you cross Athens Street, would that require any type of permit or study from either the Federal or State Department of Transportation before you could cross Athens Street?

A No, sir.

MR. GORDON: Can I go back to the survey, please, of Exhibit 1. Can we clear my marks. Your Honor, might I use the map exhibit that defense counsel used?

THE COURT: That's fine. You want to put up the Plaintiff's exhibit?

MR. GORDON: The Defendant's exhibit.

THE COURT: I mean Defendant's exhibit.

MR. WILLIAMS: If you hook me in, I'm up.

THE COURT: Okay.

MR. GORDON: Okay.

BY MR. GORDON:

Q Mr. Anderson, you previously identified this to be the church property (indicating) and this to be what you call

the runaround and we call it a private industrial track. Do you recognize that as Athens Street?

A That's the one going to Royston; is that 29?

Q That's right. Highway 29, that's Athens Street?

A There you go.

Q Now, is it true, Mr. Anderson, that you have entered into a 99 year lease with a nonprofit group to build a park and a walking trail and playground on the entirety of your line between Athens Street and the end of the line?

A No, sir. The agreement we've got with them is for them to use the walking trail, which is not uncommon with the railroad.

Q If you will, just focus on the question. Did you enter into a lease with a group called TORCH of Hartwell, Inc, a nonprofit entity, to lease them the use of your property from Athens Street to the end of the line?

A We did.

Q And is that a 99 year lease?

A That's true.

Q And they pay you regularly -- regular payments, I take it?

A That's correct.

Q And at the end of the 99 years they have an option to purchase it for $1?

A That's correct.

Q Now, you have approved their use of the property for a public park?

A But not interfere with the rail operation.

Q Well, if I told you that the lease said that you acknowledged that the lessee intended to develop the lease property as a public park and lessor expressly approved such use, is that not an approval of their use of the property as a park?

A Yes. I just stated they have use of the property, but not to interfere with the rail operation.

Q Can you point to me in the lease -- and I can certainly provide you with a copy of it -- but can you point to anything that says that you may continue to operate commercial rail service on that span between Athens Street and the end of the line?

A I don't have that before me. And my general manager and attorneys drew that up.

Q But you would agree that this document sets forth your agreement?

A (No response).

Q Now, in that agreement, do you remember negotiating a term that the lessee was to do any repairs needed in this area?

A That's right.

Q In fact, would you agree that you required the lessee, the TORCH group, to assume the full and sole

responsibility for the condition, operation, repair, replacement, maintenance and management of the premises?

A That's including the rail.

Q Now, how would the nonprofit manage your railroad?

A They manage what they do and not what we did.

Q That's correct. They would be able, through this lease, to manage the property from Athens Street to the end of the line. Do you also remember that you acknowledged in this lease that the person -- that you were relieved of any duty to maintain the property?

A I don't have that before me.

Q I'm sorry and I don't mean to put you on the spot by that at all. Do you happen to remember that you had a clause in here that all the parties acknowledged that the premises had not been maintained for several years and was in a state of disrepair and that you were not obligated to make any repairs?

A They were referring to the buildings, the depot and other buildings in that lease.

Q But it wasn't limited in the lease that you know of, was it, to the building?

THE COURT: Is there a provision in the lease that terminates the lease if he resumes the use of that part of the line?

MR. GORDON: The lease is terminable by him or by the railroad under certain specified conditions. This lease

appears in the court record as document 14-1 in its entirety.

THE COURT: But does it let him declare that, okay, I'm now going to start using this as an active line again and that's the basis for terminating the lease?

MR. GORDON: No, sir. That is not provided for in the lease at all.

THE COURT: Well, how would operating a trail and a park in the area of your tracks be compatible with you actively running trains down there?

THE WITNESS: The walk would be off the track, away from the --

THE COURT: The walking trail is off the tracks?

THE WITNESS: Yes, sir.

THE COURT: But wouldn't that be unsafe to have a walking trail where you're actively moving trains?

THE WITNESS: We had an agreement that when we were going to run the train we would notify them and they wouldn't be occupied at that time.

THE COURT: That's in the lease you understand?

THE WITNESS: I'm not sure about that. But they could not take up any rail or remove any of that.

THE COURT: But they could have their families out there walking up and down the track and if y'all knew you were going to run a train through there you would give them some kind of notice not to do that?

THE WITNESS: Well, you always look out for pedestrians being out there and blow the whistle and ring the bell and all that goes with it.

THE COURT: Okay. Go ahead.

BY MR. GORDON:

Q Mr. Anderson, are you familiar with the TORCH plans that state that as many as 100,000 people a year may be using the walking trail?

A I'm not.

Q And I don't mean to confuse you or put any words in your mouth. You have the right to terminate the lease which is in Article 14, 14.1 specifies five areas where you can terminate the lease.

MR. GORDON: And if I can provide a copy, please, to the witness, Judge?

THE COURT: Yes, sir. How is this really relevant to the trespass claim and jurisdiction issue?

MR. GORDON: Judge, I think this shows that he cannot return this track to service, that he is legally bound and he is unable to return the track to service. I know that he says he can --

THE COURT: But how does that affect, first of all, whether he still has the superior interest in that property that the church claims they own?

MR. GORDON: We think that has already been

established, Your Honor, through the deeds that are in the record and that we'll enter into evidence today.

THE COURT: How does this add to it? How does this evidence about the track not being able to be used again in the future, how does that add to that issue?

MR. GORDON: It shows the impossibility of the need for the runaround track.

THE COURT: How is that relevant? If he owns the area where the runaround track is -- which I know you dispute --

MR. GORDON: Yes.

THE COURT: But if he owns it and he doesn't want the church to -- well, if he owns it and as long as he's not creating a nuisance, then, he can go on that property and do whatever he wants and he's not a trespasser.

MR. GORDON: He can certainly do that on the 20 feet that he owns.

THE COURT: Well, what I'm suggesting to you is they claim they've got an interest beyond the 20 feet. I haven't decided one way or the other whether they do because I hadn't heard all the evidence. But if I were to conclude that they've got an interest beyond the 20 feet, then regardless of whether he wants to use it as a runaround or not, he can't be a trespasser on his own property.

So it doesn't really matter whether he intends to

return it to the runaround use or not, if it's determined that he has an ownership interest in the property.

MR. GORDON: I agree, Judge, with the hypothetical.

THE COURT: I understand that what it appears factually -- unrelated to him officially abandoning the property, the line -- is pursuant to the Federal Act. It looks like what he did, the time that he did the lease, is he didn't have any present intention to use the full line, but I don't know that that affects a trespass claim which depends upon who actually owns the property or has the superior interest to that area where they claim he is trespassing. So let's move on.

MR. GORDON: I agree with that, Your Honor. The issue is who owns this property.

BY MR. GORDON:

Q Mr. Anderson, do you acknowledge that the only deed you have is the deed that you received from the Hartwell Railway?

THE COURT: Let me ask Mr. Williams a question. What if the church, instead of filing a trespass action, had filed in the Superior Court an action to quiet title? In other words, they claim that all he owns is the 20-foot right-of-way and that they own up to the 20 feet which includes the area where the tracks partially sit, would it be your position, Mr. Williams, that that action would be removable to federal court based on complete preemption? If it's just a quiet title

action to settle who has title to the property.

MR. WILLIAMS: You're asking me to give you an off the cuff answer on a pretty complex legal issue.

THE COURT: Okay.

MR. WILLIAMS: But I'm going to try and give you one.

THE COURT: It seems like that if that could be decided in the state court, Mr. Gordon, you could get the quieted title issue resolved first and that takes care of everything else, if you truly think you've got the evidence to -- that's part of your argument to me is that you want me to decide who owns the title which should be decided by a Superior Court Judge.

MR. GORDON: Judge, I agree with that, that's why I made the motion to remand. Now, it may have been in artfully plead to start with, I'll give you that.

THE COURT: Did you intended to allege that?

MR. GORDON: We did intend to ultimately have a quiet title action on this property. We felt it was critically important though to halt the work from continuing and that was the purpose of bringing this lawsuit was to receive an injunction which halted the work, because we had been unable to get that voluntarily, and to -- an injunction to stop the work basically on the basis of trespass. The title question may have not been artfully plead, but it could be, and that is

clearly a Superior Court issue. And if that is -- we can certainly return and do that if we were back in the Superior Court.

THE COURT: Well, before coming in here this morning I guess I was not entirely clear that that was -- well, I guess I did understand that was part of your argument. But I was focused on the use of the track which is a, perhaps, a federal law question. But if this is just a matter of quiet title deciding who owns the property upon which part of the railroad sits and whether there is indeed evidence as to who owns it, and then not withstanding the deed evidence whether there is evidence of prescriptive title, then that is dispositive of really the trespass action which it sounds like it would be. I'm having a hard time figuring out how that ought to be in Federal court.

MR. WILLIAMS: May I, Your Honor.

THE COURT: Yes, sir. You think that's the New Orleans case?

MR. WILLIAMS: It is the New Orleans case. It doesn't matter who owns underneath as long as it falls within the jurisdiction.

THE COURT: No, no, no. What I think they're saying is not only do they own underneath, but that you don't own a right-of-way because your man was never given a right-of-way to this part of the property unless he acquired it by prescriptive

use that was adverse.

MR. WILLIAMS: We're ignoring what Congress was worried about which is why this is preempted.

THE COURT: Well, I understand congress -- congress does not want -- congress wants to have restrictions whenever there is a interference with the railroad that is affecting interstate commerce.

So if you got a track out there that a railroad is using and then congress has certain rules and wants to have certain jurisdiction whenever anybody else is coming in there trying to interfere with the movement of those trains, the operation of those trains. But I don't think Congress gave a railroad company a license to go build their train track on my property without my permission.

MR. WILLIAMS: We don't have any evidence --

THE COURT: And if they did so I don't think they intended for me to have to go litigate that in Washington, DC under the STB.

MR. WILLIAMS: We don't have any evidence that happened in this case, Judge.

THE COURT: Well, what they say the evidence is -- and I haven't decided it yet because I haven't reviewed all the deeds and everything in detail -- but what they're saying is is that Mr. Anderson's predecessor in title didn't give him anything other than a 20-foot right-of-way.

Now, he may have thought he gave him these tracks and he may have been using these tracks without having an actual right-of-way but all he gave him in the deed was a 20-foot right-of-way and whatever sat on that. And the only thing that sat on that was the mainline plus part of the little sidetrack, not the full runaround.

So, if that's all his predecessor in title had and that's all he gave him, then, that's what he got. And so he can't come onto the church's property, which is beyond what he got.

So there's got to be some legal determination, did he, in fact, get more than the 20-foot right-of-way? And whether he got more than the 20-foot right-of-way seems to me to be a state law question because it has to do with what he was deeded or whether he acquired it, anything beyond the 20 feet, through prescriptive use. If he did acquire the title then it becomes a federal question as to whether they can prevent him from resuming a runaround in that property that he owns.

I've just got a hard time -- I'm having a hard time thinking that the issue of whether the railroad owns the property is a federal issue that can only be decided in the limited jurisdiction of the STB.

MR. WILLIAMS: I will concede, Judge, that who owns the land is not an STB issue.

THE COURT: Right. Well, they're claiming that you don't own the land or the right-of-way beyond 20 feet.

MR. GORDON: Yes.

THE COURT: So somebody has got to decide that legal determination first.

MR. WILLIAMS: I don't agree.

THE COURT: Why not? Because if you don't own the land then you don't have the right to be on the land and therefore --

MR. WILLIAMS: The reason we're here today, Judge --

THE COURT: -- you're trespassing. The reason we're here, as I understand it, is because the railroad company wants to go and do some construction in an area that is beyond the 20-foot right-of-way. And if the church is correct, that they do not have any legal property interest in that area where they want to go do their digging, then they don't have the right to do that not because of STB or federal law, but they don't have the right to do it because for the same reason that they can't come in your backyard and run a railroad track right through your swimming pool. It's not a federal question. It's a preliminarily "whose got title to the property question."

Now, I might conclude, after hearing all the evidence, that he owns it, that he owns more than the 20-foot right-of-way. That this runaround has been used for years adversely to whoever was there or through prescription and

that, therefore, he got that property even though it's not in the deed. And then the issue does become a federal issue as to whether they can restrict him from building it back or not. But as far as whether he got more than the 20-foot easement, I'm not sure that I'm the one or any federal judge or certainly not the STB, is the one to decide what he got and what he didn't get.

MR. WILLIAMS: May I speak to it?

THE COURT: Yes, sir.

MR. WILLIAMS: We're not here because of a -- when I say here, I mean in your court.

THE COURT: Yes, sir.

MR. WILLIAMS: -- because of a property dispute.

THE COURT: I think we are but you go ahead and tell me why you don't think we are.

MR. WILLIAMS: We're here because of an injunction.

THE COURT: Right.

MR. WILLIAMS: The injunction was granted by a state court which stopped a federally --

THE COURT: Because they thought you were trespassing.

MR. WILLIAMS: I'm sorry.

THE COURT: The injunction was issued by the state court judge because they thought Mr. Anderson, with all due respect, was a trespasser. That's why the injunction was

issued. It wasn't to enjoin some regulatory proceeding or stopping from -- it had the effect of stopping him from building a track upon which his trains were being used. But as I understand the state court injunction, it was, you do not -- the church has the superior property interest in this property. You do not have the right to be on this property doing what you're doing and therefore you are a trespasser.

Now, whether or not the Superior Court Judge actually issued an order yet -- he didn't have the time to fully hear it because y'all removed it right after the TRO -- but whether he would eventually issue an order that would say under Georgia law the title is in the name of the church, there's no evidence that you obtained an easement or a right-of-way by prescription and, therefore, you are permanently enjoined from asserting rights as if you were an owner because you're not. Whether that was where he would eventually end up or not I don't know. But that would certainly be part of that state court action. So in light of their contention and some evidence, why is this not a property dispute?

MR. WILLIAMS: Because it is an existing operating railroad, with an existing track that was being rehabilitated, that has been for the last hundred years a part of the interstate rail system, which is the exclusive jurisdiction of the Surface Transportation Board, and whether you like the fact that the STB has said we can stop a property owner, a

legitimate property owner, here there's no facts one way or the other yet because we are just on the very surface of the issue. Whether you like it or not the STB can stop a legitimate property owner from terminating rail service. That's when you got to go and petition the STB. And they know that as well as anybody because -- and if you know the full breathe of this dispute they're attacking us on this one little sliver outside of our 20-foot right-of-way. That's the only thing that's before you right now. They're in the STB already trying to take the 20-foot from us, the mainline. They filed a petition for adverse abandonment with the STB back at the beginning of 2016. And they are there already asking for exactly that.

Now, they're trying to do an end run. Because they're not going to get what they want anyway because they made the decision to buy land on both sides of the railroad track and they want to hook them together, and they bought it that way.

When we came in and had no idea they were even laying claim to our right-of-way because -- when I say our right-of-way I'm including the additional track because it's been there for a hundred years and they don't have anything to suggest we don't have the right to be there. And we could spend hours and hours, and I have, in the courthouse pouring through the deeds to put together this puzzle about who owns what out there. But the STB has sidestepped that whole issue

by saying once it's part -- if it is a necessary part of the interstate rail system that we have to have to continue to operate the railroad -- I mean, to continue to maintain interstate commerce in this country we're taking jurisdiction over it. That's what ICCTA says.

And they can go and have their quiet title action in the state court and I'm perfectly fine with that. We're here because of the injunction. And we can't continue to do what we're required to do to serve customers because they have stopped us --

THE COURT: What if they proceeded with their quiet title action and the ruling of the state court is y'all may have been running this track for all these years on which you thought was your right-of-way but you were actually running it over somebody else's property, who didn't give you permission to do that, and these are the subsequent folks in the line of title and you, therefore, don't have the right -- you've got the right to operate your track all day long, but before you can run your track you've got to run it on the property that you have the legal right to put the track on. And if the court finds that you didn't have the legal right to put your track here why couldn't that court issue an injunction preventing you from building it back?

MR. WILLIAMS: If they reach that finding, which we

haven't gotten to --

THE COURT: Right.

MR. WILLIAMS: -- we've got an injunction with no finding and they're interfering with interstate commerce, which is exclusively a jurisdiction of the STB, if we get way down that road, which isn't going to happen tomorrow or the next day, then I and my client will cross that bridge when we come to it.

THE COURT: Okay. Well, it just seems to me that while you don't think the title is an issue, the Plaintiff thinks it is a huge issue. Because they think that -- or they are at least making the argument that the property ownership records support their position that part of this runaround was constructed on property that they did not own or have a right-of-way.

MR. WILLIAMS: I understand that's their contention and mine is exactly the opposite.

THE COURT: Well, based on preliminarily what I have seen, what it looks like, is that either by permission or by mistake part of the runaround, sometime in its history, was likely built beyond the 20-foot right-of-way and on to other property where there was no deed providing that property. And I can see how that can happen.

MR. WILLIAMS: And that's a classic prescription adverse possession scenario.

THE COURT: And that Superior Court could conclude that notwithstanding the absence of the deeds or whatever they have acquired it through prescription through the years. And this doesn't ultimately prevent your argument with regards to jurisdiction. But that hurdle has got -- that's got to be decided at some point.

MR. WILLIAMS: And if the Court decides -- if they go back to state court and they pursue a quiet title action without the injunction my client faces a double risk, they may lose and they may have spent all this money on the runaround track and don't get the benefit of it. But interstate commerce continues until then.

We are only here because of the injunction. The injunction has stopped interstate commerce. The Judge in the state court -- with all due respect to Judge Malcolm -- is now interfering. He is regulating interstate commerce by stopping the flow, the movement of trains, on a portion of the interstate commerce rail system and that's what the STB prohibits. That's what ICCTA prohibits. That's where your jurisdiction comes in.

THE COURT: Okay. Well, I'm not going to ask you to speculate hypothetically. Do you have any more questions of this witness?

MR. GORDON: No, I do not, Judge.

THE COURT: Sir, you may step down.

MR. WILLIAMS: Your Honor, may I have just a little redirect.

THE COURT: Yes.

MR. WILLIAMS: And I'm going to do this real quick, but I want to get this in the record.

THE COURT: Sure.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q You were asked, Mr. Anderson, about taking up the rails and Mr. Gordon actually said taking up the track. Do you remember that?

A That's correct.

Q Did you take up the track?

A I took up the rail and the plates, no crossties.

Q So I'm just going to --

MR. WILLIAMS: For the record, Your Honor -- run through a series of pictures that show the old crossties still in place.

THE COURT: This is on what you call the runaround area? Is that what we're getting ready to see pictures of?

MR. WILLIAMS: That's correct.

THE COURT: All right. Go ahead.

BY MR. WILLIAMS:

Q Mr. Anderson, please look at Defendant's Exhibit Number 8 and tell me if you can identify that?

A I'm looking at the mainline track.

Q And do you see the property of the church in the picture?

A That's correct.

Q And where is the church building in this picture?

A To the left, but I don't see it. It doesn't show.

Q Right. And if you look in the lower left-hand corner do you see something sticking up out of the ground?

A I do.

Q What is that?

A Are you talking about that reflects kind of like a piece of rebar or are you talking about the --

Q I'll show you another picture.

A Now, point it out for me.

Q Looking at -- you see the mainline on the right-hand side of the picture, right?

A That's right.

Q Do you see that piece of rail sticking up in the center of the picture off to the left of the mainline rail?

A That's correct.

Q What is that?

A That's coming off of what we refer to as the frog.

Q What's a frog?

A It's part of the switch that went into the runaround. The frog is still in place. The switch is still in place on

the mainline to go into the runaround.

Q So the bottom of this picture is where the runaround track starts?

A That's correct.

Q And it moves off to the left in the photograph?

A That's correct.

Q And where the dirt is disturbed to the left of the mainline, what is that area?

A That's where the runaround is.

Q And is that the same place it used to be?

A Always.

MR. WILLIAMS: I move for the admission of Exhibit 8, Your Honor?

MR. GORDON: No objection.

THE COURT: It's admitted. Is that where y'all were doing work before you got the Judge's order? Is that why it's disturbed?

THE WITNESS: That's correct.

THE COURT: Go ahead.

BY MR. WILLIAMS:

Q Again, Defendant's Exhibit 9, same photograph. Can you see any better what is shown sticking up out of the ground right there?

A The rail or the little stake?

Q The little stake.

A That little stake is the center line for the runaround.

THE COURT: Are you saying there is a rail bed underneath that dirt, meaning crossties?

THE WITNESS: The crossties were still under there, yes, sir.

THE COURT: And gravel?

THE WITNESS: And gravel.

THE COURT: But you're not going to have to replace those crossties when you reconstruct it?

THE WITNESS: Yes, sir. As he goes further we'll show what we've already done.

THE COURT: You're going to dig it all up and put in new ones, right?

THE WITNESS: Right.

THE COURT: Go ahead.

MR. WILLIAMS: Move for admission of Defendant's Exhibit 9?

THE COURT: It's admitted.

BY MR. WILLIAMS:

Q Tell the Judge what's shown in this picture, please, Mr. Anderson.

A That's the mainline to your right and the runaround to your left.

Q And this is on which side of -- What's the street

we're seeing in the picture?

A Webb Street.

Q So that's on the east side of Webb Street?

A That's correct. No, the west side. The tracks are on the west side -- east side and the tracks are on the --

THE COURT: So your plan is to run the mainline and the runaround through that road?

THE WITNESS: The mainline and the runaround back in place.

THE COURT: Through that road?

THE WITNESS: Yes, sir.

THE COURT: Go ahead.

MR. WILLIAMS: Move for admission of number 10, Your Honor?

THE COURT: It's admitted.

BY MR. WILLIAMS:

Q Number 11, Mr. Anderson.

A Yes, sir.

Q Same thing?

A Same thing.

MR. WILLIAMS: Move for admission of 11, Judge?

THE COURT: It's admitted.

BY MR. WILLIAMS:

Q Number 12, Mr. Anderson, where are we in this picture?

A We're standing on the main -- I mean, the runaround track to where we are grading to go through Webb Street to the grade over there for the runaround.

Q And that grading is for the reconstruction of the runaround track?

A That's correct.

MR. WILLIAMS: Move for admission of 12, Judge?

THE COURT: It's admitted. Is that a pond or a parking lot to the left?

MR. WILLIAMS: That's a parking lot.

THE COURT: Okay. Go ahead.

BY MR. WILLIAMS:

Q Number 13, Mr. Anderson, what is that?

A That's the runaround switch that was coming in to where we just showed where we were grading.

Q And that's the frog in the middle of the picture?

A That's correct.

MR. WILLIAMS: Admission of 13, Judge?

THE COURT: It's admitted.

BY MR. WILLIAMS:

Q Number 14, Mr. Anderson. There's that thing sticking up out of the ground again. Can you tell what it is now?

A That's a spike for the centerline on the crosstie that was there where we were removing the dirt.

Q That would be in the vicinity of the switch; is that

right?

A That's correct.

Q Is that a switch tie?

A It appears to be, yes, sir.

Q Explain what a switch tie is?

A A switch tie is a longer tie than a -- a regular crosstie is eight and a half foot and then in a switch you go from 16 down to a nine foot to get back in your mainline.

Q And that's because the tie has to be long enough to hold both tracks at some point?

A That's correct.

Q And these pictures were taken during construction; is that right?

A That's right.

Q And this is as it existed while you were working on this project?

A Right.

THE COURT: How many new feet of rail are you going to ultimately have when you finish this project?

THE WITNESS: How much are we replacing?

THE COURT: Right. How much new rail across how many feet?

THE WITNESS: It's in the vicinity of 300 feet.

THE COURT: And you've got to pay for the cost of putting it back in through that highway?

THE WITNESS: Yes, sir. That's an agreement we have with the state.

THE COURT: But y'all pay for that and not the state?

THE WITNESS: That's correct.

THE COURT: So there's nowhere in that three quarters of a mile where you could feasibly do a runaround before you get to that road?

THE WITNESS: No, sir. We don't have the right-of-way. No. It would be very expensive to --

THE COURT: Well, this is going to be expensive too, isn't it?

THE WITNESS: Nothing like putting in two switches. A switch is about $30,000 a piece. So you'd have to put in two.

THE COURT: So you're using the old switches?

THE WITNESS: You wouldn't if you --

THE COURT: For this? For this project you're using the old?

THE WITNESS: We're going to use the existing switches.

THE COURT: The existing switches?

THE WITNESS: Yes, sir.

THE COURT: There's no abandoned property along that three quarters of a mile that somebody would be reasonable and -- I'm sure once they found out you wanted it that it

wouldn't be reasonable anymore. But this is the only way for you to do what you think you need to do; is that correct?

THE WITNESS: That's correct. And also to serve this customer, Tenneco.

THE COURT: Okay. Go ahead.

MR. WILLIAMS: Move for admission of 14, Judge?

THE COURT: It's admitted.

BY MR. WILLIAMS:

Q Looking at 15, Mr. Anderson. Do you see the church building now?

A I do.

Q And is that the same tie with the same spike in it?

A That's correct.

MR. WILLIAMS: I move for the admission of 15, Judge?

THE COURT: It's admitted.

BY MR. WILLIAMS:

Q This would be the west end of the runaround; is that right?

A That's correct.

Q Again looking at now to 16, Mr. Anderson. Is that a better picture of the tie in question?

A That's the crosstie that was there when we were removing the dirt for the construction of putting the track back -- the rail back.

Q And are those existing holes that were in that

crosstie?

A That's correct.

Q And those are spike holes, right?

A That's correct.

MR. WILLIAMS: Move for 16?

THE COURT: It's admitted.

BY MR. WILLIAMS:

Q Mr. Anderson, look at 17, please. Can you identify that?

A That's ties that was in the runaround.

Q And that's not the same ties we were just looking at is it?

A No, sir.

Q These are east of that?

A These are regular crossties, yes, sir.

Q And what's that building in the background of the picture?

A The church.

MR. WILLIAMS: Move for 17, Judge?

THE COURT: It's admitted.

BY MR. WILLIAMS:

Q And then, Mr. Anderson, number 18? Same ties?

A Same ties.

Q And when you were doing the grading work out there you were physically present, weren't you?

A Yes, sir.

Q And you saw the tractor going through there and you uncovered these ties; is that right?

A That's correct.

Q Were there also ties that were broken and damaged?

A That's correct.

Q What happened to them?

A We took those up and replaced them with relay crossties.

MR. WILLIAMS: I move for admission of 18, Judge?

THE COURT: It's admitted.

BY MR. WILLIAMS:

Q And again, the same two crossties, Mr. Anderson?

A That's correct.

MR. WILLIAMS: I move for admission of 19, Judge?

THE COURT: It's admitted.

BY MR. WILLIAMS:

Q And then 20, Mr. Anderson, same crossties?

A That's correct.

MR. WILLIAMS: Admission, Judge?

THE COURT: It's admitted.

MR. WILLIAMS: That's all the pictures I'm going to have, Judge.

THE COURT: Okay.

MR. WILLIAMS: I'm going to ask him a couple of

follow-up questions.

THE COURT: All right.

BY MR. WILLIAMS:

Q Under your lease with TORCH, Mr. Anderson, TORCH has to keep the rails in place; isn't that right?

A That's correct.

Q Now, who maintains the rails if you're going to return the track to service?

A Hartwell Railroad. We do.

Q And why did you do the deal with TORCH?

A It was something I thought would help the community and they brought a good plan together to Dave Bishop, my general manager. And we, like, always try to be a good neighbor and support the community and northeast Georgia like we did with the church with the agreement with them for a cross walk.

Q And what is TORCH going to be doing at the very east end of the wye, far beyond the runaround track?

A Parking?

Q No. Far beyond the end of the runaround track, you know, down there where the light --

A That's where the park -- that's my understanding that's where the park is going to be. They wanted to restore and protect the turntable because that's a part of history. There's not but two of them around and we happen to have one of

them, the turntable.

Q And then also down in the depot area?

A That's correct.

MR. WILLIAMS: That's all I have, Judge. Thank you.

MR. GORDON: Your Honor, might I have a few redirect?

THE COURT: All right.

RECROSS EXAMINATION

BY MR. GORDON:

Q Mr. Anderson, I want to show you what we have marked for identification as Plaintiff's 9-J. Mr. Anderson, do you see this picture. Do you see the marker there in the foreground of the picture?

A I do.

Q And do you see another --

A You're not at the speaker.

Q Do you see another red marker about where I've just put my other finger?

A I do.

Q And then there is another red marker right about there?

A Right.

Q Now, did you see our surveyor make those or -- Did you see our surveyor mark the right-of-way that you own?

A I didn't see him. But, no, sir.

Q So you don't know whether that's the right-of-way or

not?

A No.

Q If I were to represent to you that that's ten feet of the center line of your mainline does it look about that to you?

A I can't tell by the picture, no, sir.

Q All right.

THE COURT: Do you know whether you could construct your runaround in this area if you had to confine it to that 20-foot right-of-way? You wouldn't be able to do it, would you?

THE WITNESS: No, sir.

THE COURT: All right. Is that it?

MR. GORDON: Just one other thing. If I can have the Defendant's first picture, Defendant's 1 back.

MR. WILLIAMS: It's up.

BY MR. GORDON:

Q Mr. Anderson, would it be possible to construct a wye right there at Quality Industries?

A You're still not at --

Q I'm sorry, Mr. Anderson. Would it be possible to construct a wye at Quality Industries as I've just shown in red there?

A No, sir.

Q Why?

A Because of the lake.

Q The lake is not where the mark is. Do you see the mark that I put on it?

A Yes, sir, I see it.

Q I haven't made the red mark over the lake, have I? The lake is off over here, isn't it? Off the picture?

A There's not enough room to put a wye down there to answer you.

Q Of course the wye that's there was put there, right? The one leg of the wye? I mean, if that had another leg that spur would become a wye, wouldn't it?

A If. If.

Q If it was there.

THE COURT: Who owns the property, what looks like, undeveloped property to the east of the wye? Various people? Is that undeveloped?

MR. GORDON: It's undeveloped, Judge. And I don't -- I believe that Tenneco owns a part of it. That's the plant that's right in the middle of the picture and the remainder is under private hands, I believe.

THE COURT: I mean, I know it would be expensive, but could you feasibly build a runaround in that area somewhere? Is there enough length of rail there?

THE WITNESS: No, sir. Me being familiar with the track and how it lays.

THE COURT: So if some church member or TORCH member or combination of church and TORCH members came together and said we can all get together and work this out, there's really no feasible place in there to work it out to accommodate your interest and theirs; is that what you're saying?

THE WITNESS: Yes, sir.

THE COURT: It's not just dollars and cents?

THE WITNESS: No, sir.

THE COURT: Okay.

MR. WILLIAMS: If I may ask him, Judge.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q What is the problem with that location, Mr. Anderson?

A Pardon me.

Q What is the problem with that location for a runaround track?

A The grading is whether it would be cost prohibitive, as well as we don't own the right-of-way.

THE COURT: Okay. Let's -- what were those Plaintiff Exhibit numbers so we can admit them that you used?

MR. GORDON: That was Plaintiff's 9-J, the photograph.

THE COURT: I admitted it.

MR. GORDON: Your Honor, if I might go through the exhibits?

THE COURT: Well, why don't we just wait until the end and you can just put them all in in bulk.

MR. GORDON: Very well, thank you.

THE COURT: Let's do this. We're going to have to take a lunch break. The business man, who is just going to come in here and tell me how important this is, we can do that in five or six minutes, can't we?

MR. WILLIAMS: I would think so, yes, sir.

THE COURT: Well, let's get him in. Sir, you may step down.

THE WITNESS: Thank you.

THE COURT: Right up here, sir. We're going to try to get you out of here so you can go back to work or wherever you want to go. Raise your right hand and take the oath.

COURTROOM DEPUTY: Do you solemnly swear that your testimony in this case shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT: Sir, if you would just be seated in that chair. State your name for the record and spell it for the court reporter.

THE WITNESS: My name is Jonathan Talbot Colehower. J-O-N-A-T-H-A-N, Talbot T-A-L-B-O-T, Colehower, C-O-L-E-H-O-W-E-R (Spelling).

THE COURT: Mr. Williams?

JONATHAN TALBOT COLEHOWER

Witness having been duly sworn, testifies on

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q Mr. Colehower, thank you for coming today. Sorry you had to wait so long, we appreciate it. What do you do for a living?

A So, I am the President and CEO at Quality Holdings.

Q And what is your basic education and business background, very quickly?

A So, I graduated from business school at Vanderbilt and I spent the next eight years or so in management consulting at Accenture, I was then in the software business. Always around supply chain and manufacturing at Oracle for five years, and then I was the CEO of a software company up in Boston for a few years, and then I was with a management consulting firm, McKenzie and Company, for several years and then just recently I was the chief marketing officer for Manhattan Associates which is a software company based in Atlanta, Georgia.

Q So, tell us about Quality Holdings, please.

A Yep. Quality Holdings is a business that has been active for probably 20 years. It is based in Hartwell, Georgia. It was recently sold by the owner, his name was Tom Habel. Tom Habel sold the business to a private equity firm named Jordan-Blanchard Capital out of Columbus, Georgia, and

they were looking for somebody to run the business is how I met up with Jordan-Blanchard in March of 2016 and became the CEO in May of 2016.

Q And what kind of products do y'all make?

A Yep. Our business, we have several different types of business, but the primary business is in rotational molding, so, it's essentially the plastics business. And we are a contract manufacturer for companies that manufacture rotationally molded products. So, if you think about an empty tank on the back of a John Deere tractor, a plastic tank on the back of a John Deere tractor, that's something that would be rotationally molded. The requirements are typically it needs to be light weight, it needs to be very durable, it needs to be waterproof. So those are some of the things that kind of make it distinctive as a rotationally molded product.

Q And what kind of raw materials do you use?

A So, 80 percent of our raw material is from what they call LLDPE, which is a polyethylene substance that are these pellets. This is what we receive in the rail cars that arrive at our facility. So it's these pellets that are then pulverized into a powder that looks -- well it is -- this is an example of the powder that we pulverize, and then that powder is then essentially colored and then we put it into a cast aluminum mold and that cast aluminum mold is then -- essentially it rotates in a large oven. And when it rotates

the polyethylene melts, covers the inside of the mold, for say 15 minutes we will cook it, and then you pull it out, cool it down and then you remove the part from the mold. That represents about 80 percent of what we do.

Q You brought a sample of a finished product?

A I did.

Q If you would just, please, show the Judge?

A Okay. This was the smallest example that I could find. We typically make fairly large products. This is called a rocking horse feeder. So most people that own horses will tell you that horses should eat from the ground, not up high. So this is called a rocking horse feeder. It sits on the ground, it doesn't tip over and it serves that purpose.

The reason I brought this one is because a lot of our customers are entrepreneurs. They have an idea, they want to bring it to market, and that's an example of a woman who is an entrepreneur out of Florida, had the idea and we've been manufacturing those for her for five years.

Q How many people do you employ at the plant?

A So, we fluctuate because our business is somewhat seasonal. The peak for 2016 was a hundred -- right around hundred employees.

Q And how has your business grown since you have taken over?

A So, in 2016 the top line revenue was up by 20 percent

and the EBITA, the earnings before taxes and interest, was up 40 percent. So we're a 10 million dollar business in 2016, and my forecast for 2017 is that we'll be somewhere around 12 million.

Q And how is that going to affect your need for rail service?

A Well, it will increase for sure. That's the largest input to our process.

Q So, you get your raw material by rail?

A Correct.

Q And how much product or how much material is in a single rail car?

A Two-hundred thousand pounds.

Q And how would changing to truck affect your business?

A So, one of the nice things about the product that we buy is this polyethylene, these pellets, are a commodity. So anybody can look out on the web and find out what the price is on any given day. So, right now we pay 72 cents per pound. If I were to do that by truck that would be 80 cents a pound. So it's about a 10 percent cost reduction -- cost advantage that we have by being on the rail spur.

Q And how many cars did you get in 2016?

A Twenty-one in the year.

Q And what is your forecast for 2017?

A I'm expecting we'll have 25.

Q And are there other opportunities that you're exploring because you are rail served?

A Yes. We have -- I'm looking at two opportunities right now. We've got one rotational molding company, which is located in Toccoa, Georgia, they've asked if we would pulverize, essentially turn this into this (demonstrating) for them because they don't have the capacity to do it. They've asked if we would do a million pounds. So, last year we did four million pounds and that would be an additional million on top of that.

Q And what role -- what was the significance of rail service for your parent company when they shopped this particular property?

A Well, I think it was huge. I mean, having the rail spur gives you a cost advantage in the market. I'd love to say that our customers come to us because of our product quality or our service, but there is no doubt that price is a huge factor and having that price advantage gives us an advantage in the market.

Q And how would your business be impacted without rail service?

A A couple of ways. One, would be that we would have a price increase for sure. Ten percent, at lease, price increase, and that doesn't include all of the extra material handling from what we do today. So that would be an immediate

impact. I would then have to figure out either how we're going to make up that difference or how I can approach my customers and ask them or basically tell them that we're going to have a 10 percent price increase.

The second would just be from an overall logistics standpoint. Bringing a rail car in for us is fairly straightforward. The rail car comes in, we connect a tube underneath it, that tube automatically gets pulled in through a vacuum into the pulverizer to produce this. If we have to start buying in a bulk truck, now I have to unload it, move the material over to the pulverizer and then somehow get it up into a gravity feed or some sort of a way to get it into the top of the pulverizer. So there are business process changes as well as the economics.

Q You're aware of the dispute that's going on between the railroad and the Methodist Church. How far is your plant from the church?

A A mile. I don't know for sure. I don't want to say exactly. I would say a mile, but I don't know exactly.

Q Are you in favor of the railroad being able to improve its service to you?

MR. GORDON: Your Honor, I object to the question.

MR. WILLIAMS: I'll withdraw it.

THE COURT: All right. I think he has covered the essential information that I need to know.

MR. WILLIAMS: I don't have anything further. Thank you very much.

THE COURT: Cross examination?

CROSS EXAMINATION

BY MR. GORDON:

Q Mr. Colehower, just a very few questions. You've been able to handle your business and the dramatic increase that you've had with your current rail service; is that correct?

A Yes, sir.

Q And I believe that you testified that what you anticipate doing was adding four cars in 2017?

A That's my current forecast, yes.

Q That would be to go from 21 cars to 25 cars?

A Correct.

Q And your current service is satisfactory; is that right?

A Correct.

Q And all of the concerns that you have about moving to truck that presumed that there was no rail service, correct?

A Correct.

Q So if you continue to have rail service, from your perspective, you're fine, right?

A Right.

Q Thank you.

MR. GORDON: That's all I have.

THE COURT: Any redirect?

MR. WILLIAMS: No redirect. Thank you.

THE COURT: All right, sir. Thank you for coming. You're excused.

We're going to take a lunch break. As I told you before I had this other hearing scheduled at 2:00 which is obviously going to get bumped back. I really think, realistically, we're not going to get back to this until 3:00. I hate to do that, but we need to take at least an hour for lunch and then I think I can move that other hearing along pretty quickly to get it done in 30 minutes.

How much more of these other witnesses; are they going to be cumulative or is it going to be new stuff?

MR. WILLIAMS: I expect both of them to be new stuff.

THE COURT: And how any witnesses do you have?

MR. GORDON: Judge, we have one and I anticipate 20 minutes.

THE COURT: We are going to stay until as long as it takes to finish today.

MR. WILLIAMS: Well, I'm hopeful that the other witnesses will be quicker then the ones this morning.

THE COURT: I don't think you'll need to be back -- you can come back whenever you want -- but I don't think we're going to get back to you until 3:00. So, you'll just have to

take a long hour and a half lunch break. The rest of us will be in recess until 2:30.

(RECESS)

THE COURT: We are going to resume the hearing in the case of Hartwell First United Methodist Church, Inc. versus Hartwell Railroad Company, et al. case 3:16-CV-169. Mr. Williams, have you got another witness?

MR. WILLIAMS: I do, Your Honor. I call Dave Bishop, please.

THE COURT: All right. Dave Bishop. Sir, if you would come to the witness stand to your right.

COURTROOM DEPUTY: Do you solemnly swear that your testimony in this case shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

THE COURT: Get situated so you're speaking into that microphone. State your name and spell it for the court reporter?

THE WITNESS: Charles David Bishop. C-H-A-R-L-E-S, D-A-V-I-D, B-I-S-H-O-P (spelling).

CHARLES DAVID BISHOP

Witness having been first duly sworn, testified on

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q Mr. Bishop, where do you live?

A Monroe, Georgia.

Q Where did you go to school?

A University of Tennessee.

THE COURT: You're not supposed to admit that when you're in his jurisdiction.

THE WITNESS: I know. I'm persona non grata.

THE COURT: We won't hold it against you.

MR. WILLIAMS: That's why I'm not going to take it easy on him either, Judge.

THE COURT: We're going to blame that on your lawyer for asking you the question, but go ahead. What's next?

BY MR. WILLIAMS:

Q Were you in the military?

A Yes.

Q What did you do in the military?

A I was a pilot in the Air Force.

Q What did you fly?

A B-52s.

Q And what have you done railroad wise in your career?

A I've been working for the railroad since October of '95.

Q And what was your first railroad job?

A Great Walton Hartwell Railroad.

Q Working for Mr. Anderson?

A Yes.

Q What was your job title or your duties?

A General manager.

Q What does general manager do for the Hartwell Railroad?

A Involved in all functions of the day-to-day operations, legal, regulatory and other matters.

Q I couldn't understand the last part, Mr. Bishop.

A Regulatory and other matters.

Q Did you actually operate trains?

A No.

Q Never got certified?

A No.

COURTROOM DEPUTY: Mr. Williams, are you plugged in to the HDMI cable?

MR. WILLIAMS: I am. Am I not showing up? Let me do my check to make sure.

(Working on video system)

MR. WILLIAMS: I'm going to start a reboot on it and I'm betting that will fix it, and I'll keep asking him some preliminary questions while I wait for it to reboot.

BY MR. WILLIAMS:

Q Describe some of the duties you did for the railroad during your -- you're retired now; is that right?

A Right.

Q When did you retire? The first time?

A I attempted to retire on February 13th -- April the 13th.

Q Of what year?

A 2013.

Q How many times have you retired since then?

A Apparently several.

Q And describe all the various things that you would do for the Hartwell Railroad? You were the general manager for all the railroads; is that right?

A Correct.

Q Describe what you would do for them?

A I did a lot of administrative work, as far as agreements and so on. I did some day-to-day operational things as far as manifest and other activities like that, right-of-way issues, regulatory issues and day-to-day administrative activities.

Q What kinds of agreements did you deal with?

A Generally lease agreements for encroachments and other matters of that nature.

Q What do you mean by an encroachment?

A Either a pipeline, wire line, or other activity that required use of the right-of-way.

Q Did you have a system that you used, a series of agreements that you kept on file, for all these different kinds

of encroachments?

A Correct.

Q What was the normal process for generating an agreement for somebody that wanted to use part of your right-of-way?

A They would fill out an application, submit it with their details as far as their drawings and what they wanted. We would review it for AREMA, which is American Railroad Engineering Mechanical Association standards, and then we would proceeded from that point to try to reach a resolution or an agreement.

Q In terms of an agreement, what's it typically made of? You've got the actual contract and then some exhibits?

A We have pretty much boiler plate details and then we would incorporate the various attachments applied to the specific lease or agreement.

Q What would you typically find in the types of attachments that would be attached to one of these documents?

A Drawings, profiles, and other things related to what was being applied for.

Q Was that one of your primary responsibilities for the railroad?

A Yes.

Q At some point did you get involved in dealing with the Hartwell First United Methodist Church?

A Yes.

Q Tell me about that, please.

A It was in the early 2000s, I believe. Mr. Jack Edmonds initially approached that the church wanted a crossing for a sidewalk and some pipe lines.

Q And a crossing there behind the church?

A Correct.

Q And who were you dealing with?

A Initially Mr. Edmonds, and then an application came in, I believe from, from Armentrout, an engineering firm.

Q And that was the engineering firm you understood was working for the church?

A Correct.

Q Let me direct your attention, Mr. Bishop, to what has been marked as Defendant's Exhibit Number 34. Do you see that in front of you on your computer monitor?

A Yes.

Q What is that? I'll let you start with the cover e-mail.

A That's an e-mail from a Bret Thurmond with Armentrout and Roebuck.

MR. GORDON: May it please the Court, our monitors are not showing that. Judge, its over here so I can deal with it.

THE COURT: Well, we need to kind of figure out

what's wrong with our equipment so we might as well do it right now.

(Recess - working on computer monitors)

THE COURT: Okay. We'll figure it out later. Go back over there to the lectern.

MR. GORDON: I will. Thank you.

BY MR. WILLIAMS:

Q So the first page of Defendant's Exhibit 34 is an e-mail from Mr. Thurmond?

A Correct.

Q And he is the one you were dealing with on behalf of the church for the crossings?

A Yes.

Q And that's dated what date?

A July 22, 2008.

Q And what is the second page of this e-mail?

A That's the application from the engineering firm.

Q And does it say what kind of application it is, what it's looking for?

A A pipeline agreement.

Q What kind of pipeline did the church have; do you recall?

A I don't remember the dimension. I know it was under the track.

Q And it says -- does it say how many tracks it wants

to cross?

A Two.

THE COURT: This is relevant how?

MR. WILLIAMS: If you'll bear with me you'll see.

THE COURT: Okay.

BY MR. WILLIAMS:

Q Mr. Bishop, if you look at the second page it identifies the applicant as Hartwell First United Methodist Church; is that right?

A Correct.

Q And it's signed by Mr. Whittemore?

A Yes.

Q And, then, this third page, is this the type of attachment you received?

A Correct.

Q And is this a piece of paper that you rely upon for determining what you're willing to do for the church?

A Yes.

Q They're supposed to describe what they need?

A As it applies with the application. Page 2 of the application gives you the dimensions and the structure as far as pressure and so on and sizes.

Q And, on this document, do you see a pipeline?

A Can you scroll it?

Q Do you see the railroad tracks?

A Yes.

Q Do you see the pipeline roughly where the frog is?

A Yes. Okay, I see them up here at the top portion, two of them.

Q And, of course, this drawing is labeled C100 and it comes from the Armentrout Engineering firm; is that right?

A Correct.

Q And another drawing and document establishing, again, that information you need; is that correct?

A Yes.

Q And this would be -- to speed things along, this would be the profiles that you're looking for?

A Right, and specifications of what's being put in.

MR. WILLIAMS: Your Honor, move for admission of D-34?

THE COURT: Admitted. I'm not sure yet of the purpose, but I'll admit it.

BY MR. WILLIAMS:

Q How many agreements had you entered into with the church?

A Three.

Q Let me direct your attention to Defendant's Exhibit 39. Do you recognize this document?

A Yes.

Q And what is this?

A It's an agreement with the church saying it was for a sanitary sewer and storm sewer across the railroad.

Q So this is the agreement that was the result of the application we just went through?

A Yes.

Q Did you enter into this agreement with the church?

A Yes.

MR. GORDON: Your Honor, we'll be happy to stipulate that that agreement was made.

THE COURT: Okay.

MR. WILLIAMS: All right. Move for its admission?

THE COURT: What's the number?

MR. WILLIAMS: Thirty-nine (39).

THE COURT: It's admitted.

MR. WILLIAMS: I also have, Mr. Gordon, the sidewalk agreement which is my Exhibit 38. Will you stipulate to that?

MR. GORDON: That's fine.

MR. WILLIAMS: And also the road crossing agreement for the end of Bank Street, which is my Exhibit 40.

MR. GORDON: May we look at that?

THE COURT: Thirty-eight (38) is admitted. Pull up 40.

MR. WILLIAMS: Yes, sir.

BY MR. WILLIAMS:

Q Do you recognize Defendant's Exhibit Number 40,

Mr. Bishop?

A Yes.

Q What is this?

A It's a crossing agreement for a private road crossing.

MR. GORDON: We will stipulate that the agreement is authentic.

THE COURT: It's admitted.

BY MR. WILLIAMS:

Q Mr. Bishop, following the execution of these agreements, did the church actually utilize the licenses they were granted?

A Yes.

Q And what did they put in?

A They put a -- in this case it was a crossing. They put in the pipelines and they also put in a sidewalk crossing.

Q And that would all be behind the church across your right-of-way on both tracks?

A As far as the pipeline and the sidewalk, this crossing agreement was further west from the church property, per se.

Q During your tenure with the railroad, did the railroad ever indicate its intent or have the plan to abandon the property behind the church, either of those two tracks?

A No.

Q And I'm going to refer to the mainline and, separately, the runaround track, which is the one we're here fighting about today. Did the church ever ask for the property?

A No.

Q Were you later involved in discussions with the Georgia Department of Transportation?

A Yes.

Q And also the City of Hartwell?

A Correct.

Q Tell us about those, please.

A They were for --

MR. GORDON: Your Honor, unless my client was present that would be hearsay, his conversations with Georgia Department of Transportation or City Hall.

MR. WILLIAMS: It's being offered for the purpose of explaining, of course, the conduct, Judge.

THE COURT: All right. For that purpose I'll allow it.

BY MR. WILLIAMS:

Q What did the Department of Transportation and/or the City of Hartwell ask you to do?

A They wanted to pave over -- they were repaving a street in front of the Depot building and they wanted to pave over the crossing at that time.

Q What's the name of the street?

A (No response).

Q Is it the one next to the church right there?

A It's between the church and the Depot. I don't remember the name.

Q That would be Webb Street?

A Webb Street, correct.

Q And what did you tell them?

A That we would agree to it but that we reserve the right to resurrect or reinstall the crossing.

Q And why did you agree to it?

A It's accommodation.

Q I'm sorry.

A Accommodation to the State and then the city wanted the sidewalk at the same time when they were redoing the paving.

Q Let me ask you to look at Defendant's Exhibit 42, Mr. Bishop, and see if you can tell me what that is, please.

A A letter to the city manager for the City of Hartwell concerning railroad crossing at Webb Street.

Q And what is the specific purpose of this letter?

A The letter was to tell them that we would work with them and that we would develop an action plan that would work for all concerned.

Q And you are expressing your intent to maintain the

integrity of the tracks?

A Correct.

MR. WILLIAMS: Move for admission of Defendant's 42, please?

THE COURT: It's admitted.

BY MR. WILLIAMS:

Q Here, Mr. Bishop, is a letter dated August 5, 2009. Can you identify that for us, please, Defendant's Exhibit 43?

A A letter, again, to the city manager, David Aldrich. Met with Dennis White, who I believe was his public utilities man, regarding the curbing and other improvements on the right-of-way at Webb Street.

Q And to speed things along, again, just a letter confirming your desire to maintain the ability to return the tracks into operation?

A Right. Removing the improvements at their expense should the railroad need to reopen the crossing.

MR. WILLIAMS: I move for admission of Defendant's 43, Judge?

THE COURT: It's admitted.

BY MR. WILLIAMS:

Q And then finally, Mr. Bishop, let me get you to look at Defendant's Exhibit 44. And tell me if you can identify this, please?

A It was a letter to the area engineer for GDOT

regarding the crossing that was being paved over.

Q And the purpose of this letter?

A Again to reserve the right to reopen it in some future point.

Q And that would include the mainline and the runaround track that we've been discussing here?

A That's correct.

MR. WILLIAMS: I move for admission of Defendant's 44?

MR. GORDON: Can counsel display the text of the letter, please?

MR. WILLIAMS: Sure.

MR. GORDON: No objection.

THE COURT: It's admitted.

BY MR. WILLIAMS:

Q Why was the railroad, at this time, willing to allow the removal of these crossings?

A Well, the day to day usage was not every day or required regularly, and to accommodate and be a good citizen as far as long-term relations with the local governing officials.

Q Were you also involved in the discussions with TORCH about the lease?

A Yes.

Q Tell us about that, please.

A The city personnel or individuals representing the city through TORCH wanted to establish a downtown corridor to enhance downtown development for activities as far as fairs, festivals and so on, as well as a walking trail and physical therapy type arrangement that would be a catalyst for drawing people to downtown Hartwell. In addition, they were looking to have a corridor or an area where they could attract people off of Interstate 85 to facilitate further enhancement of downtown Hartwell.

Q And why did the railroad entertain this request for a lease?

A Again to accommodate and coordinate with the local officials to see if we could come up with beneficial arrangements for both parties.

Q And did the railroad expect the tracks to remain in place even during the lease?

A Yes.

THE COURT: How long does it take to get from Hartwell to here?

THE WITNESS: Approximately 45 minutes, somewhere in that nature.

MR. WILLIAMS: Your Honor, I don't have anymore questions for Mr. Bishop.

THE COURT: Cross examination?

MR. GORDON: Very few questions, Your Honor.

CROSS EXAMINATION

BY MR. GORDON:

Q Mr. Bishop, the drawings that were admitted into evidence as D-34, et cetera, those were drawings that were construction drawings, weren't they?

A They were what was submitted by the engineering firm as to what was being done.

Q Right. Showing you where they wanted to cross?

A That's correct.

Q Now, you did not take those drawings to be boundaries that actually showed property lines, did you?

A There was some specifications or stipulations on there that showed boundary lines.

Q That did show the boundary lines?

A Yes, and that's what I relied on.

Q If you can take a look at D-34 and tell me where they are?

MR. WILLIAMS: You want to see D-34 drawing?

MR. GORDON: Yes.

BY MR. GORDON:

Q If you could, sir, I think you will be able to do that on the screen in front of you. Can you identify where it says on this construction drawing where the property line is?

A I need to see the legend. I'm unable to see the legend. The property line is shown as a dash dot dash dot

dash.

MR. GORDON: Can we look at the bottom of it?

MR. WILLIAMS: Down here?

MR. GORDON: Can you move it to the right? I believe you just moved it to the left.

MR. WILLIAMS: I'm sorry.

BY MR. GORDON:

Q Now, show me on that diagram -- show the Court, please, on that diagram where those marks are that showed that the property line is depicted, if they exist at all?

A Do I point to it?

MR. WILLIAMS: You can actually touch your screen and it will make a mark on the thing.

THE WITNESS: (Witness complies).

BY MR. GORDON:

Q You believe that that shows the property line?

A Yes.

MR. GORDON: I believe that the document will speak for itself, Your Honor. But it's not the same as it appears on the ledger.

BY MR. GORDON:

Q Now, have you ever seen a property boundary survey of the church?

A No.

Q Did you ever ask for a boundary survey of the

church?

A No.

Q Did you have any input with the church architects where you contended that you had a 40-foot right-of-way?

A No.

Q So I'm showing you what's been marked as Exhibit Number 1 --

MR. GORDON: And if we could blow it up on the church half of it, please.

BY MR. GORDON:

Q Now, would you agree that that line is generally the boundary line on the south side of the railroad, the right-of-way?

A Yes.

Q Now, do you see the other property line that begins here and extends straight down that way?

A Yes.

Q Do you know that to be a property line as well?

A I don't know that -- I know that's what's surveyed, but it doesn't give me --

Q It is.

A It is a boundary line?

Q Now, let's assume for a moment, if you will, that that is the property line or the right-of-way boundary line. Is it clear to you that the spur track is substantially off the

railroad right-of-way?

A Based on that drawing?

Q Yes, thank you. And I'm not trying to trick you. That's exactly what I want. Based on that drawing it shows that the rails are off of the railroad right-of-way. Now, down here can you see these small numbers -- we can blow them up for you -- where the surveyor established the width of the railroad right-of-way.

A Okay.

Q Can you see right here?

A Yes.

Q Does that show 10 feet on either side of the mainline track?

A Yes.

Q Now, with it blown up a little bit, can you see the property boundary a little bit better?

A I see the dark black line.

Q Pardon me?

A I see the dark black line through here.

Q Very well. And you see the language that explains the distance and the markers and the number of feet on that property line, correct?

A Yes.

MR. GORDON: Now, if you'll move over, please, to the left just a little bit. No, the other way. Can we clear the

screen.

BY MR. GORDON:

Q Now, do you recognize this area to be the tracks that are east of Webb Street?

A Correct.

Q And as far as you know is that where the railroad intends to reconnect these two tracks?

A Yes.

Q Now, do you see the RW marks here, for right-of-way. Do you see that it says six and six right here?

A Yes.

Q Now, would that seem to indicate to you -- and you are certainly not a lawyer nor a surveyor -- but would that indicate to you that the railroad mainline, at that point, had a 12-foot right-of-way?

MR. WILLIAMS: Your Honor, I'm going to object. I don't even follow this line of questioning. This is something somebody drew and put some stuff on and what does it indicate is not really relevant to what the facts are.

MR. GORDON: Your Honor, I think it's very relevant what the facts are because if the track -- the rebuilt track is not on the railroad right-of-way then it has no right to be there.

THE COURT: Go ahead and ask him your questions. I'll give it what weight it is entitled to.

BY MR. GORDON:

Q Let's do this, Mr. Bishop, let's go to Exhibit Number 3. Now, are you familiar with that as a portion of the val map?

A Yes.

Q And did you understand that the val map generally determined the right-of-way boundaries?

A At that point in time.

Q Okay. Now, does that show the right-of-way to be 10 feet on either side of the mainline there?

A Yes.

Q And does it show it 6 feet on either side of the mainline there?

A Yes.

Q Has anyone ever talked to you about the Clinkscales agreement by which the church spur was connected to the cotton oil mill?

A I don't recall specifically the name of the locations.

Q Had you ever read the Clinkscales agreement? The agreement that governs the use of that spur near number 5.

A Vaguely in some distant past.

Q Now, the track that you see right here that no longer exist, does it?

A No.

Q Is that a private track?
A Correct.
Q And this one, the same thing?
A Right.
Q Did you seek STB approval to remove those lines?
A Those were there by an agreement.
Q They were there by agreement?
A With the cotton --
Q With the cotton mill?
A Right.
Q Let me show you what we're going to mark as Plaintiff's Exhibit Number 8 -- no, I'm sorry.

MR. GORDON: Your Honor, I find that the Clinkscales agreement actually exist in the record as document 8.1, which is an exhibit to the Defendant's motion to dissolve the injunction. Well, 8.1 is the brief. The Clinkscales agreement was shown in the record as Court document 8.2. May I exhibit the document to the witness?

THE COURT: Yes, sir.

BY MR. GORDON:

Q Mr. Bishop, I realize that you're not a lawyer and you're not in business of interpreting documents, but you said that you had believed that you had seen the Clinkscales agreement before. Does that appear to be it?
A Yes.

Q Now, if you will, look at the highlighted portions of that document. Specifically, let's look at number 4. If you would take a minute and read that, please.

A What do you want -- which part?

Q Number 4. Does that correctly read that "He -- and by he it means Mr. Clinkscales -- he, at his own cost and expense, will maintain the industrial track as extended from the points, from the point of clearance there on to the terminus thereof at all times during the life of this agreement keep it in good condition and repair in all respects." Did that put the burden of maintenance of the Clinkscales track on Mr. Clinkscales?

A Yes.

Q And this agreement -- it's referred to on page 1 as the Clinkscales Industrial track, isn't it?

A Would you repeat that.

Q On the first page it's called the Clinkscales Industrial track?

A All I see is it looks like something PE Clinkscales, that's all I see.

Q All right. I don't want to put you on the spot, sir. If you'll go to Article 6 of that agreement and take a look at that. Does that say that Mr. Clinkscales will indemnify and hold harmless the railroad against any and all damage resulting from negligence of the party of the second part, that is Mr.

Clinkscales?

A Yes.

Q His servants and assigns and all others -- I'm sorry and all users of said industrial track and the right-of-way therefore?

A Yes.

Q Now, in your time with the railroad has anyone ever talked to you about the Clinkscales track and any concern that they may have that the Clinkscales heirs could terminate the agreement?

A No, it's not to me.

Q You are familiar with the TORCH agreement. I believe you testified that you were involved in the negotiation of it?

A Yes.

Q I certainly don't expect you to recall the various terms of the TORCH agreement.

MR. GORDON: Your Honor, might I approach the witness with a copy?

THE COURT: Yes.

BY MR. GORDON:

Q This appears in the Court record as Court document 14.1 and it will also be entered into evidence as Plaintiff's 8. Is that the agreement that resulted -- is that the agreement that you were working on, the agreement that came

about that put the -- that leased the tracks and buildings to the nonprofit group TORCH?

A Yes.

Q Does that agreement -- I believe it's paragraph 14 or Article 14. Article 14 on default, page 11. Do you see that?

A Yes.

Q And it talks about events of default and then it gives five separate matters that could occur. Is it true that all of those five matters that could occur, that could cause a default in this lease, are matters in which the lessee has failed to carry something out; like pay the rent?

A Yes.

Q Now, is there anything in that paragraph or, in fact, any other component of the agreement that says that the railroad can terminate it for their own convenience or for the use of the reuse -- renewed use of the track?

A The default provisions were with the lessee in the negotiations with TORCH.

Q And the agreement, of course, serves as the proof of those negotiations, correct?

A I'm sorry.

Q This agreement is the product of your negotiations?

A Correct.

Q And if you don't mind flipping to the very last page of that document, Plaintiff's 8, the very last page, page 587.

MR. GORDON: Judge, I do have it in the Court record already. May I tender into evidence at this hearing the Court document that is already a part of the record?

THE COURT: Sure. Make sure it's identified.

MR. GORDON: And I believe that the witness has just identified the agreement as being the one between the parties. If you look at the signature pages.

THE COURT: What is its designation in the record though? What's the document number?

MR. GORDON: I believe, and let me check, I believe it's 14-1. Yes. In the record it appears as 14-1 in its entirety.

THE COURT: It's admitted.

MR. GORDON: Thank you.

BY MR. GORDON:

Q Now, if you'll flip to the very last page of that agreement you should find a diagram or a map. Does that drawing show the property that was leased to TORCH of Hartwell, Inc.?

A Yes.

Q And does that include the railroads right-of-way from the Depot or actually from Forest Avenue all the way to Athens Street?

A Yes.

Q And does it include the specific right-of-way that

bisects the church property, which on this diagram has a number of 132 on it?

A Yes.

Q It even shows the leased area to be across Webb Street, doesn't it?

A Yes.

Q Even though the tracks have been removed.

A (No response).

Q Now, can you point to anything in the agreement or even anything in your recollection, for that matter -- especially anything in the agreement -- where the railroad reserved the right to reopen this area for commercial traffic?

A The discussions in instigating this lease were to be a friendly endeavor with the City of Hartwell, the TORCH personnel, with -- and no implied but understood in general discussions, that the future of the railroad could reinvigorate a discussion further into the operations of the railroad.

Q And I appreciate your earlier comment when you were being directly examined that the railroad entered into the agreement to accommodate local officials and build goodwill.

A That's correct.

Q Now was there any other motivation entered into the agreement?

A Preservation of the railroad right-of-way.

Q Would the payment of $335,000 be a motivation as well?

A It was a long-term lease.

Q And is that the amount that the TORCH group has guaranteed to pay the railway over the course of the lease?

A That's correct.

Q That's yes?

A Yes.

Q Thank you. Now, let me just ask you one more time -- and I don't want to prolong it and you said that you had some discussions or there was some implication -- but is there anything at all in the agreement where the railroad retains the right to continue to use the leased track for commercial railroad operations?

A No.

Q Thank you. I appreciate your candor. In fact, did you understand, too, that the TORCH group had a plan to remove the rails and replace them with some type of light or fake rail?

A No.

Q You weren't a part of that discussion. Thank you.

MR. GORDON: That's all I have of this witness.

MR. WILLIAMS: Very small redirect, Your Honor.

THE COURT: All right. Mr. Williams?

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q Mr. Bishop, do you know the date on the Clinkscales agreement that you were just questioned about a moment ago?

A I didn't look at it.

Q Do you still have it in front of you?

A No.

MR. WILLIAMS: I have it on my computer if I can get it switched over.

MR. GORDON: I can stipulate that Judge. It was June 28th, 1919.

BY MR. WILLIAMS:

Q Mr. Bishop, you say you started working for the railroad in what, '95?

A Correct.

Q From '95 until your retirement, did the Hartwell Railroad ever serve a customer at the location of this track just east of Webb Street?

A I don't recall specifically a customer on that siding, but we used it for runaround purposes to facilitate a grain bin that was across Webb Street from the Depot and to service it required that we utilize that track.

Q And, of course, Mr. Gordon pointed out for you that it was Mr. Clinkscales responsibility to maintain that track under the agreement; is that right?

A That's correct.

Q Has Mr. Clinkscales done anything to maintain that track in the last 20 plus years?

A No.

Q Would it be fair to say things might have changed since 1916?

A Yes. There is a provision in here if I could have you scroll up.

Q I'm sorry.

A If you would scroll up I saw a provision while ago. I don't remember the number. That the railroad retained the right -- keep scrolling, please. Article five.

> "All the rails and materials and fixtures in said existing track is and shall remain vested in the railroad and the railroad shall have entire control of said industrial track as extended in the operation thereof, may use the same as well for the business of third persons not party hereto as for that of the party of the second part hereto provided however, that such use of said industrial track would benefit third persons shall not unreasonably interfere with the business of the party of the second part."

So the railroad did retain title to the rail as well.

Q Do you have the TORCH lease in front of you?

A Yes.

Q I happen to also have it on my computer. Turn to Exhibit C of the TORCH lease. It's going to be on page 29 according to the document. Have you found it?

A Yes.

Q That's going to be the -- attached as an exhibit are the license agreements of the church; is that right?

A Yes.

Q And so when I scroll to page 30 that's the same drawing that the church submitted to the railroad in support of its license agreement, is that right?

A Yes.

Q And that's the document that you identified a moment ago that showed the boundary line or the property line on TR?

A Yes.

Q And that's the document you identified a moment ago that showed the boundary line or the property line; is that right?

A Yes.

Q And that line is actually called the property line on the legend; isn't that right?

A Yes.

Q And on this document -- did you rely upon this

document the church gave you?

A Yes.

Q What did you rely on it for?

A It showed me where they were placing the pipes and what they showed to be their property line. And when I saw that there was no issue about the property line per this drawing I had no reason to go further than that.

Q Had you seen the drawing that Mr. Gordon showed you a few minutes ago, where it showed your track on their property, would you have handled this differently?

A Yes.

Q What would you have done?

A Not issued it.

Q And, on this document the church gave you, where is the runaround track?

MR. GORDON: Your Honor, I'm not sure he established that the church gave him this document. Rather I think he established that the church's architect did.

MR. WILLIAMS: Well, it was attached to the application from Mr. Whittemore. Let me go back to that.

MR. GORDON: That's all right. Mr. Whittemore signed it.

BY MR. WILLIAMS:

Q You got that from Mr. Whittemore, right?

A Yes, when the application came in.

Q On whose property does this document show the runaround track to be on?

A It's showing in the rear corridor.

Q And specifically it's not shown on the church property; is that right?

A That's correct.

MR. WILLIAMS: That's all the redirect, Your Honor. Thank you.

MR. GORDON: Just one other question.

RECROSS EXAMINATION

BY MR. GORDON:

Q Mr. Bishop, if the spur track did not appear within the right-of-way belonging to the railroad on the 1916 val map wouldn't that mean that the railroad would have had to have acquired additional right-of-way?

A To the best of my memory that spur track was extended subsequent to another agreement east of Webb Street which required another industry and that track was extended across Webb Street to service that at some point, I believe in the '20s. This val map is 1916 -- if my memory -- 17, somewhere in there. And it reflected what was in place at that point. Subsequent to that, when the track was extended across Webb Street, it was extended to accommodate another customer utilizing the spur of what went into the Clinkscales property.

Q Was that Gold Kist?

A I don't recall the name of the company, but it was on the east side and north of the mainline where currently Depot Street is.

Q Did Gold Kist go out of business in 1995?

A There was a -- I don't recall the name of the company per se, where the corn bins were, but it was in that time.

Q That was Hartwell Grain and Elevator? Hartwell Grain and Elevator went out of business in 1996, didn't they?

A I believe so. I served them. When I first started we served that customer.

Q So the two customers that you had over in that area were Gold Kist and Hartwell Grain and Elevator?

A At that time, yes.

Q Both of which went out of business in about 1996?

A Yes.

Q Do you recall any other customer that you ever serviced since 1996 over that portion of the track?

A No, nothing other than the use of the runaround for operational purposes.

Q Using the runaround for your cars maybe, right?

A Correct.

Q But not for any commercial traffic?

A Not at that time because other businesses on Depot Street butted up against the right-of-way in '95.

MR. GORDON: Thank you.

THE COURT: All right, sir, you may step down. Let's take about 15 minutes and we'll come back and finish up with whatever you've got.

MR. WILLIAMS: May Mr. Bishop be excused, Your Honor?

THE COURT: Yes, he may.

(RECESS)

(JUDGE ENTERS)

(TESTIMONY CONTINUED)

THE COURT: All right. Call your next witness.

MR. WILLIAMS: Thank you, Your Honor. I'd call Mr. Joe Whittemore for purposes of cross examination.

THE COURT: Mr. Whittemore, if you could come to the witness stand, please.

COURTROOM DEPUTY: Do you solemnly swear that your testimony in this case shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT: Please be seated, sir. Once you get situated if you would state your name for the record and spell it for the court reporter.

THE WITNESS: My name is Joe Whittemore, J-O-E, W-H-I-T-T-E-M-O-R-E (spelling).

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

JOE WHITTEMORE

Witness having been first duly sworn, testified on

CROSS EXAMINATION

BY MR. WILLIAMS:

Q Mr. Whittemore, if you can't hear me for any reason, let me know.

A Thank you. I have hearing aids so I may.

Q You can wave, that will be fine. You are here representing the church; is that right?

A That's correct.

Q What is your position with the church?

A I am chairing a task force that was set up by a church conference.

Q And when did you take that position?

A Spring of 2015.

Q Was that when the task force was created or did you have a predecessor?

A No, it was created at that time.

Q So you have been the only chair?

A Yes, sir.

Q And what is the purpose of the task force?

A The task force was set up to look into the property matters. Specifically to spend time trying to find out what the situation was as far as the tracks running through the church property, and see if we could make some determinations

as to exactly what the facts were.

Q What is the interest of the church in the tracks?

A The tracks bisect the current property of the church. We had been very hopeful that our future plans could include the utilization of that area. We have somewhat of a flooding issue there when it rains. We also are very concerned about the safety of cars coming into the church. Basically if the property belongs to the church and is not being used for other purposes we've made the determination that we would like to pursue having the tracks abandoned by STB.

Q There is no dispute that -- I thought we were all in agreement that the railroad does own at least 20 feet; is that right?

A My understanding is that the railroad has a right-of-way to 20 feet. I'm not a lawyer. So, I can't really answer your question but my understanding is that there is a right-of-way, not fee simple ownership, of that land. As I say I'm not a lawyer.

THE COURT: Do you understand that the -- who do you understand owns the fee title to the land on which the right-of-way runs that is there adjacent to the church? Do you understand the church owns that, subject to the right-of-way?

THE WITNESS: My understanding has been -- I'm not a lawyer -- but my understanding has been that if the tracks are abandoned that, under Georgia law and under court cases, that

at that point in time the church would be able to file for a clear title with the Superior Court, and that would be our intention if we are successful with the abandonment process.

THE COURT: Is it your understanding that your predecessor in title owned the land at one time upon which the right-of-way runs?

THE WITNESS: Yes, sir. Mrs. Thornton.

THE COURT: Are railroad right-of-ways fee simple or are they easements?

MR. WILLIAMS: Do you want me to just answer the question?

THE COURT: Yes, sir. If you know?

MR. WILLIAMS: I do. This is pretty much my specialty.

THE COURT: Yes, sir.

MR. WILLIAMS: And the answer is: It depends. I knew you would be impressed by that.

THE COURT: What about the 20-foot right-of-way here that goes by the church? Does the railroad own that in fee or is it an easement?

MR. WILLIAMS: This particular piece of property was acquired from L. F. Thornton or J. L. Thornton. I can't remember the lady's name.

THE WITNESS: Louisa.

MR. WILLIAMS: On the deed it just gives her initials

or on the conveyance. And it was actually condemned. It was not by deed. And in those days -- I don't know how much railroad history --

THE COURT: Condemned by who?

MR. WILLIAMS: By the railroad.

THE COURT: So what type title did they obtain to it, fee or easement?

MR. WILLIAMS: That, you have to go back to the charter of that particular railroad to determine what the power of condemnation that they got gave them.

THE COURT: Do we know?

MR. WILLIAMS: I have not looked at it.

THE COURT: So we don't know. It could be a strip in fee --

MR. WILLIAMS: It could be.

THE COURT: -- or it could be an easement?

MR. WILLIAMS: Could be.

THE COURT: Go ahead.

MR. GORDON: Judge, might I take a quick crack at the question too?

THE COURT: Yes, sir.

MR. GORDON: I do think it depends. This railroad, to the extent we have researched it, and some places in the county has as much as a 100 foot right-of-way and other places it's as little as 12 feet. But the piece here, the 20-foot

piece that we acknowledge they have the right to use was conveyed for the purposes of the railroad only. It was not a fee simple conveyance.

THE COURT: Go ahead.

BY MR. WILLIAMS:

Q When did the church acquire the land that this track sits on?

A I don't have the exact date, but it would have been around 2005, 2006, in that area. Now, I'm sorry, are you talking about the north side of the track or the south -- the south side of the track we acquired in like 2005/2006. The north part of the track was given to the church around 2000.

Q Who gave it to the church?

A Springs Industries.

Q Now, you bought the other from -- you bought the mill property on the south side, right?

A That's correct.

Q And isn't it true that in that purchase that small piece just on the north side was also part of that purchase? The part where this particular piece of track sits on?

A No, sir. I do not believe so.

Q Do you have knowledge of whether any of the land on the north side was acquired at the same time as the Springs purchase?

A It was not.

Q It's your understanding that the only thing purchased in 2005 or 2006 was on the south side of the track?

A That's correct.

Q Have you done any work on your own researching the title of any of this property?

A I have as an accountant.

Q Okay. I mean, you've gone to the courthouse and looked at deeds and things like that?

A I have.

Q And you've not found any document that addresses how the railroad got to this piece of land; isn't that correct? I'm talking about the runaround track, not the mainline?

A That's correct.

Q Now, a few moments ago you answered one of my questions about what the function of the task force was and what the church's interest is in the railroad's property or the right-of-way. And you said that you someday -- if I say it incorrectly please correct me -- that you someday hope to make use of that. Did I say it correctly?

A Yes, in the context that if it were ours.

Q But it's not, right?

A Pardon.

Q It's not yours, correct?

A The right-of-way is not.

Q Right. But you've nonetheless filed an adverse

abandonment proceeding in the STB; isn't that also correct?

A You mentioned that before. We have not filed at this point in time. We have filed a notice of intent and our plan is that we will file in the future, but we have not filed with STB for adverse abandonment at this point in time.

Q And the adverse abandonment would take away the railroad's ability to operate on this line, wouldn't it?

A Yes.

Q And you know the railroad is opposed to that, right?

A Yes.

Q But it's your intent to proceed with it anyway?

A That is correct.

Q So you're in essence trying to take the railroad's land, isn't that fair?

A I do not concede that it is the railroad's land. That deed says -- the Thornton deed says, "that the railroad has the right to construct and operate a railroad." It does not say that the land is the railroad's land. Again, Judge, I'm just an accountant.

THE COURT: All right.

BY MR. WILLIAMS:

Q So you're trying to take away the railroad's right to operate on the land?

A That's correct.

THE COURT: And, when you say the land, you're

talking about the 20-foot easement?

THE WITNESS: Yes, sir.

THE COURT: You have learned in your title search which you believe is that the railroad, at one time, built a track on the Ms. Thornton land?

THE WITNESS: That's correct.

THE COURT: That was not conveyed to them as a right-of-way because it was outside of the 20 feet?

THE WITNESS: Judge, in my understanding of this the mainline was built --

THE COURT: Within the 20 feet.

THE WITNESS: -- within the 20 feet in the 1880s. Sometime between then and the 1916 val map the spur over to Webb Street was built. And what we believe, at this point, is that it was built outside of the 20-foot right-of-way.

THE COURT: Does your research indicate that that part of the line was originally built as just a spur that terminated on that property and did not reconnect as a runaround and that they later connected it to be a runaround? Is that what you believe happened?

THE WITNESS: Yes, absolutely. And I believe that the documents clearly show that. The original spur, what we call the north spur, went to Webb Street. It did not go across Webb Street. And then in 1919 the agreement, which was presented earlier, authorized Clinkscales to have an industrial

spur to his warehouse which was on the other side of Webb Street. And at that point in time the spur was extended across Webb Street to Mr. Clinkscales warehouse.

THE COURT: But still not connected back yet?

THE WITNESS: That is correct.

THE COURT: Did the first spur, before Clinkscales, go onto Ms. Thornton's property beyond the 20-foot right-of-way or was it not until the Clinkscales spur was added that it went beyond the 20 feet?

THE WITNESS: That north spur where it is right now, as far as we know, is where it was originally.

THE COURT: So when the first part of the spur was built it went outside of the 20-foot right-of-way to some extent?

THE WITNESS: Yes, sir. To a great extent. There's only a small amount of that spur track that is inside of the 20-foot right-of-way.

THE COURT: And would the property owner at the time that the spur, the first part of the spur was constructed -- the property owner, whose land that went over, who was that at first, the first spur? Would that property owner have benefited from the spur and then likely agreed for it to come over their property because they thought they were getting some benefit out of it?

THE WITNESS: As far as we know the spur was built to

what was called -- it was an allowance between farmers to start off with but after they -- somewhere between the time that they started their allowance they built a warehouse on the corner of where the mainline, the main track is and Webb Street and that was the Farmers Union Warehouse. And that was there for many years, it's not there any longer. That was what that spur came to.

THE COURT: That was the first spur, before Clinkscales came there?

THE WITNESS: Yes, sir.

THE COURT: And then at some point Clinkscales had an operation that needed rail access so there was an agreement to extend it further?

THE WITNESS: The first spur, yes.

THE COURT: To extend the first spur over toward Clinkscales?

THE WITNESS: Over to the Clinkscales warehouse, yes, sir.

THE COURT: And then at some point -- so all of that is obviously outside of the 20-foot right-of-way that the railroad had for the mainline?

THE WITNESS: Not only that but on the Clinkscales side of it it's only a 12-foot right-of-way, six and six.

THE COURT: Because Clinkscales is on the other side of the road?

THE WITNESS: Yes, sir. And that is completely outside of the 12-foot right-of-way which was the Richardson property originally.

THE COURT: And is it your understanding that those spurs were constructed by the farmers or the business people that built them as side tracks or do you understand the railroad constructed those?

THE WITNESS: I don't know that I have a clear understanding of that. But the Clinkscales spur was built under the agreement that was between Mr. Clinkscales and a federal judge, incidentally, that was overseeing the railroad. It was going through bankruptcy and that type of thing at the time. As far as I know the railroad built the first spur, what we call the north spur, over to the farmers warehouse.

THE COURT: Right. To service the farmers?

THE WITNESS: Yes, sir, to service the farmers.

THE COURT: And then after they built Clinkscales -- -- when did they connect the Clinkscales back to the mainline?

THE WITNESS: That's an interesting question and I don't know the answer. But it was sometime after 1920s that connection was made. And as far as we have been able to determine it was made without any right-of-way or anything else at that point in time.

THE COURT: Just a rule of "do". Just did it?

THE WITNESS: As far as we know, yes, sir.

THE COURT: So what the church would like to eventually do is have the entire 20-foot right-of-way that is there adjacent to the church property, but you understand that you've got to go to the STB to do that. But what you're seeking to have done, without going to the STB, is to keep them off of your property, which you contend is the property that is north of where the 20-foot right-of-way ends?

THE WITNESS: Yes, sir.

THE COURT: It's the church's position that at most what the railroad has at the moment is just the 20-foot right-of-way, and that 20-foot right-of-way boundary that is north, the northern boundary. Everything north of that north right-of-way boundary is the church's property?

THE WITNESS: That is correct. And we have not attempted to interfere with the 20-foot right-of-way to --

THE COURT: You know you've got to get the STB permission before you can do that?

THE WITNESS: Yes, sir.

THE COURT: Do you know when the church learned that the old spur was actually outside of the 20-foot right-of-way and on your property or did you not have reason to be concerned about that because it was not in operation?

THE WITNESS: It was not in operation.

THE COURT: But in 2008 it was in operation, correct?

THE WITNESS: That was the testimony, but I don't

believe that's correct, Judge. I think that the spur, as far as it's commercial use, was taken out of operation in 1996 based upon what we have been able to find.

THE COURT: Was that before the church acquired this additional property?

THE WITNESS: Yes, sir. And the 2008 is, of course, within about three years of the time that the church acquired it.

THE COURT: So when you acquired this additional property -- the property that you acquired was this property that you now say the church owns that the spur was on? In other words, the church has only owned that piece of property since when? The disputed piece here, the piece that is north of the 20-foot --

THE WITNESS: The north piece --

THE COURT: -- north piece?

THE WITNESS: -- was given to the church in about 2000. The southern side of it was bought from Springs Industries in about 2005 or '06.

THE COURT: But the southern side -- there is no argument there at the moment because the part you own on the southern side there is no track on that?

THE WITNESS: Correct.

THE COURT: All of the dispute is on the north side?

THE WITNESS: Yes. And all of the spur tracks that

were on the southern side have already been --

THE COURT: Abandoned.

THE WITNESS: -- they were closed, abandoned, closed.

THE COURT: So is it your testimony or your recollection that when that property on the north side was deeded, was given to the church, is it your recollection or your understanding that the spur on the north side was being used or was not being used?

THE WITNESS: It was not being used. It had not been used for years.

THE COURT: So the testimony in your view that it had been used up to 2006 is not consistent with your recollection?

THE WITNESS: That's correct.

THE COURT: Was the track still there at that time though --

THE WITNESS: Yes, sir.

THE COURT: - so somebody could say it could have been used potentially if they had wanted to be used to use it, but you're saying that there were no trains running on it?

THE WITNESS: The track was there as is shown in our building construction drawings.

THE COURT: Right.

THE WITNESS: You know, I mean, it's on the drawing because it's there --

THE COURT: Right. But it was sitting up -- the rail

was sitting up -- not like it is now, but it was sitting up, the rails, you could see it. You're just saying that trains weren't coming down it?

THE WITNESS: -- yes, sir.

THE COURT: And this information that you got about the history of that property is based on you actually going to, in part, going to the record room in the courthouse and trying to figure out what all the deeds indicate, plus your knowledge of -- how long have you lived in the area?

THE WITNESS: I've lived there 40 years.

THE COURT: How long have you been associated or affiliated with this church?

THE WITNESS: Forty years.

THE COURT: Okay. So it's based on what you found in the record room and your personal recollection of the property in the area?

THE WITNESS: I might add, Judge, that the --

THE COURT: Is that true, what I just said?

THE WITNESS: Yes, sir. And I might add that the research that I did -- I started with the val map because on the val map are legends that show exactly each piece of property and it gives the deed references at the courthouse and all that. So I didn't just go down and just pull stuff up. I used the val map legend in order to find the various deeds.

THE COURT: And how did you even know what a val map

was?

THE WITNESS: That is interesting. I didn't until Mr. Anderson mentioned its name last Thanksgiving. I knew what I had, but I had never connected the term val map with it. But I had that because it's recorded and I had the val map. I had what I thought was a plat, but as it turns out that was -- what I was using was a copy of the recorded val map.

THE COURT: And you're a CPA, an accountant? What are you?

THE WITNESS: Yes, sir. I'm a retired CPA.

THE COURT: Retired CPA. That's your professional background?

THE WITNESS: Yes, sir.

THE COURT: And what is your pin?

THE WITNESS: Rotary.

THE COURT: That's your Rotary pin, okay. All right. Any other questions?

MR. WILLIAMS: Just a couple, Judge.

BY MR. WILLIAMS:

Q Are you trying to do title searches, Mr. Whittemore?

A Say that again, please.

Q I'm sorry. Are you trained to do title searches?

A No, sir.

Q As a CPA I presume you're fairly meticulous?

A Yes, sir.

Q Attention to detail?

A Yes.

Q Did the church get its own title search?

THE COURT: For what, the gift, the north gift?

MR. WILLIAMS: Yes.

THE COURT: The north gift.

BY MR. WILLIAMS:

A THE WITNESS: Counselor, I'm not sure about that. We have a warranty deed.

Q From who?

A On the gift that came from Farm Springs. I'm not sure what your question is, so I really don't know the answer.

Q Did the church get a title search on that property?

A I do not know the answer to that.

Q Does the church have title insurance on that property?

A To my knowledge, yes.

Q You say you've been in Hartwell 40 years?

A Yes, sir.

Q Has the runaround track been in place that entire time?

A Up until 2008.

Q Up until 2008 the track was in place?

A Say it again.

Q I said, up until 2008, as far as you know, that track

has always been in place?

A Yes.

THE COURT: For 40 years?

MR. WILLIAMS: For 40 years.

THE COURT: From what he can say, I guess.

MR. WILLIAMS: Right.

THE WITNESS: I don't know --

THE COURT: I mean, now I'm seeing where the confusion has come in from the spur and the runaround, and I don't know if you've got evidence to the contrary. But it sounds like the runaround may have started as a spur and then it was ultimately converted into a runaround. Do you have reason to believe his understanding of that is not correct?

MR. WILLIAMS: To a certain extent, Judge, we are all just speculating.

THE COURT: Okay. So we don't -- I mean, that makes sense what he says, but I don't know.

MR. WILLIAMS: Well, Judge, we have the val map that shows it as a spur.

THE COURT: The val map does show it as a spur, but does it show it all the way connected?

MR. WILLIAMS: No, it does not.

THE COURT: It doesn't. Okay. So we know at one point -- somebody didn't go down there and say we need a runaround and we can construct it all at one time?

MR. WILLIAMS: Correct.

THE COURT: It looks like that it was done in phases?

MR. WILLIAMS: Correct. As is the nature of rail property.

THE COURT: Right.

MR. WILLIAMS: It evolves over time as demand increases.

THE COURT: Okay. Well, the problem here, though, I guess, is that the previous owner of what they ended up with may have had no problem with the spur because it was benefiting his property, the first spur. But then what ends up happening when it gets converted -- when it gets eventually built into a runaround then it's not consistent with the original purpose for which it was constructed.

MR. WILLIAMS: Or he could have just as easily had no problem with that too.

THE COURT: He could have.

MR. WILLIAMS: Because I have not heard one shred of evidence --

THE COURT: Could you have a situation where the STB would not necessarily have had jurisdiction over a private spur, but then once it got connected back to the mainline and "became a runaround" they automatically assumed jurisdiction of the entire track?

MR. WILLIAMS: It's extremely possible, Judge, that

it became a runaround before there was either an ICC or an STB.

THE COURT: So that when the statute was enacted and jurisdiction was imposed if it was a runaround, it would be your argument, that they had jurisdiction over the entire runaround?

MR. WILLIAMS: If it existed at the time, certainly.

THE COURT: If it existed. Okay. Go ahead. This is very interesting, but a little complicated.

BY MR. WILLIAMS:

Q It was always a track connected at both ends as long as you have known; is that correct?

A Counselor, I did not go down there and look at the track until a year and a half ago. I have no idea what it was when I moved to Hartwell.

Q Have you ever seen a customer served on that line, meaning specifically the runaround track, in the time you have lived in Hartwell?

A I wouldn't know whether it was on the runaround track or not. I am not an observer of railroads, Counselor. I think the answer is no.

Q So likewise a car could have -- that track could have been used in 2006 or 2005 and you wouldn't have seen it?

A That's correct.

Q Don't take this as insult, but I assume you didn't know the Clinkscales and never met the Clinkscales?

A No, sir, I did not know the Clinkscales.

Q Who owns the land today that the church and the runaround track sit on? Who do you claim owns that land?

A The church.

Q Is it Hartwell First United Methodist Church, Inc.?

A Yes.

Q Because I understood that Methodist churches have to convey their land to another level or something?

A That is incorrect.

THE COURT: That's Presbyterians.

MR. WILLIAMS: I'm sorry.

THE COURT: That's Presbyterians. Maybe some Methodist too, I don't know. But I know it's Presbyterians, usually that applies to them.

THE WITNESS: Any United Methodist Church has what is called a trust clause. And what that trust clause provides is that if the church goes out of -- if the church body goes out of business, if it's not doing ministry, at that point in time the title goes over to the North Georgia Annual Conference. But as long as the church is involved in its ministry the trust clause has no application.

THE COURT: So is it your view that the church owns the property that is outside of the 20-foot right-of-way because Ms. Thornton owned the property and y'all got everything that she got?

THE WITNESS: Yes, sir.

THE COURT: Okay.

THE WITNESS: And we own it with a trust clause. There is a trust clause in the deed.

THE COURT: Right. I mean, if you went back to the -- the part that is under the runaround, that was conveyed to you more recently, though, correct?

THE WITNESS: The north side --

THE COURT: The north side.

THE WITNESS: -- was conveyed to us in like 2000 and the south side we acquired.

THE COURT: But the 2000 that was given to you on the north side that's the property that actually you contend is the property on which the runaround sits?

THE WITNESS: Judge, the deed -- the deed actually -- Mrs. Thornton's deed says that a right-of-way runs through her back yard. So my guess would be that at that time that she owned the property on the north and the property on the south, but I do not know that.

THE COURT: But you didn't get the property on the north in 2000 from Ms. Thornton or her heirs, you got it from some other company, right?

THE WITNESS: We got it from Springs Industries which had a --

THE COURT: And they had gotten it from Ms. Thornton?

THE WITNESS: Yes, sir. It had come to them over time.

THE COURT: And when Springs Industries deeded the property to you, do you know whether they just referred in the deed that same property that Ms. Thornton owned that extended up to the railroad right-of-way or -- why couldn't nobody determine -- well, you did, you said that your surveyor surveyed out based on what was in the 2000 deed to the church?

MR. GORDON: Yes. And the 2000 deed and the south side deed and the railroad right-of-way.

THE COURT: So your survey is based on legal description from the 2000 deed?

MR. GORDON: Yes, sir.

THE COURT: Okay.

MR. GORDON: And others.

THE COURT: And that's not just speculation as to what was Ms. Thornton's property, there's actually a legal description, obviously, in that deed that says this is the boundary. And according to your surveyor the boundary extends up to the 20-foot right-of-way for the mainline track?

MR. GORDON: Yes, sir.

THE COURT: So anything north of the 20-foot right-of-way northern boundary was conveyed by Ms. Thornton to this company that conveyed it to the church in 2000. That's your position?

MR. GORDON: Yes, Your Honor.

THE COURT: You don't think it's that clear?

MR. WILLIAMS: No, sir, not at all. I've looked at the title myself and it is nowhere close to that clear. I would have to hear from that surveyor as to how he made that decision to draw that line.

THE COURT: Okay. All right, well go ahead.

MR. WILLIAMS: Thank you, sir.

THE COURT: Have y'all tried to survey it? You've not had the need. You didn't think you had the need?

MR. WILLIAMS: We haven't had the need. We didn't even know there was a challenge to our property until about six weeks ago.

THE COURT: You didn't know that your runaround was allegedly on church property?

MR. WILLIAMS: Had not a clue.

THE COURT: I'm surprised -- anyway -- go ahead.

BY MR. WILLIAMS:

Q You mentioned the Farmers Union Warehouse earlier?

THE COURT: Did the Superior Court Judge hear all of this?

MR. GORDON: No.

THE COURT: Is he aware that -- was the survey in existence when you had your hearing in front of him?

MR. GORDON: Yes. He was -- let me say he received a

considerably truncated view than what you have had.

THE COURT: Okay.

MR. WILLIAMS: Truncated and one-sided.

MR. GORDON: The survey was in evidence and the val map both in evidence. And I believe that the Thornton deed was in evidence as well.

THE COURT: Go ahead.

MR. WILLIAMS: Just so the Court knows I got two hours notice of the hearing and I was an hour and a half away.

THE COURT: Okay.

MR. WILLIAMS: If that gives you an idea of the level of preparation I had.

MR. GORDON: And Judge, let me tell you, he did a remarkable job in defending his client in that case.

THE COURT: Go ahead.

MR. WILLIAMS: As borne out by the result.

THE COURT: Well, you never gave the Judge the opportunity there to determine whether he wanted to convert the TRO to a preliminary or permanent injunction.

MR. WILLIAMS: I fully concede that point because I immediately recognized the jurisdictional problem, Judge.

THE COURT: All right. You go ahead. Let's finish with this witness.

BY MR. WILLIAMS:

Q Mr. Whittemore, when you talk about Clinkscales are

you aware that Clinkscales, as a part of that agreement, dedicated another seven and a half feet of property to the railroad there?

A No.

Q Let's turn to the license agreement application that you signed. I'm looking at Defendant's Exhibit Number 34, Mr. Whittemore. You've seen this document before, haven't you?

A Yes.

Q And you filled it out for the Hartwell Railroad so that y'all could get permission to cross for the pipeline; is that right?

A I think a representative of the church from our architectural firm actually filled it all out.

Q That would be Armentrout? The firm of Armentrout?

A Yes.

Q And why were you involved all the way back in 2008 or '07, I'm sorry?

A I was the chair of the building committee.

Q Your application actually is dated in 2008. At that time did you hold the opinion that the runaround track was sitting on church property?

A I don't know at that point in time if we had really focused on that particular issue. That issue came up mostly two years ago when we got involved in this -- the idea of

having a public walking trail through our property.

Q Meaning the TORCH agreement?

A Yes. But as to whether I was -- I cannot say for sure that I either was or was not aware of the problem of the right-of-way, where the right-of-way was. I did not know that there was a 20-foot right-of-way until we got involved in it a couple of years ago.

Q You could see the railroad tracks though, couldn't you?

A Yes.

Q You knew they were there?

A Absolutely.

Q Both of them?

A Absolutely.

Q And they were open and notorious, right?

A They were what?

Q Open and notorious, obvious, plainly visible?

A Yes.

Q And the railroad was using them at some point, right? You've been there 40 years, you've seen the railroad use them?

A I think I testified before that I'm not sure that I ever saw the railroad use that, but I am not an observer of a railroad.

Q Okay. Have you ever seen a train car pass behind the church in the 40 years you've been there?

A Yes.

Q And y'all respected the railroad's property; isn't that fair?

A Oh yes.

Q I mean, that's why you made this application is because you knew it was the railroad's property?

A Yes.

Q You wouldn't go onto the railroad's property without permission, would you?

A That is correct.

Q And again that's the reason for the application?

A That is correct.

Q So until two years ago you didn't even know the church had a claim to the property, did you?

A I think that's fair, yes.

Q So for the last -- going back from 2008 when the track was taken up -- let's just use that period -- 2008 back to '88 or whatever or further back, the railroad was occupying this piece of land that the runaround track sits on; isn't that fair?

A Yes. We did not own the property on each side of it at that point in time.

Q Right. One of your predecessors did, right?

A Yes.

Q And the railroad was occupying that land for 20 or

more years; isn't that right?

A The tracks were there.

Q The tracks were there, okay. Did you see that piece of land being used for anything besides a railroad?

A What piece of land?

Q Again the runaround track?

A Based on our research it was used as a spur track for 40 years and then it was extended and then it was brought back in on the other side.

Q My question is -- I think we all agree it's been used by a railroad. My question is has it been used by anybody other than a railroad?

A No. Not to my knowledge.

Q Back to the license agreement. You signed the application, right?

A Yes.

Q And Armentrout was working for the church, right?

A They were the architects for our building of a facility at the church.

Q And I assume you were paying them?

A Oh yes.

Q So they were working for you?

A Yes.

Q And they prepared the drawing that was attached to your application; isn't that right?

A That's correct.

Q And that drawing clearly shows that the property line excludes the runaround track, doesn't it?

A I don't know about the property line.

Q Well, can you see the screen in front of you?

A Yes.

Q Can you follow the arrow or the little hand that I'm moving around?

A Yes.

Q Do you see that line right there that says property line?

A Yes.

Q And it's a long dash, a short dash, a short dash and a long dash. Do you see that?

A Yes.

Q You come over here. Let me move up now. Do you see this line right through here?

A Yes.

Q That's a long dash, a short dash, a short dash and a long dash and then a short dash, short dash, long dash. That's a property line, isn't it?

A Yes.

Q And the property line right over here -- which side is the church on, the bottom or the top?

A The church is to the right of the circle.

Q The church is over here?

A Yes. I'm sorry. I can't see the whole thing.

Q I understand.

A The church is below the circle on the left-hand side.

Q The church is down here, right?

A Yes.

Q And here's the railroad tracks, right?

A That's not showing on my screen, Counselor.

Q Oh, I'm sorry. Let me pull up. Is this a railroad track right here?

A Yes.

Q And this is a railroad track right here?

A Yes.

Q And since the church is down here this is the north side of the track, right?

A That is correct.

Q So this would be the runaround track right here, right?

A Yes.

Q And it's on one side of the property line and the church is on the other side of the property line?

A This depiction is --

Q First answer my question.

THE COURT: Well, that's what it shows. You accurately described the relationship between that dash line

and what appears to be drawn in as tracks. Go down to the legend where it says -- I'm assuming it's going to be on the right-hand corner where is says what this actually is. Can you scroll down?

MR. WILLIAMS: I can. It starts in the left-hand corner, this C-100 it says site plan.

THE COURT: Is it certified as a survey based upon legal description?

MR. WILLIAMS: It's signed and sealed by an engineer.

THE COURT: What does this fine print say? Something in here that says this is or is not to scale and all that kind of stuff?

MR. WILLIAMS: I don't know, Judge. This is the best thing I've got.

THE COURT: So this is described by Armentrout, Roebuck and Matheny as a site plan?

MR. WILLIAMS: Correct.

THE COURT: Now, what you've introduced is actually a surveyor has certified that they took the metes and bounds and the legal description and did it all --

MR. GORDON: Yes, sir.

THE COURT: A certified survey?

MR. GORDON: Yes, sir.

THE COURT: Okay, go ahead. I mean, that ought to be able to be determined. Whether it's relevant or not or whether

it's dispositive or not that's another question. But it ought to be able to be determined whether or not this runaround sits on the other side of the 20-foot right-of-way. That ought to be easy to determine rather than having the fact finder having to compare a site plan to a certified survey. Because I can tell you this fact finder, if that's what it's going to come down to, is going to go with the certified survey.

MR. WILLIAMS: Of course, Your Honor, probably realizes that --

THE COURT: It may not matter. In the final analysis that may not be dispositive.

MR. WILLIAMS: I completely agree with that.

THE COURT: But I'm just saying if the fact finder is confronted with a site plan that is not certified necessarily as to the boundaries based on legal descriptions and compare it to a survey that is certified as being based on legal descriptions, then without more, you'd be inclined to follow the survey.

MR. WILLIAMS: Well, of course, my experience has been, Judge -- and yours could be completely different -- but anytime an engineer sits down to draw one of these they usually use CAD and the basis for the CAD is they pull in the data from a certified survey so that they work from that to build these drawings. The engineer has no idea where the property line is. That's not his business. He's got to pull that in from a

survey.

Now, we haven't had any discovery so I haven't had a chance to bore down on his --

THE COURT: Right.

MR. WILLIAMS: -- but this engineer got that from somewhere. He didn't make it up.

THE COURT: Okay. Go ahead. So you're not yet willing to concede that their survey is even accurate?

MR. WILLIAMS: Oh no, sir, not anywhere close. You would be surprised how many bad surveys I have dealt with.

THE COURT: Okay. Go ahead.

MR. WILLIAMS: Especially with railroad right-of-way's.

THE COURT: Okay. Go ahead.

BY MR. WILLIAMS:

Q Now you submitted this drawing in support of your application; isn't that right, Mr. Whittemore?

A Yes, sir. I didn't, the architect did. I signed it.

Q You signed it. Okay.

A Yes.

Q Did you look at it before you signed it?

A Yes.

Q Did you look at this drawing?

A I'm sure I did.

Q And you didn't take exception to it?

A It's a construction drawing. No.

Q Don't you think a construction drawing needs to be pretty accurate?

A You are way past my understanding of all this, Counselor. This is purely and simply a drawing that was a part of our construction plans. It had nothing to do with the survey. The line that's on here is not the same line as on the survey that we're looking at now. I did not spend any time at all on that.

Q Let me ask you this. In fairness to the railroad, don't you think that you ought to represent correctly where the property line is when you apply for something like this?

THE COURT: What's the date of this again?

MR. WILLIAMS: 2008.

THE COURT: 2008, okay.

BY MR. WILLIAMS:

A THE WITNESS: I don't know that it ever crossed my mind.

Q But, as a proposition, wouldn't you agree that that would be fair to the railroad?

A For a construction drawing, I don't think so.

Q Oh, you don't think they should know where the property line is and where you're going to put stuff on their property?

A Yes.

Q And, you know, of course, that you later signed the license agreement, right?

A Yes.

MR. WILLIAMS: I'm going to turn to now Defendant's Exhibit 38.

BY MR. WILLIAMS:

Q Do you recognize this document, Mr. Whittemore?

A I have not looked at this document. But if this is the agreement that we have with Hartwell Railroad, yes, I would recognize it.

Q You would agree that's your signature in the lower right?

A Yes.

Q Can I assume you read this before you signed it?

A At the time, yes.

Q And you would agree that this is, again, the same drawing that we've just been discussing that's now an exhibit to the agreement?

A Yes.

MR. GORDON: Your Honor, I object to the relevance to this entire line of questioning. The license agreement says nothing about the property line. The drawing is a construction drawing. No amount of cross examination is going to change that fact.

THE COURT: I think I understand this issue pretty

well.

MR. WILLIAMS: I have one more question, Judge.

THE COURT: All right, Mr. Williams. Go ahead.

BY MR. WILLIAMS:

Q Mr. Whittemore, let's look at paragraph 11 of the license agreement. Do you see it right there in front of you?

A Yes.

Q Look halfway down it says: "Licensee shall not at any time own or claim any right, title or interest in or to railroad's property occupied by Licensee's crossing." That's exactly what you're doing here today, isn't it, Mr. Whittemore?

THE COURT: Well, if they actually owned the property then they didn't need a license in the first place. That's just argument. Let's move on.

MR. WILLIAMS: Well, I would suggest, Judge, that the attachment is an admission on their part that the property belongs to the railroad. I mean, that's what they represented to the railroad.

THE COURT: But isn't the area that this license is talking about it or could be construed to apply to where the crossing goes through the 20-foot right-of-way that they do not dispute is railroad property. That's the way I read this is that -- what they're talking about at the time is had this license or right to go across, whatever it is, is the railroad's right-of-way, whatever that may be, now it may be

the 20 feet or it may be the 20 feet plus the extra.

MR. WILLIAMS: Well, I think it's what's shown on the drawing because that's what this agreement incorporates.

MR. GORDON: Your Honor, that's not moniment of title at all.

THE COURT: Well, I don't think any more questioning of this witness on that is going to make it any clearer to me. So, let's move on to something else. I understand what he's saying and I understand what you're saying.

As I understand it, sir, you thought the railroad had a certain right-of-way for their track and what the church was getting here was the right to use that and go across that right-of-way, whatever it was?

THE WITNESS: Yes, sir.

THE COURT: Okay.

MR. WILLIAMS: I don't have anything further of Mr. Whittemore.

THE COURT: Mr. Gordon, have you got questions of this witness --

MR. GORDON: I do, Your Honor.

THE COURT: -- on items he's not already covered either in response to my questions or Mr. Williams' questions?

MR. GORDON: Relatively few, Judge, I hope.

THE COURT: All right. Go ahead.

MR. GORDON: And I will have him identify the exhibits for me as well and for the Court.

DIRECT EXAMINATION

BY MR. GORDON:

Q Mr. Whittemore, did you have conversations with Mr. Anderson sometime in the 2000s, the middle of 2000 through 2008 about the railroad track?

A We did.

Q Can you describe for the Court the substance of your conversations and how you understood them to be?

A We appealed to Mr. Anderson to allow the church to have the area where the tracks were. Mr. Anderson told us at the time that we should not worry about that, that he would handle it, that he would take care of the church and that he would transfer the title, or whatever he had, to the church and for us not to worry about it.

Q And when TORCH leased that same property did that give you some concern?

A It did.

Q And that's what started your current quest?

A That's correct.

Q So the church moved forward with their plans to build their new facilities in 2008. You actually saw the railroad workers remove the rail in 2008, didn't you?

A Yes.

Q And did the railroad, at that time, or any time thereafter or even before, tell you that they intended to ever reinstall the track?

A No, sir.

Q Was the main railroad line in use for commercial purposes in 2008 when the spur was removed?

A No.

Q When did the two businesses on railroad street stop or cease to exist?

A It's my understanding that the Gold Kist discontinued its operations in about 1995 and that the Grain Elevators discontinued operations in about 1996. It ties into Mr. Benson's testimony earlier.

Q Mr. Whittemore, you're familiar with all the testimony about this survey which appears as Plaintiff's Exhibit 1?

A Yes.

Q Was that survey prepared by a licensed surveyor at the request of the church?

A Yes.

Q And to the extent that you believe it to be -- or do you believe it to be correct?

A Yes.

MR. GORDON: Judge, I'm going to move the admission of Plaintiff's 1?

THE COURT: It's admitted.

MR. WILLIAMS: Can I interpose an objection to it?

THE COURT: Yes, sir.

MR. WILLIAMS: I don't think there's been any foundation laid for it, Judge. The fact that he believes it is accurate is not enough to let it be admitted into evidence.

THE COURT: Okay.

BY MR. GORDON:

Q Mr. Whittemore, did you have a surveyor draw the plat?

A We did.

Q Did the surveyor use the customary methods of looking at other plats and other surveys and other legal descriptions to draw the plat?

A As far as I know.

Q And then he certified the plat --

MR. WILLIAMS: Your Honor, I'm going to object to the response. He doesn't know.

THE COURT: I'm going to admit it at this time and I'll make a determination as to the weight that I give to it or whether I give it any weight, but I'm going to admit it as part of this record.

MR. GORDON: Thank you, Your Honor.

THE COURT: Particularly for purposes of deciding jurisdiction.

BY MR. GORDON:

Q I'm showing you Plaintiff's Exhibit 2. Is that what you believe to be the valuation map of 1916?

A Yes.

MR. WILLIAMS: We'll stipulate to Exhibit 2, Your Honor.

MR. GORDON: I'll move the admission --

THE COURT: That's admitted without objection.

BY MR. GORDON:

Q Now I'm showing you Plaintiff's 3. Is that a close-up view of the portion of the val map of 1916 that has an enlargement of the area that we have been talking about today?

A It is.

MR. WILLIAMS: We'll stipulate to 3 as well, Your Honor.

THE COURT: Three is admitted without objection.

BY MR. GORDON:

Q And does that show you that -- Well, the Farmers Union, that's your property now, isn't it, or the church property?

A That's correct.

Q And the C.I. Kidd, that is your property, the church's property?

A That is correct.

Q As well as the cotton factory, the entirety of the

cotton factory?

A That is correct.

Q As well as the Jeff Thornton estate or what is marked there as Jeff Thornton estate? That's all part of the cotton mill property, isn't it?

A Yes.

Q And the First Methodist Church of Hartwell owns all of that property?

A Yes.

Q Together with any reversionary rights that may have accompanied that property?

A Yes.

MR. GORDON: Let's go to 4. He's not objected to number 3.

BY MR. GORDON:

Q I'm going to show you Exhibit 4 which is a Google Earth view of 2014. Does that show the church property?

A It shows part of it. That particular part that's outlined is church property.

MR. GORDON: Your Honor, I move to admit number 4?

MR. WILLIAMS: No objection.

THE COURT: It's admitted.

BY MR. GORDON:

Q Number 5, is that a Google Earth view made on the same date that shows the property that we just looked at but

shows it in a more enlarged form?

A Yes.

Q Now that picture actually shows the track that is within the 20-foot right-of-way that is unchallenged or the 20-foot right-of-way that was granted to the railroad, doesn't it?

A Yes.

Q That doesn't show it going across the street, though, does it?

A That is correct.

Q Because it didn't go across the street then; is that correct?

A That is correct.

Q Now, I'm going to show you Plaintiff's Exhibit 6.

MR. GORDON: Did I move the admission of 5, Your Honor?

THE COURT: It's admitted.

BY MR. GORDON:

Q This is Plaintiff's Exhibit Number 6, which I will represent to you is the original writing of the condemnation award to the Hartwell Railway Company. And if you'll go down to the very bottom of that first page. Now, Mr. Whittemore, would you just -- I know this is somewhat difficult to read the archaic writing, but if you can start right about there and go to the end. More importantly, that line right there.

A Yes. It clearly says a 20-foot right-of-way.

Q And the next page of that agreement. Is this the clause that you referred to under cross examination that this deed gave the right-of-way to the railroad for the purposes of the operation of the train?

A Yes.

Q And there was nothing further in that, correct?

A That's correct.

Q There was no further grant? That was the total grant from the Thornton's?

A That is correct.

Q From Mrs. Thornton. In your research --

THE COURT: Wait a minute. From Mrs. Thornton or this was the condemnation?

MR. GORDON: This is the condemnation award. You will see that the signatures are the five members of the Sheriff's Jury which was the -- it was the body that handled condemnation in 1880. And you will see again under the -- if you are seeing the same screen I am, underneath it talks about the director of the Hartwell Railway Company. Just right above that it explains that the purpose of this grant is for the construction and operation of the Hartwell Railway. It does not contain any language that would make it any further than a simple condemnation award of a railroad right-of-way and that would cease to exist when the railroad stopped running. I move

the admission of 7.

THE COURT: Admitted.

MR. GORDON: Now, I'm sorry, that was 6, wasn't it?

THE COURT: That was what?

MR. GORDON: That was 6, Your Honor.

THE COURT: Six (6) is admitted.

MR. GORDON: Exhibit 7, Mr. Whittemore. Just look at that.

BY MR. GORDON:

Q Would you recognize that as being the Richardson deed?

A Yes.

Q And looking at the area that I have just highlighted can you tell what that says?

A It says that it is a 12-foot right-of-way, 6 feet on each side of the center line.

Q Six feet on each side of the track?

A Yes.

MR. GORDON: I will move the admission of Plaintiff's 7.

THE COURT: It's admitted.

BY MR. GORDON:

Q Next, Mr. Whittemore, is Plaintiff's 8 which is the entire TORCH lease with the railroad company. Are you familiar with this document?

A Yes.

THE COURT: It's admitted. There's no dispute that that's what this is, right?

MR. WILLIAMS: Correct.

THE COURT: It's admitted.

MR. GORDON: Thank you, Your Honor.

THE COURT: Which number is it?

MR. GORDON: That would be number 8.

THE COURT: All right.

BY MR. GORDON:

Q And specifically does this document give TORCH of Hartwell the right to take up rails in the leased area?

A Yes.

Q Does it require that they replace the rails?

A Yes. It does not have to be load bearing, but they can replace it with tracks that are not load bearing.

Q That are fake tracks?

A Yes.

Q Simulated tracks. And looking, if you will, on page 4 paragraph 5.1. Can you just read -- it's page 4. Mr. Whittemore, will you read the first few lines of that?

A Of 5.1?

Q Yes, sir.

A "Lessor acknowledges that Lessee intends to develop the leased premises and personal property as a public park and

Lessor hereby authorizes Lessee to make any and all alterations, additions, modifications and improvements to the leased premises and personal property as the Lessee shall deem appropriate for the Lessee's intended use; provided, however, that Lessee shall be permitted temporarily to remove any and all rails in the block between Forest Avenue and Webb Street, as long as the Lessee reinstalls all such rails at the conclusion of the construction. Lessee shall not be obligated, however, to reinstall the rails in such a manner as to such specifications that the rails are able to support rail traffic."

MR. GORDON: Very well. Now, if you will turn to page 7 articles 8.1 and 8.2.

THE COURT: Refresh my memory. What area does that -- does that cover the area where the runaround is?

MR. GORDON: Yes, sir. That specifically covered when it talks about between Forest Avenue and Webb Street. West of Webb Street is the church. So they've been given the right to remove all the rails from the beginning of the railroad on Forest Avenue -- which is not in any of the documents that we've seen so far other than symbolically -- and then all the way to Webb Street.

THE COURT: Is there another agreement between the railroad company, Mr. Williams, and the TORCH group that now allows the railroad to come in there and rebuild the runaround?

This seems inconsistent with the idea that the railroad can now come in on the leased property that it's leased to TORCH and build a runaround.

MR. WILLIAMS: You saw the language about maintaining the rails and it's not fake rails. They have to use --

THE COURT: What the language says is that they can take out the rails as long as they replace them, but the rails they put in to replace them don't have to be load bearing. So how can you have a runaround in this area of the TORCH lease?

MR. WILLIAMS: The track -- this is how the conversation went. They said, look, we want to do work in the area. We need to spruce it up. If you've seen the pictures you know what it looks like. We want to spruce it up and we've got to move the track out of the way to do it and we said fine, but you've got to put it back. Do we have to put it back so its operating quality? No, you've just got to put it back in the same condition you found it. If we want to run the train we've got to bring it up to operating condition.

THE COURT: So the TORCH folks know that y'all were planning to come in there and run a train right through the park?

MR. WILLIAMS: Yes.

THE COURT: Okay.

MR. GORDON: Your Honor, I would take exception to

that.

THE COURT: Okay. Well, that's the dispute.

BY MR. GORDON:

Q Now, Mr. Whittemore, if you'll look at 8.1. What's the gist of that one?

A Lessee's duty to maintain premises.

Q And does it specifically --

THE COURT: When was this lease entered into?

MR. GORDON: It's on the front of the Exhibit. May of 2015.

THE COURT: Okay. Go ahead.

BY MR. GORDON:

Q Did that paragraph 8.1 also have both parties acknowledging that the premises have not been regularly maintained for several years and are in a state of disrepair?

A Yes.

Q And the lessee was not obligated to make any alterations or additions to the premises. And the first sentence of 8.2, is that where the TORCH group acknowledged that the railroad will not be required to furnish any services or facilities or to make any repairs or alterations of any nature whatsoever with respect to the premises?

A Yes, sir.

Q And that the TORCH group hereby assumes the full

and sole responsibility for the condition, operation, repair, replacement, maintenance and management of the premises?

A Correct.

Q And then the final one calls upon the lessee to yield the premises at the end of the lease. And what is the term of the lease?

A Ninety-nine years.

Q And the amount to be paid as consideration for the lease?

A One dollar.

Q Well, for the purchase at the end would be one dollar?

A Yes, sir.

Q So it's what we commonly call an abandonment lease. Now, if you'll look at Exhibit 1A which would be page 27 of the lease.

THE COURT: How much longer do you think you have, Mr. Gordon?

MR. GORDON: I've got about five minutes.

THE COURT: And are you going to have any other witnesses?

MR. GORDON: No.

THE COURT: Do you have any more witnesses, Mr. Williams?

MR. WILLIAMS: I do not, Your Honor.

THE COURT: I'm just supposed to meet somebody at 6:30 and I need to contact them and tell them I'm going to be a little late if we're going to be -- I'm not rushing you. I just need to make a phone call.

MR. GORDON: I understand, Judge. I think I can wrap it up quickly.

BY MR. GORDON:

Q Mr. Whittemore, as to where I am making these marks, is that the church property?

A Yes. I'm having to get oriented.

Q And the area of the track we're talking about is basically right here?

A That's correct.

Q And the area of the Clinkscales, that is subject to the Clinkscales agreement, terminable agreement, that would be here?

A Yes, sir.

Q I'll show you a series of photographs. Let me ask you as a preparatory matter, did you make all these photographs yourself?

A I did.

Q And are they true and accurate representations of what they purport to be?

A Yes, sir.

Q Taking a look at Exhibit 9A. Do you recognize that

as having been taken on December 26th of 2007?

A Yes.

Q And does that show the tracks as they existed at the time that you began the construction work at the church?

A Yes.

MR. GORDON: I move the admission?

THE COURT: It's admitted.

BY MR. GORDON:

Q 9B. Now, was that picture taken also the same day December 26th of 2007?

A Counselor, I don't have the dates in front of me, but yes, it was.

MR. GORDON: Judge, may I give him the hard copies?

THE COURT: Yes.

MR. GORDON: I have one of these for the Court too if you would like?

THE COURT: You've got a notebook full of all the exhibits?

MR. GORDON: Yes, sir.

THE COURT: Well, that may be helpful to us.

MR. GORDON: I did bring them on a disk drive, but I did bring the Court a copy as well.

THE COURT: Let us have that.

MR. GORDON: Thank you.

BY MR. GORDON:

A THE WITNESS: Yes, in answering your question, Counselor.

Q And when you, under other questioning, said that you had seen a car on the track is this the car you were talking about?

A Yes.

Q And what's happening in that picture?

A The front end loader is moving the three old cars that were down toward the Depot to the east moving those down to the west side.

MR. GORDON: I move the admission of the picture.

THE COURT: It's admitted.

BY MR. GORDON:

Q Is this a close-up of those cars that you saw being moved on the track?

A Yes.

Q Have you ever seen any other cars being moved on the track?

A There was one other one that was moved other than just these two.

Q Okay. But have you ever seen any others than those?

A No.

MR. GORDON: Move the admission of the picture?

THE COURT: It's admitted.

BY MR. GORDON:

Q Did you take this photograph in, I believe, October of '08?

A I did.

THE COURT: What are the numbers on those two that I just admitted?

MR. GORDON: We have them numbered in the book that I just gave you, Judge. It was 9B and 9C that had been admitted, Judge. And now we are at 9D.

THE COURT: B and C are admitted.

BY MR. GORDON:

Q Did you take that picture?

A I did.

Q Was that in October of '08?

A Yes, sir.

Q Can you recognize that that truck has steel wheels that can lower and be run on the tracks?

A Yes.

Q Is the equipment that you see in that picture the railroad's equipment?

A I believe it is.

Q And is the chain coming from the back end of the backhoe or whatever that yellow piece of machinery is; is that attached to a rail that they're dragging off?

A Yes.

MR. GORDON: Move the admission of 9D?

THE COURT: It's admitted.

BY MR. GORDON:

Q 9E. Can you describe that picture and tell the Judge when you took it?

A Yes. That's one of the great historic pictures of our church. This was the contemporary service, that had been meeting in the gym, coming up to the new building where we celebrated the completion of our new building.

Q And what was the date that picture was taken, please?

A December 21st, 2008.

Q Only one track is there now, correct?

A Yes.

Q The spur track having been removed?

A Yes.

MR. GORDON: Move the admission of 9E?

THE COURT: It's admitted.

MR. GORDON: 9F. I think that's duplicative, Judge, of an exhibit already in evidence by the Defendant.

BY MR. GORDON:

Q But can you describe that for me. Is that the back of the church?

A That's correct.

Q And it shows one track?

A Yes.

Q And that was taken when?

THE COURT: 9F is admitted.

MR. GORDON: Thank you. Next.

BY MR. GORDON:

Q Where was this picture taken?

A This picture was taken on the east side of Webb Street looking back toward the west.

Q And would this be a part of the mainline and the spur tracks that we have been talking about here?

A The mainline is in the middle, the Clinkscales spur is way over on the right on the top side.

Q All right.

A And the track that is down that is in such disrepair is another track that we have not talked about.

MR. GORDON: Move the admission of 9G?

THE COURT: It's admitted.

BY MR. GORDON:

Q Mr. Whittemore, what are the significance -- there's already been a photograph entered by the Defendant that shows where the construction was taking place?

A Yes, sir.

Q The new construction. What's the significance of the orange or red posts there, stakes?

A We asked the surveyor to come and stake the line.

Q And those posts or stakes depict or they are placed on the line as the surveyor determined it to be?

A That's right.

MR. GORDON: I'll move the admission of 9H?

THE COURT: Admitted. Was that the staking that led to the survey that we've been talking about?

MR. GORDON: Oh no. That survey was much older. We had them come out and put those stakes in on November 23rd or 4th after this work had begun.

THE COURT: Okay.

BY MR. GORDON:

Q I'm showing you 9, the next picture. Does that show the work as it's been progressing?

A Yes.

MR. GORDON: I'll move the admission of that one, Judge?

THE COURT: It's admitted. What's the number?

MR. GORDON: That was 9H.

THE COURT: 9I is admitted.

MR. GORDON: Thank you. And now 9J.

THE COURT: And what are those stakes supposed to be showing?

MR. GORDON: I think you can see them on this one, Judge, too, which is 9J.

THE COURT: Why did you get them to go out there and

do that?

BY MR. GORDON:

Q Why did we have the surveyor put those stakes in place?

A This was --

Q Was this the edge of the 20-foot right-of-way?

A That's correct. That's the 10 feet on the north side of the mainline center line.

Q And did that line basically come straight up this way -- you see where it intersects with another red post here?

A That is correct.

Q And then it keeps on going. And I obviously drew the line --

THE COURT: The church property is to the right of the orange?

BY MR. GORDON:

Q Is the church property to the right of the orange stakes?

A Yes, it is both to the right and to the left because we own on both sides there. But the property on the right is church property.

THE COURT: Right. But the 20 feet immediately to the left of the stakes is the right-of-way for the railroad, right?

THE WITNESS: That's correct.

THE COURT: But it's your contention that all of the property to the right is the church's property?

THE WITNESS: That's correct.

MR. GORDON: I move the admission of --

THE COURT: What number?

MR. GORDON: That was 9J.

THE COURT: J is admitted. You say a surveyor came out and put these stakes in?

THE WITNESS: Yes, sir.

THE COURT: Was he the same surveyor that did the survey before?

MR. GORDON: Yes, Your Honor. And 9K, move the admission. That shows basically the same. The stakes are in place in that one as well.

THE COURT: It's admitted.

MR. GORDON: That, by the way, shows the track after the work was halted. And then 9L.

BY MR. GORDON:

Q Does that show the other side of the road, Joe?

A Yes.

MR. GORDON: Move the admission of 9L?

THE COURT: It's admitted.

MR. GORDON: 9M.

BY MR. GORDON:

Q Now, Mr. Whittemore, what does that show?

A It shows this is the Richardson side. The tracks on the extreme left are the Clinkscales tracks.

Q That's the track over here?

A Yes.

Q Now, did you have -- did you mark the center line -- this is the main track; is that right?

A That's correct.

Q Did you mark the center line of this main track with this rod?

A Yes.

Q Did you then measure 6 feet to each side of the center line?

A That is correct.

Q And that is what you believe the right-of-way, the deeded right-of-way is on the mainline on that side of the street?

A That's correct.

Q So the entirety of the Clinkscales track is outside of the right-of-way? Would that be your understanding?

A Exactly.

MR. GORDON: Move the admission.

THE COURT: It's admitted.

BY MR. GORDON:

Q Now, Mr. Whittemore, this is 9N. Where did you point the camera on that one?

A This is taken from Athens Street looking east and that is the mainline.

Q That is the mainline. Is that a part of the line that we're talking about that the railroad contends they will need to use?

A Yes.

MR. GORDON: Move the admission of 9N?

THE COURT: M or N?

MR. GORDON: N.

THE COURT: N is this one. It's admitted.

MR. GORDON: Thank you. And this is 9O.

BY MR. GORDON:

Q Does this show a similar part of the track between the church and Athens Street?

A Yes. This is looking west on the other side of that clump of trees.

Q And all of that depicted in 9N and 9O is that part of the TORCH lease?

A Yes, sir.

MR. GORDON: I'll move the admission of that one.

THE COURT: O is admitted.

MR. GORDON: And I think I don't have a 10, but I do have an 11.

THE COURT: How many more photographs do you have?

MR. GORDON: This is it, Judge. This is the

Clinkscales agreement. We've had a lot of testimony about it. I'm not going to go through it, but I am going to move that it be admitted.

THE COURT: What's the number.

MR. GORDON: Number 10, Plaintiff's Number 10.

THE COURT: It's admitted.

BY MR. GORDON:

Q And that agreement speaks for itself. But did you understand that agreement that Mr. Clinkscales owned the right-of-way and that he built the rails for his use?

A Yes. Not a right-of-way. It was an agreement. He actually continued to own the property.

Q He has a contract between him and the railroad?

A Yes. It's an agreement, yes.

Q And did this provide, in its later pages, a termination right of 60 days notice?

A It did.

Q Have you found anything else with respect to that track that caused it to become property of the railroad?

A No.

Q Have you found anything else, other than the Thornton deed conveying the 20 feet, that refers to the property of the railroad on the west side of Webb Street where the church is?

A There is also a Cydell deed that we believe contains some of that, but it is also a 20-foot right-of-way.

Q All right. Very well.

MR. GORDON: Your Honor, that's all I have.

THE COURT: Mr. Williams, do you have any follow-up?

MR. WILLIAMS: If he could pull up his exhibit number 1 for me, please.

THE COURT: There it is.

RECROSS EXAMINATION

BY MR. WILLIAMS:

Q When was this survey done?

A Last week. As far as printing it it was done last week.

Q So it's not old, old, old, like somebody said a minute ago?

A That's correct.

MR. WILLIAMS: That's all I have, Your Honor.

MR. GORDON: I have one question on redirect on that exact subject.

THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. GORDON:

Q Did you understand -- when you say that this survey was made last week you mean this drawing?

A This drawing, yes.

Q Was the survey that this drawing was drawn from was that the survey that was made for the church in about 2005 or

6?

A I believe so.

MR. GORDON: Very well.

THE COURT: Sir, you may go back to your seat and give that notebook to the clerk.

(Testimony concluded)

JUDGE'S DIRECTIVES

THE COURT: All right. This is what I want you to do. I would like to receive, from both sides, a written closing argument on the issue of jurisdiction based on what came out today. If you don't think anything today is any different than what your previous briefs were, then, I guess you can just submit those. But rather than taking oral closing argument on this, I would rather have it in writing so that I can -- when you give your oral closing argument I can only hear it once, if you do it in writing I can read it twice if I don't understand it the first go around.

So what is a reasonable time that you think you can -- I mean, I would think now that it's fresh on your mind is 14 days reasonable for you to get that to me or not?

MR. WILLIAMS: Are you going to want record citations and that kind of thing?

THE COURT: No. Not -- if you can reference it by description. I'm not going to necessarily need you to go tell

me what exhibit number it is.

MR. GORDON: And there won't be record cites to a transcript?

THE COURT: No. I don't think I need that.

MR. GORDON: In that event, I think I can do ours in 14 days.

THE COURT: If we do a transcript and all of that it's going to be a month. I'd rather just -- what I want is in the nature of what you would give here -- if I gave you a chance to do an oral closing argument here in about 15 minutes, I'd like for you to put that down for me in writing. It just hits the high points and on the jurisdiction issue. Because it seems to me that if I find complete preemption then the STB is going to decide a lot of these issues that we have discussed today. If I don't find complete preemption, then, the Superior Court Judge is going to decide these issues. So I've got to resolve which factual disputes I need to decide to determine whether there is complete preemption or not.

And one of the things that I'm interested in the closing arguments focusing on is there appears to be -- as I understand the Plaintiff's position, the Plaintiff takes the position that the railroad company is trespassing in the area of what the railroad calls the runaround track because that property is not on railroad property and is not within the 20-foot right-of-way. That is the Plaintiff's position.

The question for preemption purposes is whether that kind of a dispute is one that should be decided by the Transportation Board or whether or not that is something that needs to be decided by the State Court Judge.

And, then, I guess the second question is, even if the Court were to find that the property -- that the right-of-way extended to include the runaround, the question would be whether that is a main line type track that would be subject to federal jurisdiction, the STB jurisdiction, or whether it's a spur, a private spur. It seems to me --

MR. WILLIAMS: Can you say that for me one more time, please, Judge.

THE COURT: It seems to me that there's two issues. One is this title issue and, then, the second is the issue whether the nature of the track, if that is dispositive of the Plaintiff's trespass claim, whether those issues are issues that need to be decided by the STB or not. I can see it being there being a difference for preemption purposes as to whether this is a title type case, an issue of who owns the title to the property, or whether this is a case that depends upon what at one time was a track that was not regulated by the STB because it was not a main line track or it was not essential to the movement of freight in interstate commerce. That seems like to me that the Plaintiffs have got an uphill argument on that because it looks like at some point in time this was

converted to a runaround, which arguably would be the type of track that there would be federal jurisdiction. But the wrinkle here is if that runaround is built on church property would they never the less have a trespass claim for you operating a track on what, in effect, is their property? Does that make a difference and is that something that the STB is going to decide or is that something that the state court decides? But maybe I have missed it, but it seems to me those are the two significant issues here for jurisdiction purposes.

So I would like for those issues to be addressed in the supplemental brief. That is your argument, correct, Mr. Gordon?

MR. GORDON: Yes.

THE COURT: That first of all they have got the track on your land?

MR. GORDON: Yes, sir.

THE COURT: So they shouldn't trespass regardless of whether or not you have any right to interfere with what's within the 20-foot easement?

MR. GORDON: Correct. And we haven't --

THE COURT: Is your argument -- what if they have acquired -- if they have acquired -- let's say that the runaround runs on your property, that they have acquired it by prescriptive use, what is your alternative argument? That the type of track is not the type of track -- is the type of track

that can be abandoned without going through the STB?

MR. GORDON: Yes. We believe that --

THE COURT: And they have done so?

MR. GORDON: That is correct. We believe that this is the type of track that does not require STB approval to be abandoned and we believe that the voluntary abandonment or the taking up of the rails over eight years ago defeats any prescriptive claim or other adverse possession interest that they might have otherwise acquired because it is not continuous.

THE COURT: But the real question for me is whether I even decide that or whether that's the type of issue that should be decided on remand by the Superior Court. I don't know that I would ever decide the prescription issue.

MR. GORDON: I don't think you would.

THE COURT: Because if I decide that that is something that should be decided by the STB I'm just going to say send it to the STB and let them worry about it or I'm going to decide this is the kind of issue that's got to be decided as a pure state court issue. All right.

Well, send me two final briefs, one each, within 14 days and I will make a decision.

MR. WILLIAMS: That would be the 23rd?

THE COURT: I don't know. What's today?

MR. WILLIAMS: The 9th. Twenty-third.

THE COURT: Okay, yeah. Anything else we need to take up from the Plaintiff?

MR. GORDON: No, sir.

THE COURT: From the Defendant?

MR. WILLIAMS: No, Your Honor.

THE COURT: Just make sure you know what Ms. Long needs as far as the format of those exhibits so that they could be easily downloaded into our electronic system. Thank y'all for coming.

MR. WILLIAMS: Thank you, Your Honor.

MR. GORDON: Thank you, Your Honor. We appreciate your courtesy.

END OF RECORD

CERTIFICATE OF OFFICIAL REPORTER

I, Tammy W. DiRocco, Federal Official Court Reporter, in and for the United States District Court for the Middle District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 30th day of March, 2017

Tammy W. DiRocco

___________________________________
Tammy W. DiRocco CCR
Federal Official Court Reporter